## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

Mary M. Zapata (Individually and as )
Administrator of the Estate of Jaime J. )
Zapata); Amador Zapata, Jr.; Amador Zapata )
III (Individually and as Administrator of the )
Estate of Jaime J. Zapata); Carlos Zapata; Jose )
Zapata; E. William Zapata; Victor Avila, Jr. )
(Individually and as Guardian for S.A. and )
V.E.A.); Claudia Avila (Individually and as ) Case Action No. _____
Guardian for S.A. and V.E.A.); Victor Avila; )
Magdalena Avila; Magdalena Avila ) JURY TRIAL DEMANDED
Villalobos; Jannette Quintana; Mathilde )
Cason (Individually and as Administrator of )
the Estate of Arthur and Lesley Redelfs, and )
as Guardian for R.R.); Robert Cason; )
Reuben Redelfs; Paul Redelfs; Katrina )
Redelfs Johnson; Beatrice Redelfs Duran; )
Rafael Morales (Individually and as )
Administrator of the Estate of Rafael )
Morales Valencia); Maria Morales; Moraima ) **PLAINTIFFS' COMPLAINT**
Morales Cruz (Individually and as Guardian )
for G.C., A.C., and N.C.); Juan Cruz; )
Lourdes Batista (Individually and as )
Administrator of the Estate of Felix Batista), )
Adrielle Batista, Amari Batista, Alysandra )
Batista, Andrea Batista, Adam Batista, )
Marlene Norono, and Jacqueline Batista, )
 )
   Plaintiffs, )
 )
v. )
 )
HSBC Holdings plc; HSBC Bank U.S.A., )
N.A.; HSBC México S.A., Institución de )
Banca Múltiple, Grupo Financiero HSBC; )
and Grupo Financiero HSBC, S.A. de C.V., )
 )
   Defendants. )

## Table of Contents

I. **Introduction** ............................................................................................................. 1

II. **Jurisdiction and Venue** ........................................................................................ 6

III.   The Parties ...................................................................................................... 7

   A.   The Plaintiffs ............................................................................................. 7
      1.   The Zapata Family .............................................................................. 7
      2.   The Avila Family................................................................................. 7
      3.   The Redelfs Family ............................................................................. 8
      4.   The Morales Family ............................................................................ 8
      5.   The Batista Family.............................................................................. 9

   B.   The Defendants ........................................................................................ 10

IV.   General Allegations ........................................................................................ 11

   A.   The Mexican Drug Cartels ...................................................................... 11
      1.   The Rise of the Mexican Drug Cartels ............................................. 11
      2.   The Cartels at Issue........................................................................... 15
      3.   The Terrorism of the Mexican Cartels .............................................. 18

   B.   The Terrorist Attacks Against the Victims .............................................. 38
      1.   The Terrorist Attack on Jaime Zapata and Victor Avila, Jr. ............. 38
      2.   The Terrorist Attack on Arthur and Lesley Redelfs .......................... 40
      3.   The Terrorist Attack on the Morales Family ..................................... 43
      4.   The Terrorist Attack on Felix Batista.................................................44

   C.   The Critical Role and Threat of Money Laundering and Banks' Duties to
        Detect and Prevent It .............................................................................. 45
      1.   The Importance of Money Laundering to the Mexican Drug Cartels....45
      2.   The Means by Which the Mexican Drug Cartels Launder Their Money ................ 47
      3.   The Threat of Money Laundering and Banks' Duties to Prevent It.................... 50
      4.   HSBC Was Warned of the Risks and Scope of the Cartels' Money Laundering
           and Terrorist Activities ..................................................................... 54

   D.   HSBC's Material Support to the Mexican Drug Cartels...........................57
      1.   HSBC Mexico ................................................................................... 59
      2.   HSBC US .......................................................................................... 82
      3.   HSBC Group ..................................................................................... 93
      4.   HSBC Admits Criminal Liability ...................................................... 96
      5.   Money Laundered into Texas.............................................................99

V.   Claims For Relief ........................................................................................... 101

VI.   Demand for Jury Trial .................................................................................. 108

## I.     INTRODUCTION

1.     This is an action brought by American victims of horrific acts of international terrorism committed by some of the most powerful and ruthless of Mexico's drug cartels—the Sinaloa, Juárez, and Los Zetas cartels.  For the decade leading up to the attacks at issue, and with full knowledge of the drug cartels' terroristic activities, the HSBC Defendants (collectively "HSBC")—a global network of international financial institutions—knowingly provided continuous and systematic material support to the cartels and their acts of terrorism by laundering billions of dollars for them.  As a proximate result of HSBC's material support to the Mexican drug cartels, numerous lives, including those of the Plaintiffs, have been destroyed.

2.     Victims Jaime Zapata and Victor Avila, Jr. were Special Agents for Immigration and Customs Enforcement ("ICE"), a federal law enforcement agency under the Department of Homeland Security.  On February 15, 2011, while on assignment transporting cargo to Mexico City, the two were attacked in broad daylight by two car loads of Los Zetas militants on a highway outside of the city of San Luis Potosí.  While travelling in an armored vehicle displaying U.S. diplomatic plates, the agents were chased down, flanked, and forced off the road.  Ignoring cries from the Special Agents that they were U.S. citizens and diplomats, the militants fired over 100 rounds from AK-47s and other military-grade weapons inside and at the vehicle, killing Special Agent Zapata and seriously wounding Special Agent Avila.

3.     Victim Lesley Enriquez Redelfs was an employee of the U.S. Consulate Office in Ciudad Juárez, and her husband, victim Arthur Redelfs, was a detention officer for the El Paso County Sheriff's Department.  On Saturday, March 13, 2010, Arthur, Lesley, and their seven-month-old daughter attended a children's birthday party in Ciudad Juárez hosted by the U.S.

Consulate Office.  As they were leaving the birthday party in their SUV, they were followed and ambushed by members of an enforcement arm of the Juárez Cartel.  Lesley, who was four months pregnant, was shot twice in the head.  Arthur made a desperate dash for the American border as the Juárez Cartel enforcers chased the Redelfs through the streets, spraying their car with more bullets.  Just before reaching the border, Arthur was gunned down.  The Redelfs' infant daughter was found screaming in the backseat.  At the same time, other Juárez Cartel enforcers chased down and killed the spouse of another U.S. Consulate employee as he left the same birthday party with his two young daughters, who were also wounded in the attack.

4.      Two months later, another American victim, Rafael Morales Valencia ("Rafael Morales, Jr."), was also killed by the Mexican cartels.  May 7, 2010 was Rafael Jr.'s wedding day.  As Rafael Jr. exited the church with his new bride, approximately 16 assassins from the Sinaloa Cartel invaded the church courtyard.  Armed with military-grade assault rifles and accompanied by corrupt Mexican police officers who barricaded the road to the church, the assassins forced the entire wedding congregation, including small children, to the ground.  When one young man, stricken with fear, tried to flee, they shot him in the back, killing him.  The assassins then assaulted Rafael Jr.'s groomsman and uncle—Guadalupe Morales.  After Rafael Jr.'s brother and best man, Jaime Morales Valencia, pleaded with the cartel members to stop, the assassins forced Rafael Jr., his uncle, and his brother into their trucks and abducted them.  The corrupt police officers then locked the gate to the church courtyard, trapping the horrified congregation inside. After transporting the three men to a "safe house," the Sinaloa Cartel tortured them and then wrapped duct tape around their heads and faces, killing them by asphyxiation.  Their bodies were

found a few days later discarded in the back of a pickup truck in front of a park in a residential neighborhood in Juárez.

5.      On December 10, 2008, victim Felix Batista—an outspoken anti-kidnapping advocate, hostage negotiator, and former U.S. Army Major—was kidnapped by members of Los Zetas while he was in Saltillo, Coahuila.  Los Zetas targeted Batista shortly after he gave presentations to the local community on how to avoid being kidnapped—which was an important part of Los Zetas' criminal enterprise in the area.   Despite desperate pleas for his release by his wife and five children, the cartel killed Batista and put his body in an acid bath.

6.      The horrific attacks on Victor Avila, Jr. and Jaime Zapata, Arthur and Lesley Redelfs, Rafael Morales, Jr., Jaime Morales, and Guadalupe Morales, and Felix Batista (collectively the "Victims") are, unfortunately, not isolated events.  Over the course of the 21st century, the Mexican drug cartels, including the Sinaloa, Juárez, and Los Zetas Cartels, have risen as the greatest single threat to Mexican national security and one of the greatest threats to the United States.  Functioning as powerful paramilitary organizations, the cartels have brought unprecedented lawlessness to Mexico, attended by brutal and gruesome murders.  Beheadings, torture, public hangings of mutilated corpses, military-style assaults, grenade attacks, car bombings, and kidnappings are daily occurrences in many Mexican cities, and the cartels ensure that these acts are publicly displayed as a mechanism to intimidate and control the civilian population and the government.  Among their victims, the cartels have targeted law enforcement, government officials, politicians, journalists, and innocent civilians, including children.  Since 2006, the drug cartels have claimed over an estimated 100,000 lives, including many Americans.  Additionally,

tens of thousands of people have disappeared.  As a direct result of this brutality, millions of

innocent people in Mexico and the United States live in fear.

7.     During the time period leading up to the attacks on the Victims, HSBC knowingly

laundered billions of dollars for the Mexican cartels who committed the attacks, including the

Sinaloa, Juárez, and Los Zetas Cartels, knowing or deliberately disregarding the fact that said funds

would be used to support the Mexican cartels and their terrorist acts against Mexican and U.S.

citizens.

8.     Driven by its desire to expand its business and increase revenue, HSBC

intentionally implemented criminally deficient anti-money laundering ("AML") programs,

processes, and controls, which were designed to guarantee that billions of dollars of illicit proceeds

would go through its banks undetected or unreported.  And that is exactly what happened.

9.     Under the criminally deficient AML regimes, a culture of recklessness and

corruption pervaded HSBC.  Employees routinely accepted or processed large quantities of illicit

proceeds under circumstances that showed unmistakable signs of money laundering.  For example,

employees at HSBC's Mexican branches routinely accepted deposits of hundreds of thousands,

sometimes millions, of U.S. dollars from individuals with no identifiable source of income,

delivered in multiple boxes specially designed to fit the precise dimensions of the teller windows.

In the process, some employees regularly fabricated documents indicating that they had performed

required customer due diligence when they had not.  Even when money laundering accounts were

identified and ordered to be closed, employees often refused to report the activity to authorities

and allowed those accounts to remain open and active for years.  Moreover, in multiple instances,

employees accepted bribe payments from cartel money launderers to accept or process illicit

proceeds and helped orchestrate massive and sophisticated money laundering schemes for the cartels.

10.     HSBC has admitted to AML failures that were severe, systemic, and persisted for years.  It has admitted that the failures were willful, accepted criminal liability for them, and admitted that as a result of those failures, at least $881 million of drug cartel proceeds were laundered through its banks.

11.     HSBC's substantial and systemic money laundering support materially aided the activities of the Mexican cartels, including the Sinaloa, Juárez, and Los Zetas Cartels, and proximately caused the injuries to Plaintiffs.  The ability to conceal the source of their illicit proceeds and gain access to the international financial system is vital to the existence of the drug cartels and their ability to execute widespread acts of terrorism.  Money laundering is the lifeblood of the Mexican drug cartels, enabling them to construct a façade of legitimacy through which they establish, continue, and grow their global enterprises.  Without the ability to place, layer, and integrate their illicit proceeds into the global financial network, the cartels' ability to corrupt law enforcement and public officials, and acquire personnel, weapons, ammunition, vehicles, planes, communication devices, raw materials for drug production, and all other instrumentalities essential to their operations would be substantially impeded.  Thus, by facilitating the laundering of billions of dollars of drug cartel proceeds through its banks, HSBC materially supported the terrorist acts of the cartels, including the terrorist acts committed against the Victims.

12.     As a result, HBSC is liable under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, *et seq.*, for the injuries sustained by the Victims and their families by reason of the terrorist acts of the Sinaloa, Juárez, and Los Zetas Cartels.

## II.      JURISDICTION AND VENUE

13.      This matter is brought under 18 U.S.C. § 2333, *et seq.*, and thus arises under the laws of the United States.  This Court, therefore, has subject matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

14.      Venue is appropriate in this Court under 18 U.S.C. § 2334(a), as at least one Defendant resides and/or has an agent in this District.  Further, Venue is appropriate under 28 U.S.C. § 1391(b)(1) & (2) because all non-foreign Defendants reside in this District, and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including the intentional AML failings that caused hundreds of millions of dollars of drug cartel proceeds to be laundered directly into this District.

15.      This Court has personal jurisdiction over all Defendants, because, in the case of HSBC's United States affiliate, the entity is domiciled in the United States, and, in the case of all Defendants, the entities had substantial contacts with the United States and New York related to the facts underlying this action.  Defendants conspired to facilitate the laundering of billions of dollars of illicit cartel proceeds into HSBC's Mexican affiliate and then further through HSBC's United States affiliate.  Defendants used the correspondent banking relationship between HSBC's Mexican and United States affiliates—which account was opened and operated in New York—to process a substantial amount of wire transactions from the illicit Mexican accounts to financial institutions, businesses, and other persons located in New York and elsewhere in the United States.  Additionally, HSBC's Mexican affiliate exported the illicit USD banknotes that it accepted for deposit to HSBC's United States affiliate, a substantial amount which was exported into New York.  All of these illicit acts were performed with the knowledge and under the control of HSBC's global parent.

## III.        THE PARTIES

### A.      THE PLAINTIFFS

**1.      The Zapata Family**

16.      Jaime J. Zapata was a U.S. citizen and Special Agent for ICE, Department of Homeland Security.  At the time of his death he was a resident of Brownsville, Texas.

17.      Mary Zapata is the mother of Jaime Zapata and co-executrix of his estate.  Amador Zapata, Jr. is the father of Jaime Zapata.  They are both U.S. citizens residing in Brownsville, Texas. They loved their son deeply and had a close personal relationship with him.

18.      Jaime Zapata has four brothers—Amador Zapata III, a Special Agent for U.S. Customs and Border Protection and the co-executor of Jaime's estate; Carlos Zapata, a Special Agent for ICE; Jose Zapata; and E. William Zapata.  They are all U.S. citizens residing in Brownsville, Texas.  They loved their brother deeply and had a close personal relationship with him.

**2.      The Avila Family**

19.      Victor Avila, Jr. is a U.S. citizen and resident of El Paso, Texas.  Victor Avila, Jr. was a Special Agent for ICE, Department of Homeland Security.

20.      Claudia Avila is the wife of Victor Avila, Jr.  She is a U.S. citizen residing in El Paso, Texas.  Claudia Avila loves her husband deeply and has a close personal relationship with him.

21.      V.E.A. and S.A. are the minor children of Victor Avila, Jr.  They are U.S. citizens residing in El Paso, Texas with their parents.  They have a close personal relationship with their father and love him deeply.

22.     Victor and Magdalena Avila are the parents of Victor Avila, Jr.  They are both U.S. citizens residing in El Paso, Texas.  They love their son deeply and have a close personal relationship with him.

23.     Victor Avila, Jr. has two sisters—his twin, Magdalena Avila Villalobos, who resides in Fort Worth, Texas, and Jannette Quintana, who resides in Mountain View, California.  Both are U.S. citizens.  They love their brother deeply and have a close personal relationship with him.

**3.     The Redelfs Family**

24.     Arthur and Lesley Redelfs were U.S. citizens and residents of El Paso, Texas.

25.     R.R. is the minor child of Arthur and Lesley Redelfs.  She is a U.S. citizen residing in El Paso, Texas.  She was seven months old and a passenger in the SUV when her parents were ambushed and murdered.

26.     Mathilde Cason is the mother of Arthur Redelfs, co-executrix of the estate of Arthur and Lesley Redelfs, and primary managing conservator for R.R.  Robert Cason is the step-father of Arthur Redelfs, who he helped raise and provide for.  They are both U.S. citizens residing in El Paso, Texas.  They loved Arthur and Lesley deeply and had a close personal relationship with them.

27.     Arthur Redelfs had four siblings—Reuben Redelfs and Beatrice Redelfs Duran, who reside in El Paso, Texas; Paul Redelfs, who resides in Dallas, Texas; and Katrina Redelfs Johnson, who resides in Roanoke, Virginia.  They are all U.S. citizens.  They loved Arthur and Lesley deeply and had a close personal relationship with them.

**4.     The Morales Family**

28.     Rafael Morales, Jr. was a U.S. citizen who lived in La Mesa, New Mexico with his parents, sister, and nephews at the time of his death.

29.     Rafael Morales ("Rafael Morales, Sr.") is the father of Rafael Morales, Jr.  He is a U.S. citizen residing in La Mesa, New Mexico.  Rafael Morales, Sr. is a plaintiff in this action on behalf of himself and on behalf of the estate of his son Rafael Morales, Jr.  Rafael Morales, Sr. loved his sons and brother deeply and had a close personal relationship with them.  At the time of their deaths, Rafael Morales, Sr. lived and worked with Rafael Jr. and lived near Jaime.

30.     Maria Morales is the mother of Rafael Morales, Jr. and Jaime Morales.  She is a legal permanent United States resident residing in La Mesa, New Mexico.  Like her husband, Maria Morales loved her sons deeply and had a close personal relationship with them, living with Rafael Jr. and near Jaime at the time of their deaths.

31.     Moraima Morales Cruz is the sister of Rafael Morales, Jr. and Jaime Morales.  She is a U.S. citizen residing in La Mesa, New Mexico.  Moraima Morales Cruz loved her brothers and uncle deeply and had a close personal relationship with them, living with Rafael Jr. and near Jaime at the time of their deaths.  She brings this action on behalf of herself, as well as her minor children, G.C., A.C., and N.C.  The Cruz children, all U.S. citizens, also loved their uncles deeply and had close personal relationships with them, living with Rafael Jr. and near Jaime at the time of their deaths.

32.     Juan Cruz is the adult son of Moraima Morales and nephew of Rafael Morales, Jr. and Jaime Morales.  He is a U.S. citizen residing in La Mesa, New Mexico.  He too loved his uncles deeply and had a close personal relationship with them, living with Rafael Jr. and near Jaime at the time of their deaths.

**5.     The Batista Family**

33.     Felix Batista was a U.S. citizen who, at the time of his death, lived in Miami, Florida.

34.     Lourdes Batista is the wife of Felix Batista.  She is a U.S. citizen residing in Miami, Florida.  Lourdes loved her husband deeply and had a close personal relationship with him.

35.     Felix Batista had five children with Lourdes—Adam, Amari, Alysandra, Adrielle, and Andrea, who reside in Miami, Florida.  They are all U.S. citizens.  They loved their father deeply and had a close personal relationship with him.

36.     Felix Batista had two sisters—Jacqueline Batista, who resides in Hartsdale, New York, and Marlene Norono, who resides in Loxahatchee, Florida.  Both are U.S. citizens.  They loved their brother deeply and had a close personal relationship with him.

B.     THE DEFENDANTS

37.     HSBC is one of the largest financial institutions in the world, with over $2.5 trillion in assets, 89 million customers, and 300,000 employees.  HSBC reported profits of nearly $23 billion in 2013 and nearly $19 billion in 2014.  HSBC, whose initials originally stood for the Hongkong and Shanghai Banking Corporation, now has operations in approximately 6,100 offices in 72 countries.

38.     Defendant HSBC Holdings plc ("HSBC Group") is the ultimate parent company of all HSBC-related entities.  HSBC Group is incorporated in England and Wales and headquartered in London.

39.     Defendant HSBC Bank USA, N.A. ("HSBC US") is a federally chartered banking institution, headquartered in McLean, Virginia, with its principal office in New York City.  HSBC US operates more than 230 bank branches throughout the United States, manages assets totaling $190.5 billion, and serves around 2.4 million customers.  HSBC US is the principal subsidiary of HSBC USA Inc., an indirect, wholly owned subsidiary of HSBC North America Holdings Inc.

("HSBC North America").  HSBC North America is the holding company for HSBC Group's operations in the United States and is headquartered in New York City.

40.	Defendant HSBC México S.A., Institución de Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico") is the principal operating company of Defendant Grupo Financiero HSBC, S.A. de C.V. ("HSBC Mexico Group").  HSBC Mexico Group is an indirect subsidiary of HSBC Group and is one of Mexico's largest financial service conglomerates, with nearly 1,000 branches throughout the country, over $36 billion in assets, and over 8 million clients. Headquartered in Mexico City, HSBC Mexico and HSBC Mexico Group collectively have over 17,000 employees.

## IV.	GENERAL ALLEGATIONS

### A.	THE MEXICAN DRUG CARTELS

#### 1.	The Rise of the Mexican Drug Cartels

41.	While long a powerful force in Mexico, since the turn of the 21st century the Mexican drug cartels have soared to unprecedented size, strength, and dominance.  The Mexican cartels are now responsible for the production or supply of over ninety percent of the illicit drugs imported into the United States, including cocaine, heroin, methamphetamines, and marijuana. They have also expanded into other criminal enterprises and now control major kidnapping, human trafficking, weapons trafficking, and extortion enterprises throughout Mexico and the world.  Their operations are international in scope, with a presence throughout Latin America and North America, as well as overseas in Asia, Africa, Europe, the Middle East, and elsewhere.  The cartels have a presence in nearly every major city in the United States.  They are highly organized and sophisticated enterprises, containing cells with specific assignments, such as transportation, security/enforcement, and money laundering.

42.     The rise to dominance of the Mexican drug cartels resulted in large part from a shift in the distribution model of cocaine into the United States.  Much of the cocaine smuggled to the United States originates in Colombia.  For decades, the powerful Colombian drug cartels— including the Medellin and Cali Cartels—controlled all aspects of the production and distribution of cocaine into the United States.  This, however, began to change in the 1990s due, in large part, to the success of international efforts to impede the Colombian trafficking routes into the United States through the Caribbean and Gulf of Mexico.  With shipment along these routes becoming increasingly difficult, the Colombian cartels turned increasingly to the Mexican drug trafficking organizations.  The Mexican drug cartels, who already had a ready-made trafficking infrastructure for heroin and cannabis smuggling, initially subcontracted with the Colombian cartels to transship cocaine through Mexico and into the United States.  This relationship, however, quickly evolved, with the Mexican drug cartels transitioning from mere couriers to the massive wholesalers they are today.  By 2007, the Mexican cartels controlled over 90 percent of the cocaine that enters the United States.

43.     The Mexican cartels' control of the cocaine market has sparked an enormous power growth.  Being by far the most lucrative enterprise for the cartels, cocaine trafficking has reaped substantial annual profits for the Mexican cartels, enabling them to grow in size, sophistication, and strength.  With fleets of aircraft, trucks, ships, and even semi- and fully submersible sea vessels, the cartels have mobilized into sophisticated international networks, moving massive amounts of illicit narcotics into the United States each year.  The resulting profits have enabled the cartels to grow internationally and deepen their trafficking infrastructure.

12

44.     Immense profits have also enabled the Mexican cartels to expand their enterprises through corruption of politicians, government officials, and law enforcement.  There is scarcely an area of Mexico not touched by the corruption of Mexican drug cartel proceeds.  From city and state police officers, to prosecutors and judges, federal soldiers, city mayors, state governors, and beyond, there are countless Mexican public officials on the payroll of the Mexican cartels.  It is estimated that the cartels spend more than a billion dollars each year just to bribe the Mexican municipal police.

45.     As a result of the corruption, there are large swaths of Mexico where the cartels reign free, executing their criminal enterprises with impunity.  For example, according to the Mexican Attorney General in 2009, at least 80 municipalities in Mexico were controlled by the drug cartels.  The expansion of corruption has amplified the ubiquitous presence of the cartels; with public officials and law enforcement working for them, millions of innocent Mexican citizens are left without protection or recourse from the cartels.

46.     At the same time, the cartels have transcended from mere criminal organizations to a formidable militant force.  With a deep well of resources, the cartels have morphed into highly organized paramilitary organizations with an arsenal of military-grade weapons, such as AK-47s, 50-caliber machine guns, grenades, rocket-powered grenade launchers, surface-to-air missiles, anti-tank rockets, and bazookas.  Comprised of many former members of the Mexican military, including the Mexican Special Forces, the cartels are equipped with not only high-powered weapons, but also military-grade technology, such as armored vehicles, Kevlar ballistic helmets, body armor, and night vision goggles.  Moreover, having established sophisticated radio networks, with some radio

towers reaching over 300 feet high, the Mexican cartels are able to coordinate large scale operations, including paramilitary attacks.

47.     According to a 2006 congressional report, "drug cartels operating along the southwestern U.S. border are a 'country unto themselves' with intelligence capabilities, weaponry and communications equipment that challenges the Border Patrol and local law enforcement." *See* House Committee on Homeland Security, Subcommittee on Investigations, *A Line in the Sand: Confronting the Threat at the Southwest Border*, U.S. House of Representatives, at 22 (2006) (hereinafter "*Line in the Sand I*").  The report further states that this "new breed of cartel is not only more violent, powerful and well financed, it is also deeply engaged in intelligence collection on both sides of the border."  *Id.*

48.     With their size and power, the Mexican cartels have wreaked havoc on the Mexican population, posing a substantial threat to Mexican national security and undermining the legitimacy of the Mexican government.  The cartels openly war with police and military, launching infantry-style assaults with advanced weaponry.  They have also assassinated public officials and journalists, tortured, maimed, and beheaded their victims, employed psychological operations, and co-opted and corrupted the military, police, and political officials at all levels of government.

49.     Facing unprecedented levels of violence and corruption, the Mexican government has turned to its military to combat the cartels.  In 2005, Mexican president Vicente Fox first deployed Mexican military troops to combat the cartel threat.  Then, in 2006, his successor, Felipe Calderón, declared war on the drug cartels and greatly expanded the Mexican military deployment. The Mexican efforts to combat the cartels would grow to involve over 50,000 military troops and 5,000 federal police.

50.     The cartels have responded with brutal force, waging war in both the streets of major cities and small towns throughout Mexico.  Since 2006, the drug cartels have killed over 100,000 people, including many Americans.  This does not include the tens of thousands of people who are missing, and the untold number of murders that go unreported because of a media and civilian population terrorized into silence.  Moreover, during this time frame, drug cartel violence has spilled into the United States, particularly in border regions in Texas, Arizona, New Mexico, and California.

**2.     The Cartels at Issue**

51.     With the rise of the Mexican cartels, several dominant organizations have emerged, controlling the significant majority of the drug trafficking and criminal enterprises in Mexico.  These cartels battle fiercely over the major drug corridors through Mexico into the United States, known as "plazas."  The dominant cartels at issue in this suit are (1) the Sinaloa Cartel, (2) the Juárez Cartel, (3) the Gulf/Los Zetas Cartel, and (4) Colombia's Norte del Valle Cartel.

a.     *The Sinaloa Cartel*

52.     At all relevant times, the Sinaloa Cartel has been one of Mexico's most powerful drug cartels.  Headed by the elusive Joaquín "El Chapo" Guzmán, the Sinaloa Cartel emerged as one of the leaders in moving cocaine from Colombia to the United States.  Composed of a network of cell organizations, the Sinaloa Cartel has grown to be the most dominant cartel in Mexico today, controlling, by some estimates, over 50 percent of Mexico's drug trade.  The organization controls much of central and western Mexico, including the states of Sinaloa, Baja California, Sonora, and parts of Chihuahua, Jalisco, Nayarit, and Oaxaca.  It is also believed to have a substantial presence in over 40 countries, including areas throughout Latin America, the United States, Europe, Africa, and Asia.  Long a target of international law enforcement efforts, its

leader, Guzmán, has twice escaped out of a maximum security prison in Mexico—once through the front door, and once through a subterranean tunnel constructed from his cell to an abandoned house nearly a mile away.

b.   *The Juárez Cartel*

53.     At all relevant times, the Juárez Cartel has been one of Mexico's most powerful drug cartels, led by its founder Vicente Carrillo Fuentes.  The Juárez Cartel historically controlled the coveted Juárez-El Paso corridor, one of the three primary drug smuggling routes along the U.S.-Mexico border.  Approximately 70 percent of the cocaine smuggled into the United States annually is transported through this corridor.  The Juárez Cartel's enforcement arm—"La Linea"—was founded by corrupt active and former police officers who were extensively trained in urban warfare.  The Juárez Cartel was, for a time, allied with the Sinaloa Cartel.  But sometime in the mid-2000s, the Juárez Cartel split from its former ally, and a fierce war erupted between the two cartels to control the Juárez-El Paso corridor.  With the eruption of the war, the Juárez Cartel aligned itself with the Barrio Aztecas, a violent transnational gang that has executed thousands of people at the direction of the Juárez Cartel.  The brutal violence resulting from the war between the Juárez and Sinaloa Cartels earned Ciudad Juárez the infamy of being the murder capital of the world, with over 10,000 cartel-related murders occurring in the city between 2006 and 2012.  The conflict has reportedly worn down the Juárez Cartel, and today it is believed that the Sinaloa Cartel controls much of the Juárez-El Paso corridor.

c.   *The Gulf/Los Zetas Cartel*

54.     The Gulf Cartel is based in the border city of Matamoros in the northeastern Mexican state of Tamaulipas.  At the beginning of the 21st century, the Gulf Cartel was considered one of the most powerful Mexican cartels.  The strength was in large part attributable to the Gulf's

powerful enforcement arm, known as Los Zetas.  Los Zetas originally consisted of members of an elite special forces unit of the Mexican Army, trained in the United States at the School of the Americas at Fort Benning, GA, but they were successfully corrupted by Gulf Cartel leader Osiel Cárdenas Guillén.  Los Zetas became powerful military-style assassins with an organizational structure including counterintelligence, intelligence, and tactical enforcement units.  They originally worked exclusively for the Gulf Cartel but later began contracting their murder-for-hire services to other cartels.  Los Zetas eventually split from the Gulf Cartel to become an independent organization.  Since 2010, Los Zetas and the Gulf Cartel have been embroiled in a war over Tamaulipas, Nuevo León, and other territory for control of drug smuggling corridors.  The conflict has created an environment of urban warfare, with military-style raids on prisons, kidnappings of journalists, murders of law enforcement, and attacks on civilians and the military.

55.     The conflict with Los Zetas has greatly diminished the Gulf Cartel's area of influence in Mexico, while Los Zetas' area of influence has spread throughout most of eastern and central Mexico, including the states of Coahuila, Nuevo León, Tamaulipas, San Luis Potosí, Zacatecas, Veracruz, Chiapas, Campeche, and Quintana Roo, among others.  Today they are often considered the primary rival of the Sinaloa Cartel.

d.   *The Norte del Valle Cartel*

56.     While based in Colombia, the Norte del Valle Cartel was, until at least 2012, inextricably linked to the dominant Mexican cartels—including the Sinaloa, Juárez, Los Zetas, and Gulf Cartels—in the international transshipment of cocaine into the United States.

57.     In or around the early 1990s, a group of drug traffickers based in the Norte del Valle de Cauca region of Colombia began to dominate the cocaine trade in Colombia.  This group, which became known as the Norte del Valle Cartel, was, from the early 1990s until at least

17

2012, the primary producer and exporter of cocaine from Colombia into Mexico and ultimately

into the United States.  While a brutal force itself, the Norte del Valle Cartel employed the

Autodefensas Unidas de Colombia ("AUC")—Colombia's most powerful paramilitary

organization—to protect its drug routes and drug laboratories.  It is estimated that at its peak, the

Norte del Valle Cartel was responsible for over 60 percent, and perhaps over 90 percent, of the

cocaine smuggled into the United States.

58.     To sell its cocaine in the United States, the Norte del Valle Cartel aligned itself

with multiple Mexican cartels, including the Sinaloa, Juárez, and Gulf/Los Zetas Cartels.

Generally, the cocaine produced by the Norte del Valle Cartel was transported from the interior of

Colombia to coastal locations where the Norte del Valle Cartel worked with these Mexican groups

to ship the cocaine into Mexico.  Once in Mexico, the Mexican drug traffickers would stage the

cocaine and then transport it into the United States along the various corridors.

59.     Thus, at all relevant times, the Norte del Valle Cartel and the Mexican cartels,

including the Sinaloa, Juárez, Los Zetas, and Gulf Cartels, were inextricably intertwined in the

production and distribution of cocaine into the United States.  The Norte del Valle Cartel

manufactured the product, and the Mexican cartels served as the wholesalers and distributors.

**3.     The Terrorism of the Mexican Cartels**

60.     While violence has always been associated with the drug trade, since the early 2000s

the savagery of the Mexican drug cartels has soared to an unprecedented scale.  Routinely directed

at law enforcement, public officials, the media, and innocent civilians, the Mexican cartels—

including the Sinaloa, Juárez, and Los Zetas Cartels—employ terrorist tactics to intimidate, coerce,

and control the Mexican civilian population and the government.

61. Torture, beheadings, hanging corpses, public assassinations of government officials and journalists, mass executions, kidnappings, attacks on civilians, car bombs—these things have become a way of life for millions of Mexicans. And with virtually no recourse with local and state law enforcement, who are often corrupted or unwilling to apprehend or prosecute the perpetrators of the violence, millions of people in Mexico and along the U.S. border live in fear.

   a.   *Gruesome Public Displays Designed to Intimidate and Coerce*

62. In executing their horrific murders, the Mexican cartels—including the Sinaloa, Juárez, and Los Zetas Cartels—employ psychological tactics to maximize the effect of terror. A common tactic referred to as "corpse messaging," involves Mexican cartels arranging the dismembered bodies of their victims for public display, often accompanied with large-lettered messages (known as "narcomantas"), warning others of similar fates. From the decapitated head of an anti-cartel blogger placed atop a keyboard; to disemboweled corpses hanging from a highway bridge with the message "[t]his will happen to all the internet snitches"; to the decapitated body of a mayoral candidate left with the message "[t]his will happen to all the [expletive] politicians who don't want to align with us, you [expletive] traitors"; to seven bodies found in a car with the message "this happened to us for calling the military anonymously and this is also going to happen to [certain officers] of the federal police"; to a severed head found pinned with the message "See. Hear. Shut up. If you want to stay alive"—the cartels parade their spectacular atrocities to terrify an entire society into submission.

63. To further propagate their message of terror, the Mexican cartels frequently broadcast their atrocities on social media. Multiple online videos depict masked cartel militants bearing heavy weaponry as they torture and execute defenseless victims. For example, one video released by Los Zetas shows four women, hands bound, on their knees, and bare-breasted,

surrounded by 13 militants in black masks pointing assault rifles at their heads.  One woman was

forced to confess that her brother was a member of a rival cartel.  The militants then used a variety

of instruments, including hunting knives, a machete, and an axe, to behead and then mutilate the

women.  In retaliation, the rival cartel later filmed and published a retaliatory execution of a 15-

year-old boy from Honduras.  Surrounded by similar masked militants, he too was forced to

confess a cartel affiliation and was then beheaded.

64.     Many of the murders are tinged with a macabre ingenuity that amplifies the horrific

effect of the violence.  For example, in September 2006, cartel members in Michoacán rolled five

severed heads onto a crowded night club dance floor.  In another instance, after brutally

beheading a man on video, members of the Sinaloa Cartel excised the victim's face and stitched it

to a soccer ball.  Other body parts of the victim were found in boxes throughout public streets.

65.     These horrific and spectacular displays of violence are, in a word, terrorism.

Indeed, according to a 2006 Congressional report, the ruthless methods of violence that the

Mexican drug cartels employ "are no different than the techniques used by Al Qa'ida and other

terrorist organizations.  This level of brutality is particularly troubling as the cartels are executing

these vicious murders a mere stones-throw from U.S. soil."  *Line in the Sand I*, at 12.

> b.  *Attacks on Children and Women*

66.     In executing their acts of terror, the drug cartels spare no one, not even children.  A

May 2011 report from the U.S. State Department found that "[c]hildren and family members are

increasingly becoming victims of drug violence."  The report found that between 2006 and 2010 at

least 994 people under the age of 18 were murdered by the cartels.  The report further found that,

according to Mexican experts, competing cartels targeted children "to terrorize the population."

Terrorist attacks on children include:

- A massacre in San Luis Potosí of an entire family, including a mother, her children, and her 22-month-old granddaughter, whom they shot last and at close range;

- An attack on an off-duty police commander in Chihuahua while she was taking her five-year-old daughter to school; both died of multiple gunshot wounds;

- The execution of three young girls between the ages of 12 and 15 in their home in Ciudad Juárez; three cartel assassins showed up to kill their father but, when they realized he was not at home, they killed the girls instead;

- An attack on a four-year-old girl who was found dead with a bullet to the chest, slumped over the body of her murdered, bound, and gagged mother.

67.     Civilian women are also frequent victims of the drug cartels.  In northeastern Mexico, for example, the number of murdered women increased over 500 percent between 2001 and 2010.  Many women are also kidnapped and forced into prostitution, a lucrative side business of drug cartels used to increase profits and fund their other enterprises.  In addition to abduction and murder, the cartels frequently use rape as a means to control women and intimidate rival cartels, public officials, and the community at large.

    c.   _Mass Murders_

68.     The drug cartels' barbarism includes senseless and horrific mass murders.  Examples include:

- The Valentine's Day 2001 slaughter of the Mexican village of Limoncito de Alaya in Sinaloa; masked men with automatic rifles stormed a birthday party and murdered almost all of the village's men and boys, 12 in all;

21

- The killing by the Juárez Cartel of at least a dozen people, whose corpses were discovered in a mass grave in 2004 in Ciudad Juárez outside of a house that has since been coined the "murder house";

- Beginning in at least 2008, multiple military-style raids on drug rehabilitation centers, massacring all persons present, including the rehabilitation center employees;

- A September 15, 2008 terrorist attack on a crowd of innocent revelers during a Mexican Independence Day celebration in a town square in Morelia, Michoacán, where cartel operatives hurled two grenades into the crowd, killing eight people and injuring 100; commenting on the incident, U.S. Ambassador to Mexico Antonio O. Garza denounced the perpetrators as "narco-terrorists";

- A 2010 massacre of 72 immigrants, including pregnant women, from Central and South America on their way to the United States, who were accosted by a convoy of Los Zetas in San Fernando, Tamaulipas; according to the sole survivor, the cartel demanded that the immigrants serve as cartel members, and when they refused, they were lined up face-down on the ground and sprayed with gunfire, with a coup de grâce to each victim in the head;

- A 2011 massacre of at least 193 people who were travelling through San Fernando, Tamaulipas on passenger buses when they were hijacked by Los Zetas members; their bodies were discovered in a series of mass graves; according to interviews with a Zetas Cartel member and others, the female victims were raped and tortured, while many of the males were forced to fight to the death with other hostages with knives, hammers, machetes, and clubs; a U.S. citizen was among the victims;

- The March 2011 massacre of the town of Allende in Coahuila; Los Zetas forces raided the town, destroying dozens of homes with bulldozers and grenades, kidnapping and executing, by some accounts, over 300 people;

- An August 2011 attack by Los Zetas members on a casino in Monterrey, Nuevo León, killing at least 52 people; the cartel members stormed the casino, opened fire, doused the entrances in gasoline and set the casino ablaze; most of the victims were women, including pregnant women; and

- A May 2012 massacre by the Sinaloa Cartel of 14 people in Nuevo Laredo; their headless bodies were found in an abandoned vehicle in front of the customs agency; their heads were placed in several coolers in front of the municipal palace, along with a narcomanta signed by the Sinaloa Cartel's leader, "El Chapo" Guzmán, demanding that public officials recognize the presence of the Sinaloa Cartel in Nuevo Laredo.

        *d.* _Attacks on the Media_

69.      The Mexican drug cartels also target journalists. Since 2000, it is estimated that over 100 Mexican journalists have perished at the hands of the Mexican cartels, often tortured and mutilated in the process. These murders are in retaliation for journalists investigating cartels' atrocities or publishing negative commentary on the cartels, and are usually carried out publicly as a warning to others in the media. Since 2006, Mexico has consistently ranked as one of the deadliest countries for the press. The cartels have even openly attacked television and newspaper outlets with grenades and machine guns, including (1) a February 6, 2006 grenade attack on El Mañana newspaper in Nuevo Laredo, Tamaulipas, (2) a May 17, 2007 grenade attack on Cambio

Sonora, a newspaper in Hermosillo, Sonora, and (3) a July 30, 2010 attack on a television station, La Televisa, in Nuevo Laredo.

70.     The murders of journalists, include:

- The March 16, 2004 murder of Roberto Mora García, a Nuevo Laredo journalist who wrote extensively on drug cartels and their ties to local government; Mora was stabbed 26 times on his way home from work;

- The August 31, 2004 murder of Francisco Arratia Saldierna, a freelance journalist in Matamoros, Tamaulipas, who wrote frequent columns exposing political corruption and organized crime; Arratia was found beaten and tortured with broken fingers, a fractured skull, and burned palms;

- The November 28, 2004 murder of Gregorio Rodríguez Hernández, a photographer for a newspaper in Mazatlán, Sinaloa; Rodríguez was murdered at a restaurant while eating with his wife and child; the murder was retaliation for Rodríguez photographing police officials with Sinaloa Cartel members;

- The November 21, 2006 murder of Roberto Marcos García, a reporter for various publications who long reported on violent crime and drug trafficking and had been the target of threats; Marcos was run down by a car in the eastern state of Veracruz and shot multiple times;

- The April 6, 2007 ambush of Amado Ramírez, a prominent journalist in Acapulco, outside of his Radiorama office; commenting on the murder, Ricardo Castillo—news director for Acapulco's leading daily, El Sur—said: "Of course we're scared.  He was the most visible of all of us, and his murder was meant to send a message....  More than an

effort to silence the media, it's part of a strategy to instill terror.  The assassination of a

journalist isn't just any killing.  It touches the basic fibers of society.";

- The September 24, 2008 murder of Alejandro Fonseca Estrada, the host of a popular

  morning call-in show in Villahermosa, who spearheaded a vocal anti-crime and anti-

  kidnapping campaign; Fonseca was shot multiple times by four men in a van while

  hanging anti-crime posters in a major street;

- The November 13, 2008 murder of Armando Rodríguez Carreón, a veteran crime

  reporter for El Diario de Juárez, who published articles exposing drug cartels and their

  corruption of local public officials; Rodriguez was shot in front of his eight-year-old

  daughter; shortly before his death Rodriguez stated publicly that despite the risks

  associated with being a journalist in Ciudad Juárez, "I refuse to live in my house like a

  prisoner.  I refuse to live in fear.";

- The May 25, 2009 murder of Eliseo Barrón Hernández, a reporter for a paper in

  Torreón, Coahuila who exposed ties between the Sinaloa Cartel and local police; he

  was beaten and abducted in front of his two daughters, shot in the head, and discarded

  into a ditch; following his death, the Sinaloa Cartel hung five banners in prominent

  spots in Torreón, one saying: "We are here, journalists.  Ask Eliseo Barrón.  El Chapo

  and the cartel do not forgive.  Be careful, soldiers and journalists.";

- The November 2, 2009 murder of Bladimir Antuna García, a seasoned reporter in

  Durango who frequently reported on violent crime and was investigating police

  corruption; he was kidnapped, tortured, and strangled to death; his body was

accompanied with a note that read: "This happened to me for giving information to the military and for writing too much"; and

- The January 8, 2010 murder of Valentín Valdés Espinosa, a journalist in Saltillo, Coahuila who reported on military raids against drug cartels; Valdés was abducted, tortured, and shot; next to his discarded body was a message that read: "This is going to happen to those who don't understand.  This message is for everyone."

71.     These unrelenting attacks and murders have crippled the media.  Overwhelmed by a sense of helplessness after the murder of one of its journalists (the second in two years), one newspaper—El Diario de Juárez—published a front page editorial on September 19, 2010, titled "What do you want from us?"  Addressing the cartels as the "señores," the newspaper wrote: "You are, at present, the de facto authorities in this city because the legally mandated authorities have not been able to do anything to keep our colleagues from continuing to fall, although we have repeatedly demanded they do so."  Noting that even in war there are rules protecting media workers, the paper wrote: "We do not want more deaths.  It is impossible to carry out our role in these conditions.  Tell us therefore what is expected of us ....  [E]xplain to us what is wanted of us in order to stop paying the price with the lives of our colleagues."

72.     The attacks, however, have continued, and, as a consequence, the media has been largely silenced from performing its essential function of investigating and reporting on crime, violence, and public corruption.  Publications such as El Mañana in Nuevo Laredo have gone so far as to publicly announce their decision to stop reporting on cartel violence.  El Mañana's announcement was prompted by a military-style attack on its offices in May 2012, where several grenades were detonated and the building was sprayed with machine gun fire for several minutes.

26

73.     With mainstream media effectively silenced, social media became an important alternative channel for citizens to report cartel violence and navigate cartel checkpoints and war zones.  But the terrorism against the media quickly spread to social media bloggers.  In the course of three months in 2011, the cartels killed at least four outspoken social media bloggers in horrific displays of violence.  The first of these murders occurred on September 13, 2011, where the tortured and disemboweled corpses of two young bloggers were hung from a highway bridge in Nuevo León with the message "this is going to happen to all those posting funny things on the internet."  Then, on September 26, 2011, the severed head of a prolific blogger—Marisol Marcías Castañeda—was found atop a prominent monument in Nuevo Laredo.  The head was placed atop a keyboard with a message that read: "I'm here because of my reports, and yours....  For those who don't want to believe, this happened to me because of my actions, for believing in the army and the navy."  And on November 9, 2011, the tortured and decapitated body of "Rascatripas," a moderator for an anonymous cartel reporting website, was found with the note: "Hello!  I'm Rascatripas and this happened to me for failing to understand that I should not report things on social media websites."

   e.   _Attacks on Public Officials_

74.     Public officials are also frequent targets of the drug cartels.  From mayors to police chiefs to prosecutors, the cartels routinely execute public officials, often after kidnapping and torturing them, to terrorize the population and the government itself into accepting the cartels as the dominant authority.  According to some estimates, from 2006 to 2012 at least 174 Mexican government officials were assassinated—83 of whom were police chiefs.  The murders of public officials include:

- The November 11, 2001 murders of two federal judges—Benito Andrade Ibarra and Jesús Alberto Ayala—and the wife of another magistrate judge; the victims were on their way to a baseball game when a man sprayed them with at least 40 bullets from an AK-47; one of the judges had recently denied an appeal motion filed by a cartel member; Mexican Supreme Court Chief Justice Genaro Góngora Pimental called the murders "crimes against the state," the tolerance of which "put at risk the society itself";

- The June 8, 2005 murder of Alejandro Domínguez Coello, who—within six hours of his commission as police chief of Nuevo Laredo—was gunned down outside his office by two assassins who riddled his body with over 40 bullets; Domínguez was outspoken against corrupt officials and cartel violence, denouncing "the bloodshed that takes away [the citizens'] freedom";

- The May 14, 2007 assassination of José Nemesio Lugo Félix, a senior intelligence official for the Mexican Attorney General; assailants trapped Lugo's SUV during rush hour traffic and gunned him down;

- The May 27, 2007 murder of Terencio Sastre, a councilman of the town of El Cedro, Tabasco; Sastre was beheaded and his head was delivered in a cooler wrapped in newspaper on the doorstep of the newspaper offices of Tabasco Hoy; the newspaper later wrote: "It has all the characteristics of an act of intimidation and an attempt to silence the freedom of information that the publishers exercise.";

- The September 12, 2007 murder of Omar Ramirez, a commander of a special federal investigative unit, who was gunned down in broad daylight on a busy street in Mexico

28

City by members of the Gulf Cartel for making too much progress on an investigation into the cartel's illicit activities;

- The May 8, 2008 murder of Édgar Eusebio Millán Gómez—Mexico's national police chief and the public face of Mexico's war against drug cartels—who was gunned down in front of his house by several armed assassins; the murder was the fourth assassination of a high-ranking federal police official in a week; Mexico's former secretary of public safety said that Millan's murder "demonstrated a desire [by the cartels] to generate an atmosphere of terror";

- The January 2009 murder of Mexican General Mauricio Enrique Tello Quiñones, who—one week after retiring and taking a position as a commander of a special task force in Cancun, Quintana Roo—was kidnapped, had both arms and legs broken, and was subjected to prolonged torture before being killed;

- The January 2009 beheading of Martin Castro, police chief of Práxedis G. Guerrero, Chihuahua; his severed head was placed in a cooler outside of the police station; and

- The September 2010 murder of Gustavo Sánchez Cervantes, Mayor of Tancitaro, Michoacán; Sánchez was tortured and stoned to death, and his body was discarded on the side of a public street; Sánchez was 1 of at least 25 mayors murdered by cartels from 2007 to 2010.

   f.   _Attacks on Police and Military_

75.     Then there are the rank-and-file police officers and soldiers who have died by the thousands at the hands of the drug cartels.  Armed with military-grade weapons such as assault rifles and grenades, the cartels have waged open war against Mexican police and military,

launching commando attacks throughout the streets of Mexican cities.  For example, in a three-week period ending March 6, 2009 in the state of Michoacán, the cartels launched at least five grenade attacks on police patrols, stations, and the home of a police commander.  Several other such attacks occurred in five other Mexican states during the same period.

76.     The murders of police officers and soldiers are often gruesome and accompanied by torture, and the dismembered corpses are often publicly displayed to terrorize the government and the civilian population.  The murders of police officers and soldiers include:

- The April 2006 murders of Mario Núñez Magaña and Jesús Alberto Ibarra Velázquez, whose severed heads the cartels spiked on metal poles and stuck in front of a government building in Acapulco with the warning: "So that you learn respect";

- The June 6, 2006 murders of three police officers and one American civilian in Tijuana, Baja California; the bodies were decapitated and thrown into the streets;

- The May 12, 2007 murder of a police officer deposited outside a Mexican military base in Veracruz, accompanied with the note: "We'll keep on going when the federal forces get here" (a reference to President Calderón's announcement the day before that he would send federal troops to Veracruz);

- The December 21, 2008 murders of seven soldiers and a lawyer in Chilpancingo, Guerrero; the men were kidnapped by armed commandos, tortured, and then beheaded with a saw while still alive; their heads were displayed throughout the city;

- The July 29, 2009 murder of Veracruz police officer Jesus Antonio Romero and his family; nine cartel militants stormed his house with assault rifles and grenade

launchers, executing Antonio, his wife—also a police officer—and their son; the militants then set the house ablaze, burning alive Antonio's three daughters; and

- The June 17, 2010 murder of two Mexican federal police officers in Ciudad Juárez; the officers were responding to a call that a police officer had been killed; upon finding a dead man dressed as police officer in a car, a bomb in the car detonated, killing the two officers, a paramedic, and a civilian, and wounding several others.

g. *Kidnappings*

77. Then there are the kidnappings. The drug cartels have expansive kidnapping operations in Mexico, kidnapping tens of thousands of people each year. The cartels are often aided in their kidnappings by local police whom they have corrupted. Some victims are returned if a ransom is paid, while others disappear and are presumed dead. Having little faith in law enforcement, only a fraction of the kidnappings are reported. For example, according to the U.S. State Department, in 2012 an estimated 105,682 people were kidnapped in Mexico. Only 1,317 of those crimes were reported to the police.

h. *Attacks on American Civilians and Officials*

78. The widespread and gruesome terrorism of the Mexican drug cartels has impacted not only the Mexican population but U.S. citizens as well. The United States and Mexico have deep ties. With Mexicans and Americans continuously travelling across the 2,000-mile shared U.S.-Mexican border, many U.S. citizens have commercial, cultural, familial, and educational ties with Mexico. With an estimated one million U.S. citizens living in Mexico, Mexico has the largest population of U.S. citizens living outside the United States, constituting over 75 percent of all documented foreigners in Mexico. Additionally, millions of U.S. citizens have family members

living in Mexico.  It is also estimated that, as of 2013, U.S. tourists to Mexico numbered over 20
million per year.

79.      Given the millions of U.S. citizens who live in, work in, study in, or visit Mexico
each year, it has been at all relevant times foreseeable that U.S. citizens in Mexico would be
victimized by the terrorist acts of the Mexican drug cartels, and, indeed, many have been.  Since
the mid-2000s, many U.S. citizens have been killed by the Mexican drug cartels, and thousands
more have been kidnapped in Mexico and along the U.S.-Mexico border.  The Victims in this case
are among the U.S. citizens killed or injured by acts of drug cartel terrorism.  Other U.S. victims
include:

- 27-year-old Yvette Martinez and 23-year-old Brenda Cisneros, who crossed the border
  into Nuevo Laredo in September 2004 to attend a concert; they were kidnapped by
  members of Los Zetas Cartel and have not been heard from since;

- Benjamin LeBaron and Luis Widmar, American citizens living in Galeana, Chihuahua;
  after one of his family members was kidnapped by drug cartels, LeBaron became
  outspoken in the community against kidnapping and drug cartel violence; on July 7,
  2009, at least 20 armed Sinaloa Cartel assassins stormed LeBaron's house in the
  middle of the night, and abducted LeBaron and his brother-in-law Widmar in front of
  LeBaron's wife and five screaming children; the cartel members then beat the men and
  executed them; next to their bodies left on the side of a road was a sign stating that the
  murders were in retaliation for Sinaloa Cartel members who had been arrested; and

- David Hartley, who on September 30, 2010 was chased and gunned down by a gang of
  Los Zetas militants while jet skiing with his wife on Falcon Lake in Tamaulipas; two

weeks later, on October 13, 2010, Los Zetas Cartel members murdered the lead

Mexican investigator on the Hartley murder and delivered his severed head in a

suitcase to the Mexican military.

80.     United States governmental interests in Mexico have also suffered repeated terrorist

attacks by the Mexican drug cartels.  For example, on October 13, 2008, Mexican drug cartel

operatives threw a hand grenade at and fired upon the U.S. Consulate Office in Monterrey, Nuevo

León.  Less than two years later, on April 9, 2010, Mexican cartel operatives threw an explosive

device over the wall of the U.S. Consulate Office in Nuevo Laredo.  This occurred just weeks after

cartel members attacked and murdered Lesley Redelfs—a U.S. Consulate employee and one of the

Victims in this case.  Then, on February 7, 2013, Mexican cartel members detonated three hand

grenades just feet from the Nuevo Laredo Consulate Office.  The violence against the U.S.

Consulate Offices in Mexico has prompted the State Department to take drastic measures, such as

temporarily closing consulate offices to assess security, and allowing consular employees along the

border to move their families from Mexico to the United States.

81.     United States law enforcement agents are also targeted in Mexico.  Mexican cartels

have increasingly threatened agents with narcomantas, such as the one displayed in the streets of

Chihuahua on July 1, 2011, stating: "[Expletive] gringos (D.E.A.) worthless [expletive] we have you

identified and we know who you are and where you are we are going to cut your head off

[expletive]."  And, as in the case of Special Agents Jaime Zapata and Victor Avila, the Mexican

cartels have stormed, injured, and killed federal law enforcement agents in broad daylight on

public highways while the agents were performing diplomatic missions.

82.     The violence against U.S. citizens is not confined to Mexico; since at least the early 2000s, there has been an alarming spillover of drug cartel violence into the United States, threatening U.S. law enforcement and citizenry.  According to a 2006 congressional report, the "Mexican drug cartels wield substantial control over the U.S.-Mexican border.  Law enforcement on the border agree that very little crosses the respective cartel territories, or 'plazas,' along the Southwest border without cartel knowledge, approval, and financial remuneration....  Federal, State, and local law enforcement report new and ever-increasing levels of ruthlessness and violence associated with these criminal organizations, which are increasingly spilling across the border into the United States and moving into local communities."  *Line in the Sand I*, at p. 6.  A 2012 follow-up report found that "the horrific violence perpetrated by Mexican drug cartels continues to grow and, in many cases..., spills into the United States.  The cartels now have a presence in more than 1,000 U.S. cities and dominate the wholesale illicit drug trade by controlling the movement of most of the foreign-produced drug supply across the southwest border."  *See* Congress, House, Committee on Homeland Security, Subcommittee on Oversight, Investigations, and Management, *A Line in the Sand: Countering Crime, Violence and Terror at the Southwest Border*, 112th Congress, at 2 (2012) (hereinafter "*Line in the Sand II*").

83.     The Mexican cartels have attacked, kidnapped, and murdered American citizens and residents inside the United States.  Examples include:

- A hand grenade launched into a crowded bar in February 2009 in Hidalgo County, Texas;

- The September 2009 abduction and murder of Sergio Saucedo; members of the Sinaloa Cartel stormed his home and kidnapped him in front of his wife and children;

they then transported him to Mexico, tortured and murdered him, cut his hands off, and placed them on his chest;

- The October 10, 2010 beheading of Martin Alejandro Cota-Monroy in a suburb of Phoenix; a lead police detective on the case stated: "This is the message being sent: Not only are they going to kill you but they're going to dismember your body.  And, 'if you cross us, this is what happens.'";

- The May 28, 2011 kidnapping and murder of Ovidio Guerrero, a permanent U.S. resident of Mission, Texas; members of the Gulf Cartel kidnapped Guerrero under the false belief that he had stolen cocaine from the cartel; posing as police officers, cartel members falsely arrested Guerrero, then struck him and bound him with duct tape; the cartel operatives soon realized Guerrero was not the man they were looking for but, nevertheless, transported him to Mexico and murdered him.

84.     United States law enforcement is also frequently attacked by the Mexican drug cartels inside the U.S.  According to a 2012 congressional report, "U.S. Border Patrol agents continue to be subjected to spillover violence."  *Line in the Sand II,* at 24.  Noting that from 2004 to 2005 violence against Border Patrol agents increased 108 percent, the report stated that "since 2007, violence against Border Patrol agents ha[d] increased by 35 percent to include 35 deaths."  *Id.*  According to the Texas Department of Public Safety, from 2009 to 2012 there were at least 58 incidents of shots fired at Texas law enforcement officers by Mexican drug cartel operatives.  Attacks on the U.S. law enforcement officers by the Mexican drug cartels include:

- A border incursion in Hudspeth County, Texas in January 2006 where Mexican cartel members in military uniforms, armed with military-style weaponry and driving military-style vehicles, prevented U.S. law enforcement from intercepting a drug shipment;

- An incident in Hidalgo County, Texas in the summer of 2006 where two deputy sheriffs were attacked by drug cartel members from across the Rio Grande River; the cartel members fired 300 to 400 rounds from automatic weapons;

- Over 77 incidences since 2008 of drug cartel operatives throwing tire-deflating devices at pursuing law enforcement vehicles while evading arrest; these devices, which have disabled both civilian and law enforcement vehicles, pose a great risk to public safety;

- The December 2010 murder of Border Patrol Agent Brian Terry, who was attacked by Mexican cartel operatives with AK-47s; and

- The October 30, 2011 shooting of Hidalgo County Sheriff Deputy Hugo Rodriquez; responding to a reported kidnapping, Rodriguez pulled over two Gulf Cartel operatives, who opened fire with an assault rifle and nine millimeter pistol, striking the deputy in his chest and leg.

85.    Since at least 2006, Texas law enforcement officials have reported being overwhelmed by the level of resources of the Mexican drug cartels, including rocket propelled grenades, automatic assault weapons, and level-four body armor and Kevlar helmets similar to what the U.S. military uses.  Indeed, some law enforcement officers along the U.S.-Mexican border have been told to stand down when confronted by Mexican cartel militants.  Some Texas officers have been ordered to stop patrolling along the banks of the Rio Grande River altogether due to danger.

86.     The terrorism of the Mexican drug cartels, both inside Mexico and in the United States, has prompted U.S. State Department officials to issue multiple travel warnings to U.S citizens about the dangers of travelling in Mexico.  For example, on September 14, 2006, the then-U.S. Ambassador to Mexico, Tony O. Garza, issued a travel warning to U.S. citizens.  The warning was prompted by multiple incidences of violence, including (1) a kidnapping in a hotel in Nuevo Laredo of 25 people going to work for a Texas-based company, (2) multiple deaths of U.S. citizens throughout Mexico, and (3) "dozens" of unsolved kidnappings of U.S. citizens, over 20 of which had occurred in Nuevo Laredo alone.  In issuing the travel warning, the ambassador stated, "Violence in the U.S.-Mexico border region continues to threaten our very way of life, and as friends and neighbors, Mexicans and Americans must be honest about the near-lawlessness of some parts of our border region.  Recently, throughout Mexico, that violence has escalated with sharp increases in murders and kidnappings of Mexican and American citizens alike.  Many residents of Mexico have spoken to me of their deep concern, both for their personal safety and for the future of their communities ... a concern I share."

87.     Since at least 2006, the U.S. State Department has had continuous travel warnings in place for Mexico.  These warnings often urge U.S. citizens to avoid all "non-essential" travel to entire regions of Mexico, such as the states of Sinaloa and Tamaulipas, due to the drug cartel violence and the limited to non-existent law enforcement presence in the areas.  They warn that U.S. personnel may not be able to respond quickly to distress calls to these areas due to the extreme precautions needed in travelling to such regions.  Further, the State Department has at times outright forbidden U.S. government employees from personal travel to such regions and has otherwise restricted employees' business and personal travel within Mexico.

88.     The terrorism of the Mexican drug cartels, both in Mexico and along the U.S.-Mexico border, threatens the close ties that the United States shares with Mexico.  As stated by Ambassador Garza on September 14, 2006: "The recent increase in these crimes is cause for alarm for any number of reasons, among them that the crimes put a strain on travel and tourism, on the business and investment climate, and on the bilateral relationship we share.  Local law enforcement in Mexico—often driven by their fear of being targeted themselves for execution—have struggled to come to grips with rising drug warfare, kidnappings and random street violence, and the violence that continues to undermine our bilateral efforts to have the safe cross-border exchanges, tourism and commerce that are so vital to the region's prosperity."

**B.**     THE TERRORIST ATTACKS AGAINST THE VICTIMS

89.     As a foreseeable consequence of the Mexican drug cartel's widespread violence, the Victims in this case were all attacked by the Mexican drug cartels in broad daylight while engaged in peaceful activities—*e.g.*, a diplomatic mission, a children's birthday party, and a wedding.  These attacks illustrate and embody the essence of the Mexican drug cartel's terrorist activities.

**1.     The Terrorist Attack on Jaime Zapata and Victor Avila, Jr.**

90.     On February 15, 2011, ICE Special Agents Zapata and Avila were on a peaceful mission in Mexico to transport certain equipment from Monterrey to Mexico City, where they were stationed at the time.  They were travelling in a blue Chevrolet Suburban armored vehicle bearing United States diplomatic license plates.  Their mission required them to travel through regions controlled by Los Zetas.

91.     At around 2:00 p.m., while travelling southbound on Mexican highway No. 57, just outside of San Luis Potosí, Special Agents Zapata and Avila were ambushed by Los Zetas hit

squads, or "*estacas*," with at least eight Los Zetas hit men, or "*sicarios*."  Driving aggressively in front

and back of Special Agents Avila and Zapata, the *sicarios* forced the agents off the road.

92.     The *sicarios* then exited their vehicles, all bearing firearms including AK-47 and AR-

45 assault weapons.  The leader of the pack ordered the Special Agents to exit their armored

vehicle and shot several warning shots near the vehicle.  The Special Agents screamed, in Spanish,

that they were Americans and diplomats from the U.S. Embassy.

93.     Despite seeing the U.S. embassy plates and hearing the agents' pleas that they were

U.S. diplomats, the *sicarios* attempted to force open the passenger door of the vehicle while Special

Agent Avila struggled to keep it shut.  At some point during the confrontation, the passenger

window was partially lowered, at which point one of the *sicarios* pointed the barrel of his AK-47

through the window and sprayed the agents with gunfire.  Special Agent Avila was hit in several

places, and Special Agent Zapata took at least six bullets, one of which severed his femoral artery.

94.     Bleeding to death, Special Agent Zapata tried to drive away, at which point the

*sicarios* opened fire on the vehicle, spraying it with at least 100 rounds.  The bullet-ridden vehicle

stalled in a ditch, at which point several of the *sicarios* fired additional rounds, and then, unable to

penetrate the armored vehicle, left with both agents severely wounded and one dying.

95.     The agents called for help.  While waiting for help, Special Agent Zapata told his

partner and friend, "I am going to die."  Special Agent Avila responded, "No, you are not going to

die.  Be strong, help is on the way, you are not going to die."

96.     Special Agent Zapata died on the way to the hospital.  Special Agent Avila survived,

but his life has been permanently and irreparably altered, and he has suffered severe mental and

physical anguish ever since.  His wife and young children were immediately evacuated from their

home in Mexico City out of fear for their safety, with no time to gather belongings or say goodbyes.

97.     Several of the Los Zetas *sicarios* who attacked Special Agents Avila and Zapata, including the *sicario* commander—Julián Zapata Espinoza—were subsequently indicted in the U.S. District Court for the District of Columbia.  On or around May 23, 2013, Zapata Espinoza pled guilty to the crimes of murder and attempted murder of federal officers or employees while such employees were engaged in the performance of official duties, in violation of 18 U.S.C. §§ 1114, 1111, and 2.

**2.     The Terrorist Attack on Arthur and Lesley Redelfs**

98.     In March 2010, the drug war in Ciudad Juárez between the Sinaloa and Juárez Cartels was in full force.  From January 2008 through March 2010, there were over 6,000 casualties in Ciudad Juárez alone, more than the U.S. military casualties in Iraq and Afghanistan combined.

99.     To assist in its war with the Sinaloa Cartel, beginning in 2007 the Juárez Cartel aligned itself with the transnational gang Barrio Aztecas.  Since that time, the Barrio Aztecas worked exclusively for the Juárez Cartel, assisting in smuggling drugs into the United States, producing crack cocaine, and carrying out thousands of executions.  The two organizations shared a sophisticated communications network specially designed for the alliance.  From at least 2007 onward, the Barrio Aztecas executed thousands of people for the Juárez Cartel, often displaying decapitated and dismembered bodies with narcomantas written in the name of the Juárez Cartel. The Barrio Aztecas, at the direction of the Juárez Cartel, had a quota of killing at least eight people a day.  The instruction was that the murders should be public and gruesome to intimidate the Sinaloa Cartel, law enforcement, and the general public.

100.     On Saturday, March 13, 2010, Lesley and Arthur Redelfs were in Ciudad Juárez attending a child's birthday party hosted by the U.S. Consulate Office at a children's party hall. Most of the guests at the party, including Lesley, were employees of the U.S. Consulate Office or their family members.  Lesley was joined by her husband, Arthur, a detention officer for the El Paso County jail, and her seven-month-old daughter.  Lesley was four-months pregnant.

101.     As the Redelfs family left the birthday party in their SUV, several members of the Barrio Aztecas, under direction from the Juárez Cartel, laid in wait.  They were ordered to follow and assassinate any persons leaving the birthday party in white SUVs, which included Lesley and Arthur Redelfs, as well as the spouse of another U.S. consular employee, Jorge Salcido Cisneros, who attended the party with his two daughters, ages seven and four.

102.     After the families drove away, several of the cartel enforcers trailed the two SUVs. Communicating over a sophisticated radio network, one of the leaders ordered that the assassins kill the occupants of both SUVs.

103.     When the Redelfs' SUV, which had Texas license plates, came to a stop several blocks away, two car loads of assassins pulled up beside the SUV in an attempt to box it in to prevent escape.  One assassin then exited his car and fired gunshots into the passenger side, striking Lesley twice in the head.  Arthur then sped away towards the nearby U.S. border as the cartel enforcers chased the SUV.  The cartel enforcers caught up with the Redelfs near the Ciudad Juárez City Hall, shooting Arthur at least nine times as the SUV drifted and crashed at an intersection near the entrance of the Stanton Street Bridge linking Ciudad Juárez to El Paso, Texas.  Arthur's spinal cord was severed by one of the bullets and he died from massive bleeding. Their infant daughter was found screaming in the backseat.

104.     At around the same time, other cartel enforcers chased down Salcido's SUV, shooting him and his four and seven-year-old daughters.  Salcido was killed, and his daughters were wounded.

105.     Several high ranking members of the Juárez Cartel and the Barrio Aztecas were subsequently indicted in the United States for the murders of the Redelfs and Salcido.  On October 1, 2010, Barrio Aztecas hit man Jesús Ernesto Chávez Castillo pled guilty in the United States District Court for the Western District of Texas to, among other things, (1) murdering Lesley Redelfs, a U.S. employee, on account of her performance of her official duties (in violation of 18 U.S.C. §§ 1114, 1111, and 2), and (2) murdering Arthur Redelfs and Salcido with the intent to retaliate against their spouses on account of their spouses' performance of their official duties (in violation of 18 U.S.C. §§ 115, 114, and 2).  Testifying in subsequent proceedings, Chávez Castillo admitted that, beginning in 2009, he killed or ordered to be killed over 800 people (before he lost count), and that his killings included torturing and beheading victims and displaying them in public with narcomantas from the Juárez Cartel.  Upon learning that Chavez Castillo was cooperating with law enforcement, Barrio Aztecas members murdered his stepdaughter in front of his wife, and then kidnapped, tortured, and murdered his wife.

106.     On April 5, 2012, José Antonio Acosta Hernández–leader of the Juárez Cartel in Juárez and Chihuahua–also pled guilty to, among other things, conspiring in the United States to murder Lesley and Arthur Redelfs and Salcido in a foreign country in violation of 18 U.S.C. § 956.  Additionally, Acosta Hernández admitted that since 2008, he had directed or participated in more than 1,500 murders, including (1) the January 30, 2010 slaughter of 16 people at a daytime student birthday party in Juárez, and (2) a July 15, 2010 car bombing in Juárez, which killed law

enforcement officers, medical workers, and civilians.  Acosta Hernández further pled guilty to money laundering charges, admitting that he knew that the Juárez Cartel/Barrio Aztecas alliance earned millions in drug trafficking profits per year, which were reinvested into the organization to purchase more drugs to import into the United States and to purchase weapons, ammunition, and supplies to continue the organization's murderous activities.

### 3.    The Terrorist Attack on the Morales Family

107.    On May 7, 2010, Rafael Morales, Jr. and his family were celebrating his wedding ceremony at El Señor de la Misericordia Catholic Church in Ciudad Juárez, the city where his new bride had been raised.  As the congregation exited the church, approximately 16 assassins from the Sinaloa Cartel, all bearing assault rifles, were waiting for them in the church courtyard.  In the distance, barricading the road to the church, were Mexican federal police officers who were corrupted and working for the Sinaloa Cartel.

108.    The assassins were there under orders to kidnap Guadalupe Morales.  Individuals familiar with the Morales family repeatedly attempted to dissuade the orchestrator of the attack—Irvin Enriquez—from executing the attack, indicating that these were innocent people.  Enriquez ignored these pleas and ordered the attack anyway.

109.    As the wedding congregation exited the church, the assassins ordered everyone, including small children, to lie face down in the dirt.  In a panic, one young man attempted to flee but was shot in the back and killed.  The assassins began beating Guadalupe in front of the congregation.  Rafael Jr.'s brother and best man, Jaime, screamed for the men to stop, at which point the assassins grabbed him, his brother, and his uncle, forced them into two separate vehicles, and left.  A corrupted Mexican police officer then closed the courtyard gate and locked it, trapping

their horrified friends and family members inside. The Morales men were then transported to two separate "safe houses" where they were tortured.

110. Later that evening, Enriquez was in a meeting in Sunland Park, New Mexico when he received a radio call from one of the Sinaloa Cartel assassins by two-way radio. Enriquez was, at the time, engaged in a meeting where he was excited and bragging about the wedding abductions. The assassin had the three Morales men identify themselves over the radio. People in the meeting again encouraged Enriquez to release the men, stating that they were innocent. Enriquez nevertheless ordered them to be killed.

111. The assassins then killed the Morales men by wrapping their heads with duct tape. Their cause of death was asphyxiation. The bodies were found on May 10, 2010 discarded in the back of a truck in a residential neighborhood in Juárez—tortured, bound, and heads still enclosed in duct tape.

112. Multiple individuals associated with the Sinaloa Cartel have been indicted for these murders in the United States District Court for the Western District of Texas, including Enriquez, as well as the infamous Sinaloa Cartel leader, Joaquin "El Chapo" Guzman, and José Antonio Torres Marrufo, a senior enforcer for the Sinaloa Cartel. Enriquez and one other person subsequently pled guilty for conspiring in the United States—from various locations in Texas and New Mexico—to murder Rafael Morales, Jr., Jaime Morales, and Guadalupe Morales in a foreign country, in violation of 18 U.S.C. § 956.

### 4. The Terrorist Attack on Felix Batista

113. Felix Batista was a former Major in the United States Army and a prominent American security consultant who worked for a Houston-based securities firm. Dedicating his life to helping families faced with kidnappings and ransom demands, he was instrumental in the

release of over 100 hostages, including victims kidnapped by drug cartels in Mexico and by FARC in Colombia. Batista appeared on multiple media outlets in the U.S. and Mexico as a vocal advocate against the barbarism of the Mexican drug cartels.

114. In December 2008, Batista traveled to Saltillo, Coahuila, a town controlled at the time by Los Zetas. While there, the Coahuila State Secretary for Public Security arranged for Batista to give presentations on anti-kidnapping strategies to the Saltillo business community. The purpose of the presentations was to educate the public on how to avoid being kidnapped by drug cartels. His presentations included detailed slides on the drug cartel territory, bosses, and trafficking routes.

115. After giving these anti-kidnapping presentations, Batista was abducted by Los Zetas outside of a public restaurant in Saltillo. Despite pleas for Batista's release by his family and others, the cartel killed him and threw his body into an acid bath.

## C. THE CRITICAL ROLE AND THREAT OF MONEY LAUNDERING AND BANKS' DUTIES TO DETECT AND PREVENT IT

### 1. The Importance of Money Laundering to the Mexican Drug Cartels

116. With the Mexican drug cartels' vast accumulation of wealth comes a vast number of problems. The massive amounts of cash they generate create significant logistical challenges; the cash is hard to move and hide, and, unless it can be concealed and integrated into the international financial system, it is largely useless to the cartels. Therefore, to operate as the transnational criminal organizations that they are, the cartels must turn to money laundering.

117. Money laundering is the process through which illicit proceeds are concealed and transformed into apparently legitimate assets that can be integrated into the global financial system. It is the means by which the cartels (1) erase the link between the illicit activities and the

money, (2) erase the link between the money and its new owner, (3) shelter the profits from possible confiscation, and (4) make it a viable source to enable and perpetuate their criminal and terrorist activities.

118.     Money laundering typically develops in three phases.  The first phase involves introducing, or "placing," the illicit funds into the international financial system.  The second phase—known as "layering"—involves putting the illicit funds that have entered the financial system through a series of financial transactions, such as multiple wires to different accounts, to conceal the origin of the funds and create a façade of legitimacy.  The third phase—known as "integration"—involves reintroducing the ostensibly legitimate funds into the legal economy through purchases and investments.

119.     Money laundering is an integral and essential component for any illicit enterprise that yields a profit, and it is particularly important for the Mexican drug cartels.  In order to function as transnational criminal organizations, with a presence extending from Latin America to North America, Europe, the Middle East, and Asia, the Mexican cartels must have a means to place, layer, and integrate their illicit proceeds into the global financial network.

120.     Money laundering serves several vital functions for the Mexican drug cartels.  First, it allows the cartels to reinvest their illicit proceeds in their enterprise.  To survive and grow, the cartels must have a means to pay for their extensive infrastructure, including buildings, factories, equipment, weaponry, personnel, vehicles, aircraft, boats, submersible vessels, and raw materials.  To spend their money on these things, the cartels must legitimize their funds by placing, layering, and integrating them into the international financial system.

121.     Second, money laundering is a necessary component of the Mexican drug cartels' expansive corruption.  As described above, the ability to corrupt public officials has been instrumental to the drug cartels' control, allowing them to operate as a state in and of themselves in many parts of Mexico.  Large sums of cash are useless to public officials, who are particularly vulnerable to investigation when obtaining large accesses of wealth from criminal or unknown sources.  Thus, to conceal the illicit source of the bribe payments, the money must be placed, integrated, and layered into the global financial network.  Absent this ability, the drug cartels would not be able to implement their strategy of dominance through pervasive public corruption.

122.     Third, money laundering serves the important function of disguising the trail of the illicit proceeds, allowing the cartel to evade law enforcement and protect their illicit proceeds from seizure by authorities.

123.     In short, money-laundering is the lifeblood of the Mexican cartels, allowing them to create a façade of legitimacy through which they continue to fund their international activities.  It is through money laundering that the Mexican cartels have amassed sufficient wealth and power to transcend from mere criminal organizations to paramilitary forces that threaten the Mexican state itself.  Absent the ability to effectively launder their money, the Mexican cartels cannot survive. Restrict their ability to launder money and the cartels will weaken.  Eliminate it and they will cease to exist.

**2.     The Means by Which the Mexican Drug Cartels Launder Their Money**

124.     At all relevant times, the Mexican drug cartels' principal method of laundering money was through smuggling bulk cash from the United States into Mexico, and then placing the cash into the international financial system through Mexican banks or exchange houses, where the funds were subsequently moved back into the United States and elsewhere.

125.    The sale of illegal drugs in the United States generates substantial annual revenue for the Mexican drug cartels.  But because of tight AML restrictions in the United States, placing large quantities of cash in U.S. banks is difficult.  Therefore, the Mexican cartels often smuggle the U.S. dollar ("USD") proceeds into Mexico, where it is easier to place the cash.

126.    Once in Mexico, the cartels have various means of placing the USDs into the financial system.  During the relevant time frame, one of the primary and easiest ways was to deposit the dollars directly into USD-denominated accounts at Mexican banks.  As discussed in more detail below, affiliates of HSBC, in violation of law and bank policy, knowingly accepted billions of dollars of illicit USD deposits from Mexican drug cartels.  In many instances, bank employees were bribed to accept the cash, and the pervasively weak controls at the financial institution failed to stop them.

127.    At all relevant times, another method of placing illicit USDs in Mexico was through exchange houses, known as casas de cambio.  Casas de cambio are non-bank currency exchange businesses located in a number of countries, including Mexico.  Casas de cambio allow persons to exchange one type of currency for another (*e.g.*, the value of pesos for an equal value of USDs, and vice versa).  Through casas de cambio, persons in Mexico can use hard currency, such as pesos or USDs, and wire transfer the value of that currency to other accounts, including accounts in the United States.  Casas de cambio do not operate as banks—they do not hold deposits, maintain checking or savings accounts, issue lines of credit, or provide personal or commercial banking services.  Their central function is to allow persons or businesses in Mexico to exchange or wire transfer the value of hard currency from Mexico to bank accounts in the United States and other countries to conduct commerce.

128.     Casas de cambio have long presented fertile ground for money laundering.  With little regulation, many casas de cambio have served as money laundering fronts for drug cartels, laundering money in several ways, including by (1) accepting large quantities of USD cash or monetary instruments and then transferring the funds by wire within or outside Mexico through correspondent accounts with financial institutions, (2) depositing currency in the exchange house's United States or Mexican bank account and then wire transferring it through a series of accounts controlled by the cartels, and (3) issuing cashier's checks, personal checks, or other monetary instruments.

129.     Another important facet of money laundering for the Mexican drug cartels is what is known as the black market peso exchange ("BMPE").  The BMPE is a sophisticated trade-based money laundering scheme whereby USDs earned from the sale of cocaine are converted to Colombian pesos to pay the Colombian cartels for the cocaine they produce, and which the Mexican drug cartels traffic into the United States.  The BMPE is instrumental in money laundering, because the Colombian cocaine producers, such as the Norte del Valle Cartel, need to convert the USDs into usable Colombian pesos.

130.     The BMPE works as follows.  Once the Mexican drug cartels traffic and sell cocaine into the United States, the illicit USDs are delivered to money launderers, often referred to as peso brokers.  The peso brokers agree to purchase the bulk cash from the drug cartels at a steep discount in exchange for Colombian pesos.  The peso brokers simultaneously agree to sell the illicit USDs to Colombian businessmen, also at a discount, who need the dollars to purchase goods, such as cigarettes, liquor, television sets, and dishwashers that are most often sold in free trade zones around the world.

131.    Once the peso brokers receive the illicit USDs, they place the bulk cash into the financial system, usually—as described above—by depositing the cash into Mexican banks and casas de cambio.  Once deposited, the peso brokers subsequently wire the money into various accounts in the United States and elsewhere, and then purchase goods on behalf of the Colombian businessmen.  The peso brokers then transfer the Colombian pesos received from the Colombian businessmen to accounts controlled by the Colombian cocaine producers.

132.    In the end, the drug cartels successfully launder illicit USDs into seemingly legitimate Colombian pesos, the Colombian businessmen acquire goods at a steep discount, and the peso brokers make a handsome profit (*i.e.*, the spread between the exchange rate at which they purchase the Colombian pesos from the Colombian businessmen and the discounted rate at which they sell the Colombian pesos to the cartels).

133.    At all relevant times, the BMPE played an important part in the drug trafficking cycle.  It provided a ready-made way for the Mexican drug cartels to use the international financial system to pay for the cocaine they obtained from the Colombian cartels, including the Norte del Valle Cartel, while allowing the Colombian producers to receive payment in usable Colombian pesos without leaving their strongholds in Colombia.  Therefore, by participating in the BMPE, HSBC contributed directly to the international cocaine production and trafficking cycle, including the brutal acts of terrorism that accompany it.

### 3.    The Threat of Money Laundering and Banks' Duties to Prevent It

134.    The laundering of Mexican cartel proceeds poses a substantial international threat for several reasons.  First, money laundering increases the threat of the cartels' criminal and terroristic activities by facilitating the underlying crimes and allowing the organizations to reinvest the fruits of their crimes to grow and continue their operations.  Second, money laundering poses

50

a threat from an economic perspective by reducing tax revenues and establishing substantial underground economies which stifle legitimate business and destabilize financial sectors.  Third, laundering Mexican cartels' illicit proceeds undermines the rule of law and threatens the legitimacy of society itself.  In the words of the U.S. State Department: "Money laundering continues to be a serious global threat.  Jurisdictions flooded with illicit funds are vulnerable to the breakdown of the rule of law, the corruption of public officials and destabilization of their economies.... Political stability, democracy and free markets depend on solvent, stable, and honest financial, commercial, and trade systems."

135.    To address the threats associated with money laundering, laws and international banking standards are in place to ensure that financial institutions detect, report, and prevent money laundering at their institutions.

136.    In the United States, the Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.* (the "BSA"), and its implementing regulations require, among other things, that financial institutions maintain programs designed to detect, report, and prevent money laundering activity.  One such duty imposed by the BSA is that financial institutions establish and maintain an AML compliance program that, at a minimum, provides for (a) internal policies, procedures, and controls designed to guard against money laundering, (b) an individual or individuals to coordinate and monitor day-to-day compliance with the BSA and AML requirements, (c) an ongoing employee training program, and (d) an independent audit function to test compliance functions.  *See* 31 U.S.C. § 5318(h)(1) and 12 C.F.R. § 21.21.  As part of their AML programs, banks must have a risked-based program, meaning that the level of diligence necessary in a particular case is dictated by certain risk factors, to allow banks to form a reasonable belief as to the identify of its customers.  *See* 31 U.S.C.

§ 5318(l) and 31 C.F.R. § 1020.220(a).  Each bank's Customer Identification Program ("CIP") must take into account the relevant risks, including the risks present in the various types of accounts maintained by the bank, the various kinds of account-opening procedures, the various types of identifying information available, and the bank's size, location, and customer base.  31 C.F.R. § 1020.220(a)(2).  Further, banks have a duty to report to authorities known or suspected suspicious activity, including those transactions that deviate from the normal transactions expected of that particular customer without a reasonable explanation.  *See* 31 U.S.C. § 5318(g), 31 C.F.R. § 103.18, and 12 C.F.R. § 21.11.

137.    To properly implement an effective and compliant AML program, federal regulating authorities and established industry standards require that banks perform customer due diligence, which is referred to as "Know Your Customer" ("KYC") requirements.  The amount of KYC diligence required in a particular case depends on certain risk factors, including customer type, geographic location, and the types of products and services offered to the customer.  Thus, for example, a higher risk account like a correspondent account with a Mexican casa de cambio requires more scrutiny than a lower risk account, such as a resident consumer savings account.

138.    In all cases, however, proper KYC diligence requires that banks, at a minimum, (1) take reasonable measures to determine the true identity of all customers requesting service, (2) determine the customer's particular source(s) of funds for transactions, (3) determine the particular customer's normal and expected transactions, (4) monitor customer transactions to determine if they are consistent with normal and expected transactions for that customer or for similar categories or classes of customers, (5) identify customer transactions that do not appear to be consistent with normal and expected transactions for that particular customer or for customers

in similar categories or classes, and (6) determine if transactions are unusual or suspicious and, if so, report those transactions.

139.     Mexico also has laws and regulations requiring that banks institute appropriate processes, procedures, and controls to detect, report, and prevent money laundering.  Mexican banks are required to obtain customer identification information, perform KYC diligence and monitoring, and report suspicious activities to authorities.  The particular KYC requirements of Mexican banks are also risk-based, with enhanced due diligence required on high-risk accounts, including accounts dealing in high amounts of USDs.  Such accounts must be more strictly monitored and updated at least once a year, and bank employees are required to perform site visits to the customer's address to corroborate the customer's identification information.  Moreover, Mexican banks are required to institute mechanisms to monitor USD transactions over a $3,000 threshold and to detect structuring activity designed to evade the $10,000 reporting requirement. These laws and regulations were in place during all relevant times.

140.     These regulations and established industry practices serve critical roles in the fight against transnational criminal organizations and terrorism.  Appropriate customer due diligence and account monitoring allows banks to detect illicit activity, report it to authorities, and to deny or shut down accounts to money launderers who use financial institutions to further their illicit and dangerous enterprises.  Indeed, one of the key components of the international law enforcement campaign against the Mexican drug cartels has been to attack their money laundering channels, including their use of international financial institutions to place, layer, and integrate their illicit funds.

**4.      HSBC Was Warned of the Risks and Scope of the Cartels' Money Laundering and Terrorist Activities**

141.    Government agencies, regulators, and law enforcement have long alerted U.S. and Mexican banks about the money laundering risks in Mexico and have, at all relevant times, urged banks to take special precautions to guard against their institutions being used to launder Mexican drug cartel money.

142.    For example, since at least 2000, the U.S. State Department has consistently classified Mexico as a country of "primary" concern for money laundering, which is the State Department's highest risk rating.  In so doing, the State Department, in public annual International Narcotics Control Strategy ("INCS") Reports, has issued warnings that (1) the illicit drug trade is the principal source of funds laundered through Mexico, but other crimes, including corruption, kidnapping, firearms trafficking, and human trafficking are also major sources of illegal proceeds; (2) Mexico is a major drug producing and drug-transit country and serves as one of the major conduits for proceeds from illegal drug sales leaving the United States; (3) the smuggling of bulk shipments of U.S. currency into Mexico and then back into the United States through wire transfers, couriers, and armored vehicles remain favored methods for laundering drug proceeds; (4) Mexico remains one of the most challenging money laundering jurisdictions for the United States, especially with regard to the investigation of money laundering activities involving the cross-border smuggling of bulk currency from drug transactions; and (6) significant amounts of narcotic proceeds are smuggled across the border and introduced into the financial system through Mexican banks or casas de cambio, or repatriated across the border without record of the true owner of the funds.

143.    The State Department is far from the only agency that has consistently warned against the money laundering threat that Mexico presents.  For example, the Financial Crimes Enforcement Network (FinCEN)—a bureau of the U.S. Treasury Department—issued an advisory in April 2006, warning that "U.S. law enforcement has observed a dramatic increase in the smuggling of bulk cash proceeds from the sale of narcotics and other criminal activities from the United States into Mexico."  The advisory further warned that once "the U.S. currency is in Mexico, numerous layered transactions may be used to disguise its origins, after which it may be returned directly to the United States or further transshipped to or through other jurisdictions."  Specifically, the advisory warned of the risks associated with casas de cambio, warning that casas de cambio were accepting large quantities of bulk cash and then sending that cash back into the United States or selling the USDs to U.S. banks.  The advisory further warned of common money laundering activities associated with casas de cambio, such as multiple wire transfers that bear no apparent relationship with a particular casa de cambio, and U.S. deposits by casas de cambio of sequentially numbered monetary instruments.

144.    In addition, HSBC knew about several federal money laundering investigations that became public in 2007 through 2008 involving Mexico and several casas de cambio.

145.    In addition to warning of the risks of money laundering, government agencies have long warned of the terrorist activities of the Mexican drug cartels.  For example, in its annual INCS Reports, the U.S. State Department has consistently warned of the widespread violence and terrorist activities of the Mexican drug cartels, including:

- The 2002 INCS Report, which stated that "[d]rug-related violence in Mexico has moved beyond traditional rivalries between trafficking organizations"; that in 2001 the

55

cartels had executed entire villages and assassinated several Mexican judges; and that

the cartels "have demonstrated blatant disregard for human life as the executions of law

enforcement personnel, government officials, and innocent bystanders have increased";

- The 2007 INCS Report, which noted the extreme violence in Mexico, stating that in addition to controlling drug trafficking and money laundering activities, the cartels "have undermined and intimidated Mexican law enforcement and public officials" and killed thousands of people in 2006 alone;

- The 2008 INCS Report, which noted that violence in Mexico continued to increase, that the cartels had resisted President Calderón's military offensive, and that they had assassinated several high-level Mexican law enforcement officials;

- The 2009 INCS Report, which noted that the cartels "have also been effective at utilizing violence as a psychological weapon, intimidating political leaders, rival groups, and the general public"; and

- The 2010 INCS Report, which stated that "cross-border flow of money and guns into Mexico from the United States has enabled well-armed and well-funded cartels to engage in violent activities.  They employ advanced military tactics and utilize sophisticated weaponry such as sniper rifles, grenades, rocket propelled grenades and even mortars in attacks on security personnel.  [The cartels] have openly challenged the [government of Mexico] through conflict and intimidation.…  The results led to unprecedented violence and a general sense of insecurity in certain areas of the country."

146.     HSBC was well aware of the risks of money laundering and extreme violence in Mexico described in the various public advisories and reports, including the INCS Reports and the FinCEN advisories.  These advisories and reports were distributed and known to numerous AML officers and business executives for HSBC at or near the time they were published.

147.     Despite the warnings of the extreme risks posed by Mexican drug cartels' money laundering and violent activities, for the decade leading up to the terrorist attacks on the Victims, HSBC facilitated the laundering of billions of dollars of drug trafficking proceeds, including proceeds from the Sinaloa, Juárez, Los Zetas, and Norte del Valle Cartels, from its Mexican affiliates into the United States and elsewhere, giving the cartels a means to legitimize illicit funds and giving them much-needed access points into the U.S. and international banking systems.  As a result, HSBC knowingly provided material support to the Mexican drug cartels and their acts of terrorism.

**D.**     <u>HSBC'S MATERIAL SUPPORT TO THE MEXICAN DRUG CARTELS</u>

148.     Despite the warnings of the extreme risks posed by Mexican drug cartels' money laundering and violent activities, for the decade leading up to the terrorist attacks on the Victims, HSBC was complicit in laundering billions of dollars of drug trafficking proceeds, including proceeds from the Sinaloa, Juárez, Los Zetas, and Norte del Valle Cartels, giving the cartels a means to legitimize illicit funds and giving them much-needed access points into the U.S. and international banking systems.

149.     This occurred because of intentional, concurrent, and coordinated AML failures at HSBC Mexico, HSBC US, and HSBC Group.  In the years leading up to the terrorist attacks against the victims, HSBC Mexico, under the control and with the knowledge of HSBC Group, knowingly accepted billions of dollars of illicit USD cash deposits smuggled into Mexico by drug

cartels.  The funds were then laundered from HSBC Mexico back into the United States, including Texas, through HSBC US due to HSBC US's intentional and unlawful failure to monitor the transactions.  This also occurred under the control and with the knowledge of HSBC Group.  Thus, HSBC Group, HSBC Mexico, and HSBC US formed a coordinated conspiracy to facilitate the laundering of billions of dollars of drug cartel proceeds.

150.    The laundering began largely at HSBC Mexico, which knowingly accepted billions of dollars of USD cash deposits into accounts at field branches from drug cartel money launderers, and, in many cases, were paid by the cartels to do so.  HSBC Mexico and HSBC Group allowed this to happen because they intentionally set AML policies that allowed HSBC Mexico employees to, among other things, accept large deposits of USD cash under circumstances that unmistakably indicated that the funds had an illicit source.  The fact and the risks of money laundering occurring at HSBC Mexico were known at the highest levels at HSBC Mexico and HSBC Group, yet went unmitigated for at least eight years while HSBC employees continued to knowingly accept illicit proceeds from Mexican drug cartels.

151.    Many of the illicit proceeds accepted at HSBC Mexico were then further laundered through HSBC US.  HSBC Mexico often physically shipped the illicit cash to HSBC US and wired the proceeds through correspondent accounts with HSBC US.  HSBC US, per global directives givent to it by HSBC Group, willfully implemented several AML processes that, by design, guaranteed that the illicit proceeds laundered through HSBC US would go unmonitored and undetected, thereby giving the cartels virtually unfettered access to the U.S. financial system.

152.    At the same time, HSBC Group, who was aware of the high AML risks at HSBC Mexico, and was further aware that HSBC US was not monitoring the vast majority of transactions

with HSBC Mexico, did nothing to alert HSBC US of the fact that illicit drug money was being laundered through HSBC US, nor did it take the necessary steps to stop the flow of such proceeds into the United States.  Instead, it designed and maintained the very policies that caused hundreds of millions of dollars to be laundered from HSBC Mexico into the United States through its corresponding banking relationship with HSBC US, knowing that those policies were causing such money laundering to occur.

153.    HSBC has admitted that as a result of these concurrent failures, at least $881 million in drug trafficking proceeds were laundered through HSBC Mexico and HSBC US. HSBC admitted that these proceeds included the illicit funds of the Sinaloa Cartel, and that a significant amount of proceeds were laundered as part of the BMPE to convert U.S dollars into Colombian pesos for the ultimate benefit of the Norte del Valle Cartel.  In reality, however, the amount of laundered proceeds is far greater than $881 million and involves every major drug cartel in Mexico.

### 1.    HSBC Mexico

#### a.    *HSBC Mexico Knowingly Laundered Billions of Dollars of Drug Cartel Proceeds*

154.    HSBC Mexico was formed by HSBC's acquisition of one of Mexico's largest banking groups, Bital, in November 2002.  At all relevant times, HSBC Mexico was extremely vulnerable to money laundering.  The bank had over 1,400 branches throughout Mexico, including many in high-risk border regions and regions under the control of drug cartels.  These branches operated largely as franchises.  Branch managers were given considerable autonomy, with a focus on business development, reinforced by an incentive compensation scheme which rewarded new accounts and growth, not quality controls.  These branches were allowed to operate with little or no oversight or control by HSBC Mexico or HSBC Group's corporate offices.

155.    At all relevant times, a culture of recklessness and corruption pervaded many of the branches of HSBC Mexico, particularly in high-risk border regions and regions controlled by drug cartels, where money laundering risks were at their highest.  HSBC branch managers, account executives, and other employees routinely opened accounts for suspicious clients knowing the fact that the principal purpose of the accounts was to launder drug proceeds.  In violation of HSBC policy and law, employees would open these accounts without obtaining basic KYC information, including the customer address, the purpose of the account, the expected activity, and the source of USD cash deposits.  Indeed, as described in more detail below, in many instances HSBC employees manufactured required KYC information.

156.    Once accounts for known or suspected drug traffickers were opened, employees at HSBC Mexico branches would accept from these money launderers large quantities of USD cash deposits without inquiring into the source of the funds or reporting suspicious activity as required by HSBC policy and law.  The cash was often deposited under circumstances that left no doubt that the proceeds were from drugs or other illegal activity.  For example, in many cases, drug traffickers with no identifiable legitimate source of revenue would deposit hundreds of thousands of dollars of cash into HSBC Mexico accounts at a single branch in a single day.  The cash was bundled in quantities of $50,000 USD or more and placed in packages specifically designed to fit the precise dimensions of the teller windows to facilitate the efficient movement of the cash through the windows.

157.    In many cases, drug traffickers—including members of the Sinaloa, Juárez, Los Zetas, and Norte del Valle Cartels—paid HSBC Mexico employees to open accounts for them and to accept millions of dollars of laundered proceeds in those accounts.  These employees knowingly

aided and abetted the cartels in executing what HSBC Group employees have characterized as "massive money laundering scheme[s]."

158.    Even when the compliance function at HSBC Mexico identified the money laundering activity and ordered that the accounts be closed, HSBC Mexico branch managers and account executives often delayed closing the accounts—sometimes for years—while money launderers continued to make bulk cash deposits of USDs into HSBC Mexico accounts.

159.    In addition to opening USD-denominated deposit accounts for individuals, HSBC Mexico also knowingly accepted USD cash deposits and processed transactions for corporate entities that were known or suspected money launderers for Mexican cartels.  This included casas de cambio that served as money laundering fronts for drug traffickers, as well as corporations working for drug cartels to supply the raw materials for drug production, including methamphetamines.  As discussed in more detail below, HSBC Mexico employees opened and maintained these accounts without obtaining required KYC information, manufactured KYC reports, and failed to report suspicious activity for these accounts.  Further, as discussed below, HSBC Mexico continued doing business with these entities, sometimes for years, despite recommendations from AML committees that the accounts be closed due to strong evidence that they were being used by money launderers.

160.    As a result of the culture of recklessness and corruption at HSBC Mexico, HSBC Mexico was, at all relevant times, the Mexican drug cartels' preferred financial institution in Mexico to launder their illicit proceeds.  As a result, in the years leading up the terrorist attacks on the Victims, major drug cartels, including the Sinaloa, Juárez, Lost Zetas, and Norte del Valle Cartels, laundered billions of dollars through HSBC Mexico.

b.   _HSBC Mexico's Systemic and Persistent AML Failures Fostered a Culture of Recklessness and Corruption_

161.    HSBC Mexico's culture of recklessness and corruption was allowed to fester and grow by severe failures in HSBC Mexico's AML controls.  These failures were already in place when HSBC acquired Bital in 2002 and continued unmitigated for at least eight years prior to the terrorist attacks on the Victims.

162.    As summarized in a 2012 Senate report excoriating, among other things, HSBC Mexico's AML failures:

[HSBC Mexico] and HSBC Group internal documents demonstrate that HBMX's AML deficiencies were longstanding and widespread.  Audit after audit detailed long lists of problems, including inadequate compliance resources, missing KYC information, manufactured site visits, inadequate account monitoring, unread alerts, poor training on the monitoring system and assigning  [Special Client Category] designations, internal disputes over closing accounts with suspicious activity, accounts left open despite multiple [Suspicious Activity Reports] and orders by regulators to close them, a [Suspicious Activity Report] filing backlog, and an account closure backlog that spanned three years.  AML leadership at [HSBC Mexico] was also weak.  One AML director was dismissed for manufacturing notes of AML committee meetings that never took place; another was dismissed for inadequate performance; several long periods went by without any AML director in place at all.  Even AML projects with resources and high level backing were unsuccessful, such as the Restoration Project which reported in 2008, that 75% of high risk client files still had inadequate KYC documentation.

*See* Permanent Subcommittee on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, U.S. Senate, at 78 (2012) (hereinafter "PSI Report").

163.    The PSI Report continued that, despite HSBC Group's efforts to build a compliance culture, it "repeatedly faced a workforce in Mexico that disregarded the Group's AML policies and procedures, delayed obtaining required KYC data, delayed closing suspect accounts, and delayed reporting suspicious activity to regulators." *Id.*

164.    The severe AML failures were already firmly established at the bank when HSBC acquired Bital, HSBC Mexico's predecessor, in July 2002.  Prior to purchasing Bital, an internal audit conducted by HSBC Group documented severe AML deficiencies, including the facts that the bank did "not have a Compliance Department," that monitoring systems were lacking, that new customers were not asked to provide information about the source of their funds or the expected use of the account, that a significant number of accounts lacked full client information, and that new client names were not checked against various watch lists, including the U.S. Treasury Department's Specially Designated Nationals list.

165.    The audit also revealed that the bank had a history of corrupt account executives who established fictitious accounts for drug traffickers and money launderers, resulting in the forfeiture of millions of dollars to the U.S. government.  The audit concluded that the extensive shortcomings "present the potential to have another employee or group of employees become involved in another money laundering operation."

166.    That same month, the head of HSBC Group's compliance department wrote to senior executives at HSBC, including the head of HSBC Group's Legal and Compliance department and the soon-to-be head of HSBC Mexico, that Bital's AML function was "virtually

non-existent," and that there was "no recognisable compliance or money laundering function in Bital at present …."  Despite the "non-existent" AML function, the history of employee corruption, and the known risks of such corruption continuing into the future, HSBC Group went through with the purchase of Bital.

167.    The severe AML failures persisted over the next eight years and beyond.  The failures were repeatedly brought to the attention of senior officials at HSBC Mexico and HSBC Group in the form of internal reports and reports from regulatory authorities.  The reports documenting the AML failures include:

- A November 25, 2002 due diligence trip report drafted by a senior HSBC Group compliance official, noting a lack of "control culture," that Mexican regulators stated that legal and internal audit controls "do not exist," and that he did not "encounter anybody at Bital who [he] thought immediately capable of building a Compliance department";

- A January 26, 2004 email sent to the head of compliance at HSBC Group regarding two reports of inspections conducted by HSBC Mexico's regulator—the Comisión Nacional Bancaria y de Valores ("CNBV")—which criticized HSBC Mexico for, among other things, multiple files missing required KYC information and site visit reports, weaknesses in its systems' ability to detect suspicious transactions, and inadequacies in its AML handbooks;

- A May 2004 report of an audit conducted by HSBC Mexico, concluding that the bank had "insufficient controls to detect money laundering transactions in all areas of the Group in a timely manner"; that there were "high-risk areas of money laundering

transactions, which are not being monitored"; and that the AML department was

"operating with a **BELOW STANDARD** level of Control Risk" (emphasis in original);

- An August 10, 2004 email to the CEO of HSBC Mexico from a senior compliance

  official at HSBC Group reporting on his visit to HSBC Mexico to meet with CNBV

  officials, noting that while resources had "arrived" in the business area, the resources

  had "not arrived" in the area of controls; that there was no AML system in place for

  detection of unusual operations and there was poor identification of high risk

  customers; that despite assurances from HSBC Mexico employees to the contrary, "by

  far the greatest problems [with certain accounts] *is* missing KYC documentation"

  (emphasis in original); that of those accounts, 56 percent had incomplete KYC

  information, and 20 percent had no documentation at all; and that "[s]enior CNBV

  regulators were quite upset with the former AML director, who they believe had 'lied'

  to them about the adequacy of the bank's AML systems";

- A March 2005 report from CNBV finding that HSBC Mexico had failed to adequately

  consider the risk exposure of customers, failed to implement proper procedures to

  update annually the files of high-risk customers, failed to define internal criteria to

  adequately determine customers' risk exposure, and delayed establishing an AML

  committee required by law;

- A July 6, 2005 report from a senior compliance official, noting that HSBC Mexico was

  in need of an AML control officer; that the AML department was "demoralized" and

  needed prompt reorganization to "improve AML controls"; that AML "projects are

  started but seldom completed"; and that there were significant AML backlogs; HSBC

Group's head of compliance responded that "until [HSBC Mexico] has the right amount and mix of resources I cannot see [how] [HSBC Mexico's head of compliance] can make progress";

- A December 2005 internal audit report, finding that AML controls were still "Below Accepted Levels," with major failures including deficiencies in monitoring processes and parameters, inadequate risk profiles for high risk clients, a failure to complete a money laundering deterrence work plan, and inadequate training;

- An April 2007 email from the head of HSBC's Latin America audit group documenting "systemic weaknesses" in HSBC Mexico, including "KYC as identified in branch and continuous audit reports"; the "lack of adequate documentation and filing systems"; and a lack of a "compliance culture" evidenced "in the most serious way" by a number of "staff defalcations" and by a "widespread general negligence";

- Minutes from a July 27, 2007 audit committee meeting, where several HSBC Mexico failings were discussed, including branch officers being unfamiliar with AML requirements pertaining to high risk customers, and a failure by an AML committee to follow up on instructions to close client accounts;

- An October 23, 2007 email from the CEO of HSBC Mexico to the CEO of HSBC Group summarizing a CNBV inspection, noting that the regulators were concerned about "weaknesses in internal controls," "slow progress in tackling KYC data problems and anti money laundering procedures," a lack of compliance culture which had persisted since the Bital days, and an overall lack of AML training;

- A December 2007 audit on HSBC Mexico's AML procedures, finding that AML controls were still "Below Standard" and "High Risk," and noting that employees were systemically breaching KYC policies and regulations due to a lack of supervision and controls; that HSBC Mexico had delayed in reporting to authorities 4,890 accounts with unusual transactions occurring during a four month period; that the staff in field branches were not sufficiently knowledgeable regarding AML policies and regulations; that an AML committee delayed in closing suspicious accounts and reporting suspicious activity; and that HSBC Mexico had failed for at least a year to review a significant amount of transactions flagged by internal monitoring systems, "posing a potential risk that criminal transactions may not be identified which may have an adverse reputational effect on the Institution";

- A February 2008 draft report hand-delivered to HSBC Mexico's CEO by the heads of CNBV and Mexico's Financial Intelligence Unit ("FIU") expressing serious concerns about "the very high level of [money laundering] risk" at HSBC Mexico, finding that deficiencies in HSBC Mexico's internal controls had increased; that 55 percent of the files sampled by regulators were incomplete; that high profile risk clients were not properly supervised; that KYC updates for high risk customers were missing; and that HSBC Mexico's AML committee unreasonably delayed in closing suspicious accounts (citing an example of a $2.8 million account kept open for an entire year after it was supposed to be closed);

- A July 2008 email from a senior HSBC Group compliance official to HSBC Group's head of compliance noting that mandatory headcount and budget reductions were

impeding the ability to properly staff the AML department; that there was a backlog of 30,000 un-reviewed alerts flagged by the bank's electronic monitoring system; and that AML had no ability to replace poor performing staff with competent employees;

- An October 28, 2008 email from the head of HSBC's Latin America audit group expressing frustration at the slow progress of efforts to remediate KYC information on high-risk accounts and noting that internal reviews "continue to reveal an unacceptable level of 'manufactured' visit reports," which were a "key component" of KYC procedures for high-risk customers; and

- A November 27, 2008 email to the head of compliance at HSBC Group noting HSBC Mexico's "very slow" remediation efforts, the "huge back-log in closing accounts," and the longstanding practice of HSBC Mexican branches exchanging pesos for USDs for non-customers without requiring any KYC information; the head of compliance responded: "What I find most frustrating is the way in which new issues constantly emerge however much time is spent with HBMX.  The practice of changing USD in the branches presumably with little or no ID for non customers is in breach of Group policy.  When looking at our USD exposure how can this have been missed[?]"

168.    HSBC Mexico's compliance culture was so cavalier that employees systematically fabricated customer KYC information.  As documented in multiple internal audits and reports, employees routinely fabricated basic customer information, the existence of supporting documentation, and reports claiming that the employees had conducted necessary due diligence for high risk customers, such as customer site visits.

169.     The culture of manufacturing documents pervaded the top levels of HSBC's compliance department.  For example, from July through December 2004, monthly AML meetings required by law did not occur.  To disguise the fact that the meetings were not held, HSBC Mexico's Head of Money Laundering Deterrence, aided by several subordinates, fabricated attendance sheets and records of the meetings.  He then produced the false records to the CNBV in response to their request for such documents.

170.     The systemic document fabrication problem was known at the highest levels of HSBC Mexico and HSBC Group, yet HSBC did not take appropriate steps to stop it.  For example, a June 2007 internal audit revealed that seven percent of new account openings contained incomplete KYC information, which exceeded HSBC Mexico's internal tolerance by four percent.  But, writing to the CEO of HSBC Mexico, HSBC Group's global head of compliance stated that he suspected that the failure rate was far higher.  "There is," he said, "real doubt as to whether this figure is accurate as it appeared that account opening staff are able to indicate that supporting documentation is held when this may not be the case."  He continued that "[a]ccurate and complete account opening is a key AML control, particularly in emerging markets.  Serious consideration should be given as to whether either the remediation exercise and/or account opening should be handled separately by a control resource....  I wonder if we can realistically expect that branches can or will be able to address these activities given their focus on sales and customer service."

171.     Despite this admonishment from the global head of compliance to the CEO of HSBC Mexico, branch employees were allowed to continue opening accounts unchecked by a separate control resource and continued to fabricate KYC information in opening accounts.

172.    The systemic document fabrication problem was rooted in large part by a failure of HSBC Mexico to supervise or exercise control over its field staff, a fact documented in audit after audit.  This lack of supervision and control created an unacceptable risk of Mexican cartels infiltrating the bank–a fact which was known and discussed by senior executives.  For example, the internal audit report issued in December 2005 found that HSBC Mexico had little knowledge about what its staff in the field was doing.  Five months later, on May 17, 2006, a senior compliance officer expressed concern over this finding to HSBC Group's head of compliance: "A number of recommendations trouble me, but the one that most sticks out is apparent lack of monitoring of the (relatively few) AML staff in the field.  This raises a 'red flag' in a place like Mexico, where the drug cartels are very powerful and ubiquitous....  To aver, as the audit does, that 'we do not really know what our man in the field is doing' is a warning sign, if true."

173.    Despite the warning sign of HSBC's admitted lack of supervision and control over its field staff in areas controlled by drug cartels, the issue continued unabated.  For example, on October 9, 2006, HSBC Group's head of compliance sent a series of audit reports revealing severe deficiencies to several compliance officials, including the same senior compliance official who had warned five months earlier of the "warning sign" created by a lack of supervision in areas where "drug cartels are powerful and ubiquitous."  The cover email stated simply "[f]or your entertainment."  The attached audit reports found that AML controls in four of HSBC Mexico's highest risk regional offices, each with a network of over 15 branches, were "Below Standard."  Failings in all regional offices included "KYC issues and file integrity" issues, which "failed to comply with Group policies."  Despite these audit reports showing widespread AML failures in areas where drug cartels were "ubiquitous," the branches were allowed to continue opening and

maintaining accounts, many of which were high risk, without obtaining the necessary KYC information.

       c.   *HSBC Mexico was Complicit in Laundering Billions of Illicit USD Cash Deposits*

174.    Much of the billions of dollars of drug cartel money laundered through HSBC came in the form of USD cash deposits into personal banking accounts held and maintained by HSBC.  Until at least 2009, HSBC opened and maintained hundreds of thousands of such USD-denominated accounts.

175.    HSBC was incentivized to, and did, implement inadequate controls for these USD-denominated accounts.  Such accounts were, according to senior HSBC Mexico executives, a "cheap" source of revenue for HSBC Mexico.

176.    From 2004 through at least 2008, HSBC Mexico accepted over $16.1 billion in cash deposits from customers throughout Mexico.  This amount eclipsed the amount of USD cash deposits at financial institutions with market shares multiple times greater than HSBC Mexico's. HSBC Mexico then exported most of this cash into the United States through HSBC US pursuant to HSBC US's "Banknotes" program, a program where it purchased and sold physical currency.

177.    At all relevant times, senior HSBC executives knew that Mexican cartels, with assistance from HSBC Mexico employees, laundered billions of dollars of USD cash through HSBC Mexico, but failed to take the necessary steps to stop the flow of illicit proceeds.

178.    For example, a significant amount of USD cash deposits at HSBC Mexico were accepted in branches in Sinaloa state, home to the Sinaloa Cartel.  In December 2007, senior compliance officials at HSBC Group discovered what they described as a "massive money-laundering scheme" involving over $100 million in USDs in multiple branches in Sinaloa state. They further discovered that HSBC Mexico managers and employees in the Sinaloa branches

executed the money laundering scheme in complicity with people associated with the Sinaloa

Cartel.  Despite this knowledge, HSBC Mexico branches continued to accept USD deposits in

Sinaloa state.  From 2006 to 2008, HSBC Mexico accepted over $1.1 billion in physical USDs in

the Sinaloa state branches, most of which it then exported to HSBC US.

179.    At around the same time that HSBC discovered that its employees were complicit

in a "massive money-laundering scheme," Mexican regulators also informed HSBC Mexico of

similar concerns about HSBC Mexico's complicity in laundering USD cash for drug cartels.  In

November 2007, Banco de México, the central bank of Mexico, expressed concerns about the

volume of USD cash exported by HSBC Mexico into the United States.  Specifically, Banco de

México wanted an explanation as to why HSBC Mexico's USD exports were significantly larger

than its market shares would suggest.

180.    Then, on February 18, 2008, in a meeting between HSBC Mexico's CEO and the

heads of CNBV and FIU, the authorities again raised concerns about the volume of HSBC

Mexico's dollar exports.  The authorities told the CEO that they had serious concerns that the

USDs being deposited at HSBC Mexico were far greater than what HSBC's market share suggested

and represented illicit proceeds.  They told the CEO that Mexican authorities possessed a

recording of a Mexican drug lord saying that HSBC was the place to launder money.  They also

identified "suspicious internal activity" suggesting that HSBC Mexico employees were complicit in

money laundering operations at HSBC Mexico.  They further told the CEO that in the majority of

the relevant money laundering cases they had investigated in 2007, many transactions were carried

out at HSBC, and that the authorities had detected money laundering transactions that HSBC

Mexico failed to report.  They also informed the CEO of several instances where they were able to

locate documents that HSBC Mexico claimed did not exist, which, they said, "impl[ied] criminal responsibility of HSBC and its personnel."

181.    That same day, HSBC Mexico's CEO reported the concerns raised to the HSBC Group's CEO, including his assessment that the head of compliance at HSBC Mexico had "misled" them about remedial actions and communications with CNBV.  An internal investigation following the meeting with CNBV revealed that a very small number of customers accounted for a very large percentage of the physical USD deposits.  The investigation revealed that in January 2008, only 312 customers accounted for approximately 32 percent of the total cash deposits.  Despite these dire warnings and red flags, HSBC Mexico continued accepting USD cash deposits at all branches.

182.    Shortly after the meeting with CNBV and FIU, HSBC Mexico's then director of money laundering deterrence resigned.  In an exit interview with HSBC Group's head of compliance on February 27, 2008, the director said he was resigning due to fears regarding his own personal civil and criminal litigation exposure and the risk to his physical security.  He said he believed that "it was only a matter of time" before the bank and employees faced criminal sanctions, citing to a number of known money laundering incidents that had occurred at the bank. He said that there were allegations that 60 to 70 percent of the laundered drug proceeds in Mexico went through HSBC Mexico, and he believed this was allowed because senior management had "absolutely no respect for AML controls and the risks to which the Group was exposed and had no intention of applying sensible or appropriate approaches."  He cited a number of examples where business heads failed or refused to close accounts identified to be money laundering accounts, and failed to file suspicious activity reports.  He blamed the failings on what he characterized as "a

culture [of] pursuing profit and targets at all costs," and stated that he had seen no improvement in the standard of controls or types of decisions made.  He also said that the AML department was critically understaffed, working against impossible deadlines and handling an unmanageable amount of suspicious activity alerts.  He concluded that he had seen nothing suggesting that matters could improve.

183.    HSBC Group's head of compliance detailed these statements in a memorandum and, on March 7, 2008, sent them to HSBC Mexico's CEO.  HSBC Mexico nevertheless continued to accept mass quantities of USD cash deposits in all branches.

184.    Four months after the exit interview with the director of money laundering deterrence, on July 30, 2008, a senior compliance official in HSBC Group again warned of the lack of controls and widespread corruption at HSBC Mexico.  He recounted to the global head of compliance at HSBC Group an interview he had with a seasoned sub-director in HSBC Mexico's AML department.  The sub-director had reported that over 1,000 high-risk accounts had recently been identified, and that there was "little or no accountability in high-risk regions for managers who knowingly accept suspect clients." He was "alarmed at the gap between what [HSBC] sa[id] about integrity and proper AML controls, and what is actually happening out in the field, particularly in states close to the US border."  The senior compliance official then warned that the sub-director's "misgivings should of course be treated confidentially.  I don't want my sources fired or killed.  (No exaggeration here – more people are dying in the drug wars in the north of the country than are being killed in Afghanistan or Iraq)."

185.    Despite warnings of corruption at the "highest" level of HSBC Mexico's personal finance department, and warnings that whistleblowers were in danger of being "fired or killed," HSBC Mexico continued to accept USD cash deposits at all branches.

186.     Four months later, on November 27, 2008, a compliance officer at HSBC Mexico reported to HSBC Mexico's head of compliance about widespread money laundering occurring at accounts opened in HSBC branches along the U.S.-Mexico border, including Ciudad Juárez.  The compliance officer reported a recurring pattern where customers were declaring anticipated monthly account activity of $300 USDs, but then depositing millions in USDs in cash per month, usually in branches far from the border.  The compliance officer stated that both the branches that opened the accounts and received the funds were committing "very apparent breaches" of HSBC's policies.  The compliance officer stated that employees were accepting cash deposits far in excess of HSBC Mexico's $100,000 per customer maximum (some deposits approaching $1 million dollars in a single day, packaged in 20 separate bundles) without obtaining authorization from superiors as required.  Indeed, the compliance officer stated that in "my investigation so far, **NOT ONE SINGLE PERSON** ha[d] heard" of this policy.  (Emphasis in original).  The compliance officer further warned that even when money laundering accounts were eventually "closed," they stayed open for months while the money launderers continued to launder millions of dollars through the accounts.  The compliance officer concluded that "[i]t is my opinion that we are not 'Preventing' anything," and that "[w]e are allowing the organised criminals to launder their money …."

187.    That same day, November 27, 2008, the head of compliance at HSBC Group was alerted to CNBV's ongoing concern "that when-ever there is a serious [money-laundering] scheme HSBC seems to be involved."

188.     In all, despite the warnings from regulators in late 2007 and February 2008 that

HSBC was the preferred financial institution for drug cartels to launder money, and despite the

numerous internal warnings throughout 2007 and 2008 of massive money laundering schemes

and employee corruption, HSBC Mexico accepted over $4.1 billion in USD cash deposits in 2008,

notably during the height of the global financial crisis.  This was a record amount for HSBC

Mexico, exceeding by over $1 billion dollars the amount of USD cash deposited and exported in

the four prior years (which was around $3 billion).  This amount more than doubled the amount

of USD cash exports of banks that had much higher market shares than HSBC Mexico.

189.     A substantial portion of the illicit USD cash deposits that occurred at HSBC

Mexico were facilitated by a contrivance known as the "Cayman Islands" accounts.  Mexican law

prohibited most individuals from maintaining USD accounts in Mexico unless they lived near the

U.S.–Mexico border or were a corporation.  Mexican law, however, permitted Mexican citizens to

maintain offshore USD accounts.  Therefore, to circumvent the prohibition against USD accounts

for individuals, HSBC Mexico established "Cayman Islands" accounts.  These "Cayman Islands"

accounts were offshore in name only.  HSBC Mexico had *no* physical presence in the Cayman

Islands; all the services related to these accounts were performed at HSBC Mexico's branches in

Mexico.  No customer ever deposited USD cash in the Cayman Islands; all banking was performed

in Mexico.

190.     These accounts were favored devices through which cartels laundered illicit USD

cash.  In the words of one HSBC Mexico compliance officer, there was a "massive misuse of

[Cayman Islands USD accounts] by organised crime."  One example identified by HSBC Group's

head of compliance in July 2008 involved "significant USD remittances being made by a number

of [HSBC Mexico Cayman Islands] customers to a US company alleged to have been involved in the supply of aircraft to drug cartels." The company was Cabello Air Freight Inc. of Miami, which supplied aircraft to several major drug cartels.

191.    Organized crime was allowed to misuse the "Cayman Islands" accounts because of an inexcusable and gross failure by HSBC Mexico to monitor these accounts, a failure which existed and endured for years. In July 2002, prior to HSBC's acquisition of Bital, an internal HSBC audit revealed that 41 percent of the "Cayman Islands" accounts reviewed lacked full client information, and over 15 percent had no client information at all. Several months later, in November 2002, the failings were again raised when an HSBC compliance official recommended a careful analysis of the "Cayman Islands" accounts, "with particular attention to USD accounts and fund transfers to New York and the Cayman Islands." Despite this recommendation, HSBC did nothing to correct the AML deficiencies in these accounts.

192.    The failings in the "Cayman Islands" accounts continued into 2006, where, in January 2006, an internal audit found the AML controls to be "**Below Standard**." (Emphasis in original). The audit found that over 50 percent of the audited accounts lacked sufficient KYC information, while 15 percent of the audited accounts lacked files altogether. Despite the persistent failings found in the audit, including "weaknesses" in the supervision over account opening process, the audit was closed and nothing was done over the next two-plus years to address the issues. When the audit was discovered by a senior HSBC Group compliance official during a site visit in July 2008, he noted that no one had responded to the audit: "Blank looks all around." He also noted, "Fixing the Cayman accounts will be a struggle. How do you locate clients when there is no file?"

193.    As a result of the ease with which drug cartels could launder money through the "Cayman Islands" accounts, the accounts grew at an explosive rate.  In January 2006, there were only 1,500 "Cayman Islands" accounts.  By September 2008, that number had spiked to over 60,000 accounts for nearly 50,000 customers, with total assets in the accounts approaching $2.1 billion.  At that time, HSBC identified at least 2,248 of these accounts as high risk because of suspicious activity within the accounts and/or negative information regarding the account owners.

194.    Despite the known high risk of money laundering associated with the "Cayman Islands" accounts, HSBC Mexico continued to maintain USD-denominated "Cayman Islands" accounts through 2012.  As of 2012, HSBC Mexico still maintained more than 20,000 "Cayman Islands" USD-denominated accounts with assets over $657 million.

195.    Finally, on February 27, 2013, the Cayman Islands Monetary Authority revoked HSBC Mexico's banking license in the Cayman Islands.  In so doing, the authority found that "the Cayman Islands Branch of [HSBC Mexico] is carrying on business in a manner detrimental to the public interest, the interest of its depositors or of the beneficiaries of any trust or other creditors and that the direction and management of its business has not been conducted in a fit or proper manner."

        *d.*   *HSBC Mexico Continued Doing Business with Known Cartel Money Launderers Even After Accounts Were Ordered or Recommended to Be Closed*

196.    During all relevant times, when suspicious activity was identified, HSBC Mexico repeatedly failed to take action to close the accounts.  Senior business executives at HSBC Mexico repeatedly overruled recommendations from its own AML committees to close accounts evidencing clear and unmistakable signs of money laundering.

197.    Even when HSBC Mexico determined that a relationship should be terminated due to clear and unmistakable signs of money laundering, HSBC Mexico routinely delayed closing the accounts, often for years.  For example, in December 2008, there were 675 accounts pending closure based on suspicion that they were used for money laundering activity.  Closure had been ordered on 16 of those accounts in 2005, 130 in 2006, 172 in 2007, and 309 in 2008.  All 675 of these accounts remained open into at least 2009.  Drug cartels, including the Sinaloa, Juárez, and Los Zetas Cartels, laundered a substantial number of illicit proceeds through these accounts for the years that they remained open after closure had been ordered.

198.    The accounts that HSBC Mexico refused to close belonged to some of the most notorious drug traffickers and money launderers in recent history.  One such individual was Zhenly Ye Gon, a dual Chinese-Mexican citizen who, through a network of Mexican companies, illegally imported into Mexico hundreds of thousands of pounds of illicit pseudoephedrine derivatives, and manufactured mass quantities (at least 600 kilograms a day) of pseudoephedrine—the precursor to methamphetamine—for major cartels, including the Sinaloa Cartel.  In March 2007, Mexican federal authorities exercised a search warrant at Ye Gon's residence and seized $205 million in USD cash and additional currencies valued at $2 million in USDs—the largest cash seizure in history.  Additionally, authorities seized illicit weapons, including a fully automatic AK-47 assault rifle, and 12 plastic bags of pseudoephedrine.

199.    Ye Gon and his companies were long time clients of HSBC Mexico, and Ye Gon used HSBC Mexico to launder at least tens of millions of dollars of illicit drug trafficking proceeds.  HSBC Mexico was fully aware of Ye Gon's money laundering activities but did nothing to stop the money laundering or report the activity to authorities as required by policy and law.

200.    For example, in August 2005, nearly two years prior to authorities seizing $207

million in cash from Ye Gon's residence, the AML function at HSBC Mexico detected unusual

and suspicious activity in the accounts of Ye Gon and his companies.  The AML department

recommended that the accounts be closed and the suspicious activity be immediately reported to

the authorities.  The AML department also noted that it was unusual that all of Ye Gon's

accounts, including his corporate accounts, were opened and managed by the personal finance

division of HSBC Mexico.  But despite the irregularities and the recommendation from the AML

department, a senior executive in the personal finance division at HSBC Mexico refused to

authorize the account closure and ordered the AML department to abstain from reporting the

suspicious activity to the authorities.  The senior executive then said that he would undertake to

monitor any future suspicious activity in the accounts, which he did not do.

201.    Nearly two years later, in April 2007, when this senior executive was questioned

about his order to keep the account open and not to report the accounts to authorities, the senior

executive claimed he had been lied to by his support staff about, among other things, their due

diligence with respect to the suspicious accounts.  An internal investigation revealed that the

support staff had fabricated KYC information, including reports of visits purportedly made to Ye

Gon's illicit enterprises.  It was also discovered that these same employees had made large "intra-

staff" loans to each other under unusual circumstances, in violation of HSBC policy.

202.    Another high profile known money launderer with whom HSBC continued to do

business was Casa de Cambio Puebla S.A. de C.V ("Puebla").  Puebla was a longtime money-

laundering front for drug cartels, including the Sinaloa, Juárez, and Los Zetas Cartels.  In May

2007, U.S. authorities executed a search warrant freezing or seizing all of Puebla's funds held in

accounts <u>at another bank</u> in Miami, Florida and London, England.  Puebla, its owner, and several others associated with the enterprise were indicted in U.S. federal court and have since pled guilty to laundering money for drug cartels.  A substantial amount of the money that Puebla admitted to laundering for drug cartels went to the purchase of aircraft used for, among other things, the transportation of thousands of pounds of cocaine.  Ye Gon and his companies were also longtime customers of Puebla, using Puebla to launder at least tens of millions of dollars of illicit proceeds.

203.    Puebla was a longtime customer of HSBC Mexico.  Puebla laundered millions of dollars of cartel proceeds at HSBC Mexico.  Much of this money was laundered through wires directly from or to HSBC Mexico into the very accounts that were frozen or seized by federal authorities.

204.    HSBC Mexico knowingly allowed Puebla to launder drug cartel proceeds, even after its money laundering activities were made public.  In early June 2007, after the seizure of the Puebla assets was made public, the AML function at HSBC Mexico recommended that all accounts related to Puebla be terminated.  That recommendation, however, was summarily overruled by senior HSBC Mexico business executives.  Upon learning that the compliance department had capitulated to the business function, a senior HSBC Group compliance officer expressed his disbelief as follows: "It looks like the business is still retaining unacceptable risks and the AML committee is going along after some initial hemming and hawing.  I am quite concerned that the committee is not functioning property.  Alarmed, even....  What is this, the School of Low Expectations Banking? ...  The AML committee just can't keep rubber-stamping unacceptable risks ....  It needs to take a firmer stand.  It needs some *cojones*.  We have seen this movie before, and it ends badly."  (Emphasis in original).

205.     In July 2007, HSBC Mexico's CEO finally overruled senior business executives and ordered that all accounts related to Puebla be closed.  This order, however, was ignored.  HSBC Mexico continued to allow Puebla—a known money laundering organization—to launder money through its HSBC Mexico accounts.

206.     In November 2007, five months after the seizure of Puebla's funds were made public and four months after HSBC Mexico's CEO ordered the Puebla accounts closed, HSBC Mexico received a seizure warrant for all Puebla-related accounts.  It wasn't until this seizure warrant was received that HSBC Mexico took any action to freeze or close the Puebla accounts.  In the five-month interim between the time that HSBC Mexico learned that the authorities had seized Puebla accounts at another bank to the time that authorities seized Puebla accounts at HSBC Mexico, HSBC cleared hundreds of wire transactions for Puebla worth millions of dollars, many of which constituted illicit cartel proceeds.

**2.     HSBC US**

207.     Billions of dollars that HSBC Mexico laundered for drug cartels were subsequently laundered through HSBC US.  This resulted from several intentionally-designed deficiencies in its AML controls, which guaranteed that massive amounts of drug proceeds laundered through HSBC US via HSBC Mexico and other Mexican institutions would go undetected.

208.     HSBC US has a long history of AML deficiencies.  In 2003, due to severe AML failings, HSBC US entered into a "supervisory letter" with its then regulators—the Federal Reserve and the New York State Banking Department.  The supervisory letter was a formal supervisory action that required HSBC to revamp its AML program.  Specifically, HSBC US was required to enhance its customer due diligence or KYC profiles and enhance its monitoring of fund transfers for suspicious or unusual activity.  HSBC US operated under this supervisory letter until 2006.

209.     Despite this history of AML failings, HSBC US intentionally implemented several inexplicable deficiencies to blind itself to the massive amounts of money being laundered through HSBC Mexico and other institutions, earning billions in cheap revenue through the process. These acts included (1) failing to obtain or maintain *any* due diligence information or KYC information on its correspondent relationship with HSBC Mexico, (2) failing to monitor imports of bulk USD currency sent from HSBC affiliates, including HSBC Mexico, (3) rating Mexico as a "standard" risk—HSBC US's *lowest* AML risk category—which resulted in at least $670 billion in wire transfers from HSBC Mexico going unmonitored, and (4) willfully failing to provide adequate staffing and other resources to maintain an effective AML program at HSBC US.  These willful failings resulted in billions of dollars of illicit drug cartel proceeds from HSBC Mexico and other Mexican sources being laundered through HSBC US.

a.     <u>HSBC US Failed to Maintain Due Diligence or KYC Information on HSBC Mexico</u>

210.     At all relevant times, HSBC US served as the primary gateway into the U.S. financial system for approximately 80 HSBC affiliates, including HSBC Mexico, which have traditionally accounted for a large portion of HSBC US's USD activities.  In 2009, for example, HSBC affiliates cleared virtually all USD payments through accounts held at HSBC US, representing 63 percent of all USD payments processed by HSBC US.  In 2009, HSBC US processed an average daily amount of $377 billion in USD transactions.

211.     HSBC US provided USD-related services to its affiliates, including HSBC Mexico, through correspondent accounts, which are accounts established to receive deposits from, make payments on behalf of, or handle other financial transactions for foreign financial institutions.  In essence, through correspondent banking, HSBC US facilitated wire transfers and other banking services between its affiliates, including HSBC Mexico, and their clients.  It is through its

83

correspondent accounts with HSBC US that HSBC Mexico cleared USD wire transfers, or cashed

USD checks or money orders, for HSBC Mexico customers.

212.    Correspondent accounts are inherently high risk because the U.S. bank does not

have a direct relationship with the foreign financial institution's customers who, for example,

initiate a wire transfer.  Therefore, the U.S. bank has no due diligence or KYC information on the

foreign institution's customer.

213.    To guard against the risks posed by foreign correspondent accounts, the BSA and

its implementing regulations require U.S. financial institutions to conduct due diligence on all

foreign financial institutions for which they maintain correspondent accounts.  *See* 31 U.S.C. §

5318(i); 31 C.F.R. § 1010.610.  There is no exception for affiliated entities—*i.e.*, foreign

institutions with the same parent company; U.S. banks are required by law to conduct due

diligence on all foreign institutions with which they have a correspondent relationship.

214.    Thus, HSBC US was required by law to conduct due diligence on HSBC Mexico.

But from 2002 to 2010, HSBC conducted no due diligence on HSBC Mexico.  Instead, pursuant

to an HSBC Group policy, HSBC US assumed that HSBC Mexico met HSBC Group's AML

standards (which it did not) and was low risk (which it was not), and thus did no due diligence

prior to opening and maintaining the correspondent accounts.  Therefore, at no time did HSBC

US independently assess the riskiness of HSBC Mexico's customer base or business operations,

nor did it receive or review any of the countless audit or other reports warning of the systemic

AML failings at HSBC Mexico, including, among other things, the facts that HSBC employees

were involved in "massive money laundering schemes," manufacturing KYC information, failing to

report suspicious activity, and continuing to do business with known money launderers long after accounts were ordered closed.

215.    As a result of its willful blindness, HSBC US, in violation of law, processed billions of dollars of USD wire and other transactions for drug cartels, including the Sinaloa, Juárez, Los Zetas, and Norte del Valle Cartels.

### b.   *HSBC US Failed to Monitor USD Bulk Cash Exports from HSBC Mexico*

216.    During all relevant times, HSBC US operated a bulk currency business called "Banknotes," which involved the wholesale buying and selling of physical currencies throughout the world.  The business was based in New York and had operation centers throughout the world. Banknotes was the largest volume trader of physical currency in the world, controlling approximately 60 percent of the global market.  Banknotes customers included central banks, international financial institutions, and money services businesses such as casas de cambio.  These customers would sell to HSBC US their customers' physical currency they did not need on hand, and HSBC US would in turn sell other customers physical currency to be used in their daily operations.

217.    At all relevant times, HSBC US's largest volume currency in its Banknotes business was the USD.  The USDs that HSBC US purchased were transported by HSBC US into the United States and deposited with the Federal Reserve.  HSBC US earned substantial revenues from commissions earned in trading, transporting, and storing physical USDs.

218.    Banknotes was, at all relevant times, a high-risk business because of, among other things, the high risk of money laundering associated with USDs in Mexico and other high risk countries, and the high risk that the laundered physical USDs would then be repatriated back into the United States.

219.    HSBC US was well aware of the risks associated with its Banknotes business and its purchase of physical currency from Mexico. From 2000 to present, multiple federal publications and advisories from multiple agencies, including the U.S. Treasury and State Departments, have warned of the risks of illicit bulk cash being smuggled to Mexico, laundered, and then repatriated back into the United States. For example, the April 2006 FinCEN advisory, described in ¶ 141 above, was circulated to all Banknotes personnel involved with Mexico and those responsible for AML compliance in HSBC US.

220.    Prior to July 2006, HSBC US performed regular AML monitoring of Banknotes transactions. But in July 2006, several weeks after the April 2006 FinCEN advisory was distributed at HSBC US, HSBC US inexplicably stopped regular monthly monitoring of Banknotes transactions with all HSBC affiliates, including HSBC Mexico. HSBC US's deliberate failure to monitor Banknotes transactions continued until at least July 2009. As a result, from July 2006 to at least July 2009, HSBC US intentionally blinded itself to the massive amounts of USDs being repatriated from HSBC Mexico, and it failed to monitor or report discrepancies and suspicious activity of HSBC Mexico's sale of bulk USDs to HSBC US.

221.    At the time HSBC US decided to stop monitoring HSBC Mexico's bulk currency, HSBC Mexico's annual export volume to HSBC US was in the billions of dollars and growing. For example, from July 2006 to December 2008, Banknotes purchased over $9.4 billion in physical USDs from HSBC Mexico, including over $4.1 billion in 2008 alone. These quantities made HSBC Mexico the single largest supplier of USDs to HSBC US, far outstripping volumes being supplied by larger Mexican banks and other HSBC affiliates. These bulk cash receipts from HSBC Mexico exceeded the reasonably expected volumes of legitimate USDs within Mexico for

tourism, foreign business, and other legitimate purposes, and represented billions of dollars of

illicit proceeds.  HSBC US deliberately failed to monitor, detect, or report this fact to regulators as

required by law.

222.    In July 2009, federal regulators, concerned at the amount of bulk cash being

shipped from Mexico, commenced an examination of HSBC US's Banknotes business.  At that

time, HSBC US officials told the U.S. Office of the Comptroller of the Currency ("OCC") that

HSBC US conducted AML monitoring on a monthly basis, examined Banknotes transactions by

customer, and inquired when significant changes in the volume of USD sales took place.

223.    This representation, however, was false.  When the OCC conducted tests on the

2009 HBSC US Banknotes data, it found that HSBC US was unaware of significant increases in

volume of USDs being purchased from Mexico, and that there was no evidence that HSBC US

monitored its Banknotes transactions with Mexico.  "For example," the OCC wrote, "even though

transactions volumes for customers in Mexico increased significantly from the first 6 months of

2008, over the first 6 months of 2009, there was no documentation in the files that the bank

noted the change or took any action."  The OCC noted that although HSBC US employees

"assured us that adequate monitoring takes place within the business line and Compliance," they

"were unable to find anything in the files that this was the case."  HSBC US employees claimed

that they deliberately chose not to document their actions because, according to bank officials,

"too much documentation results in increased legal risk."

224.    When the U.S. Permanent Subcommittee on Investigations asked HSBC officials

to explain who ordered HSBC US to stop monitoring Banknotes transactions with affiliates and

why, no one could.  HSBC Group's head of compliance called the decision "inexplicable."  The

OCC, however, told the subcommittee that HSBC US's monitoring of its Banknotes ceased when HSBC US's supervisory agreement with its regulators expired in 2006, and did not resume until after the OCC began investigating HSBC's Banknotes operations in July 2009.  In other words, as soon as federal regulators relaxed their oversight of HSBC US, HSBC US stopped monitoring its lucrative and high-risk Banknotes business.

225.    As a result of HSBC US's intentional and inexplicable failure to monitor the illicit USDs that HSBC Mexico sold to HSBC US, billions of dollars of cartel proceeds, including proceeds related to the Sinaloa, Juárez, and Los Zetas Cartels, were repatriated back into the United States.

c.    _HSBC US Rated Mexico as Low Risk, Causing $670 Billion in Wire Transactions in HSBC Mexico to Go Unmonitored_

226.    An important component of any AML program is an automated system designed to monitor wire transactions and detect suspicious activity.  At all relevant times, HSBC US had such an automated system, which detected suspicious transactions based on parameters that the bank set.  Transactions that met the thresholds for review and the parameters for suspicious activity were flagged for additional review by HSBC US's AML department.  These flagged transactions were known as "alerts."

227.    One of the threshold parameters for review in HSBC US's monitoring was a customer risk category based primarily on the country in which the customer was located.  Each country had one of four risk categories based on the perceived money laundering risk of doing business in that country.  From lowest to highest risk, the categories were: standard, medium, cautionary, and high.

228.    From at least 2006 to at least 2009, HSBC knowingly set the thresholds in its monitoring system so that wire transfers by customers located in countries categorized in the lower risk categories of standard or medium risk, including foreign financial institutions with correspondent accounts, were not subject to automated monitoring unless the customers were also classified as high risk.  Conversely, wire transfers by customers located in countries categorized as cautionary or high risk would be subject to automatic monitoring.

229.    As a country presenting one of the highest money laundering risks in the world, HSBC US should have given Mexico its highest risk grade.  HSBC US executives and officers were well aware of the money laundering risks inherent to Mexican financial institutions.  The risks were repeatedly identified amongst senior compliance officers at HSBC US and HSBC Group.  Additionally, from at least 2000 onward, these risks were described in the numerous publicly available reports issued by the U.S. State Department and FinCEN described above in ¶¶ 140-141, as well as the various federal money laundering investigations involving Mexico and several casas de cambio, including Puebla, which had accounts at HSBC US.  All of these advisories or events were known to numerous HSBC AML officers and business executives at or near the time they occurred.

230.    Despite these clear warnings of money laundering risks in Mexico, from at least 2006 to 2009, HSBC knowingly rated Mexico—a country with one of the highest money laundering risks in the world—as standard risk, its *lowest* risk grade.  As a result, wire transfers originating from Mexico, including transactions from HSBC Mexico, were generally not reviewed in HSBC US's monitoring system.  From 2006 until May 2009, over 316,000 transactions worth over $670 billion from HSBC Mexico *alone* were excluded from HSBC US's monitoring system.

231.    As a result of HSBC US's intentional failure to monitor over $670 billion in wire transactions from HSBC Mexico alone, HSBC US wired and helped launder billions of dollars of illicit proceeds tied to drug cartels, including the Sinaloa, Juárez, Los Zetas, and Norte del Valle Cartels.

> d.    _HSBC Intentionally Failed to Provide Adequate AML Staffing and Resources_

232.    From at least 2006 through at least 2010, HSBC US operated with criminally inadequate AML staffing and resources.

233.    Despite a history of AML deficiencies and high risk business lines, from 2006 to at least 2010, HSBC significantly reduced the resources available to its AML program in order to cut costs and increase its profits.

234.    From 2006 to at least 2009, HSBC US's entire compliance department had fewer than 200 full time employees, and its AML department was only a subset of that.  During this time, HSBC US had fewer AML employees than required by its own internal plans.

235.    Further, beginning in 2006, senior HSBC US business executives instructed the AML department to "freeze" staffing levels as part of a bank-wide initiative to cut costs and increase the bank's return on equity.  HSBC US accomplished this goal by refusing to replace departing employees, combining the functions of multiple positions into one, and refusing to create new positions.  From 2006 through at least 2010, HSBC US AML officers repeatedly warned senior executives that HSBC US had inadequate compliance resources, particularly in the division responsible for maintaining correspondent relationships with foreign financial institutions including HSBC Mexico, and faced a mounting backlog of suspicious activity alerts that could not be properly reviewed without additional resources.  Their requests to increase staff, however, were repeatedly denied.

236.    Not only were staff requests denied, AML officials who objected to lack of resources were fired.  For example, on October 24, 2007, HSBC US's top AML director attended a meeting with the audit committee of the board of directors of HSBC North America.  At that meeting, the AML director raised concerns that HSBC US was unwilling to pay necessary staff related to critical AML functions and also raised concerns about severe AML deficiencies.  After the meeting, the AML director was reprimanded by her superior for causing "inappropriate concern" with the audit committee of the board of directors and that "it may not be possible to restore ... any confidence in her."  A month later, after nearly eight years of service as the AML director, HSBC US terminated her.

237.    When senior compliance officers left HSBC US, they were not replaced.  For example, after HSBC US's AML director was terminated in 2007, her position was not filled. Instead, HSBC US's head of compliance assumed her duties while maintaining all of her other responsibilities.  The head of compliance had no professional experience with U.S. AML laws and was criticized by the Federal Reserve in 2008 and 2009 for lacking the technical knowledge and experience necessary to serve as HSBC US's AML director.  Despite these criticisms, HSBC US allowed the head of compliance to continue to serve as the AML Director.

238.    Additionally, in 2007 HSBC North America's regional compliance officer, who oversaw compliance and AML at HSBC US, left and was also not replaced.  Instead, over the repeated objections of HSBC Group's head of compliance, HSBC North America's general counsel assumed the role of the top North American compliance officer, in addition to all her other duties as general counsel.  HSBC Group has admitted to authorities that the reason it consolidated the role of North American regional compliance officer and general counsel was to

save costs.  In 2009, the Federal Reserve criticized the consolidation of the roles of general counsel and regional compliance officer, noting that the regional compliance officer/general counsel had a poor understanding of AML risk, and relied heavily on HSBC US's compliance/AML director, who had an equally poor understanding of AML risk.  Despite this criticism, HSBC allowed the regional compliance officer/general counsel to continue in her role.

239.    HSBC's constraints on AML staff and resources at HSBC US allowed a significant amount of illicit activity to go undetected at HSBC US.  This fact was raised to senior executives at HSBC.  For example, in March 2008, a senior compliance officer at HSBC US conducted an internal review of the bank's AML program.  The review, which was presented to senior business executives and compliance officials, found that the AML program in the division responsible for maintaining correspondent relationships with foreign financial institutions, including HSBC Mexico, was "behind the times" and needed to be fundamentally changed to meet regulators' expectations and to achieve parity with other banks.  Specifically, the review noted that AML monitoring in the division was significantly under-resourced.  At the time, only 4 employees reviewed the 13,000 to 15,000 suspicious wire alerts generated per month.

240.    Despite the findings in the March 2008 AML review, HSBC US failed to address the lack of AML resources.  In April 2008, an AML employee told a senior executive in compliance that HSBC US's compliance department "was in the midst of a staffing crisis."  During this time, a number of AML employees noted that requests for additional resources were discouraged, and, ultimately, these employees stopped making staffing requests.  By October 2009, a senior executive in compliance remarked, "AML has gone down the hole in the past 18 months."

241.    These AML deficiencies continued into 2010 and beyond.  As a result of these deficiencies, HSBC knowingly failed to detect or address the money laundering activity originating through HSBC Mexico and other sources and being funneled through HSBC US.

**3.    HSBC Group**

242.    At all times, HSBC Group actively managed and controlled both HSBC Mexico and HSBC US, knew of the massive money laundering that occurred through HSBC Mexico's correspondent banking relationship with HSBC US, and affirmatively took steps to facilitate such money laundering over the course of multiple years.

243.    HSBC Group actively managed both HSBC Mexico and HSBC US.  HSBC Group's senior-most leadership at HSBC Group are known as Directors, Group Managing Directors, and Group General Managers.  These core individuals are responsible for managing HSBC Group's global operations.  At all relevant times these senior HSBC Group leaders were also senior leaders for HSBC US and HSBC Mexico.  For example, in 2008, the year that HSBC US acquired an unprecedented $4.1 billion in USD cash from HSBC Mexico, the management overlap included:

- P J Lawrence, a Group General Manager who was also the CEO of HSBC US;

- L J Pena-Kegel, a Group General Manager who was also the CEO of HSBC Mexico;

- Michael Geoghegan, CEO of HSBC Group and Chairman of the Group Management Board, who was also, among other things, Chairman of HSBC US and Chairman of HSBC Latin America Holdings (UK) Limited, the immediate parent of HSBC Mexico; and

- E Alonso, a Group Managing Director, who was also Chairman of HSBC Mexico.

244.    As described above, at all relevant times, HSBC US served an essential function in HSBC Group's global operations.  Specifically, HSBC US, through its correspondent relationships with approximately 80 HSBC affiliates, served as the primary gateway into the U.S. financial system for HSBC's global clients.  Indeed, according to the PSI Report, a senior HSBC executive admitted "that HSBC acquired its U.S. affiliate, not just to compete with other U.S. banks for U.S. clients, but primarily to provide a U.S. platform to its non-U.S. clients as a selling point to attract still more non-U.S. clients."

245.    At all relevant times, senior executives at HSBC Group—including its CEO and global heads of compliance, auditing, and legal—knew that HSBC Mexico's correspondent banking relationship with HSBC US was abused to launder massive amounts of USD into the United States and elsewhere.  As described above, HSBC Group conducted multiple audits of HSBC Mexico's AML compliance functions, and routinely interfaced (including extended in-person meetings and reviews) with HSBC Mexico's senior leadership about the money laundering problems.  *See, e.g., supra,* ¶¶ 164-66, 170, 172, 178, 180-82, 184, 187, and 204.   Through these activities, HSBC Group's senior leadership discovered and assessed the uncontrollable and egregious instances of AML violations and money laundering that occurred.  *Id.*

246.    Despite knowing of this money laundering activity, HSBC Group set the very unlawful AML policies at HSBC US that gave the money launderers uninhibited access to the United States financial system.  For example, HSBC Group set the illegal policy at HSBC US that exempted HSBC Mexico from HSBC US's due diligence procedures, which, had they been followed, would have exposed HSBC Mexico's systemic lack of controls, culture of recklessness, and extreme money laundering threat.  HSBC Group further set the policy at HSBC US that

allowed a customer's risk level (in this case HSBC Mexico's) to be determined solely on the risk rating of the country.  This policy, which the OCC called "unacceptable," had the effect of allowing over $670 billion in wire transactions from HSBC Mexico to go unmonitored based on HSBC US's improper designation of Mexico as a low risk country, a fact of which HSBC Group was aware.  Both of these policies were necessary components in allowing the very failings for which HSBC admitted criminal liability, including the laundering of at least $881 million in drug cartel proceeds from Mexico into the United States.

247.    Despite knowing that HSBC Mexico used its correspondent relationship with HSBC US to launder money through USD accounts, senior HSBC Group executives—including the CEO and the heads of compliance, auditing, and legal—failed to contact their counterparts at HSBC US to explain the problem or the potential impact on HSBC US's business.  Indeed, from 2002 to 2010, senior HSBC Group executives had multiple, multi-hour meetings with senior executives from HSBC US and HSBC North America, including HSBC North America's CEO, where global issues were discussed, but the AML problems at HSBC Mexico and their potential effect on HSBC US were not addressed.  Indeed, when HSBC North America's general counsel/regional compliance director learned from federal officials in 2009 that mass quantities of drug cartel proceeds were being laundered from HSBC Mexico into the United States, she asked why she had not been informed earlier.  HSBC Group's global head of compliance responded that HSBC Group does not "air the dirty linen of one affiliate with another."

248.    At all relevant times, HSBC Group had the power to stop the known abuse of HSBC Mexico's correspondent relationship with HSBC US, but allowed it to continue.  HSBC Group set the global AML policies controlling both HSBC US and Mexico, and had the power to

enhance them to ensure they were adequate and effective, but did not.  HSBC Group had the

power to require HSBC US to conduct due diligence on HSBC Mexico, but did not.  It also had

the power to require HSBC US to monitor the over $670 billion in wire transactions from HSBC

Mexico for suspicious activity, but did not.  It further had the power to correct specific AML

deficiencies that HSBC Group's auditing function discovered through its audits, but, again, did

not.  Instead, HSBC Group designed a system guaranteed to allow drug cartels virtually unfettered

access to the United States financial system through HSBC Mexico's correspondent relationship

with HSBC US, and, despite the knowledge of widespread abuse, allowed it to continue.

249.    As a result of HSBC Group's conduct, billions of dollars of drug cartel proceeds

were laundered into the United States.

### 4.    HSBC Admits Criminal Liability

250.    As a result of the above-described failings, HSBC Group and HSBC US were

investigated by several agencies, including the U.S. Department of Justice.

251.    On October 6, 2010, the OCC issued a Consent Order against HSBC US,

ordering HSBC to make dramatic changes to its AML program.  The OCC found that HSBC US's

"compliance program and its implementation are ineffective, and accompanied by aggravating

factors, such as highly suspicious activity creating a significant potential for unreported money

laundering or terrorist financing."  HSBC US's "critical deficiencies" included its (1) failure to

conduct due diligence on HSBC Mexico and other affiliates, (2) failure to monitor bulk cash

transactions with affiliates, including HSBC Mexico, (3) failure to monitor wire transactions

initiated by customers domiciled in countries it designated as standard or medium risk (which

included HSBC Mexico), (4) failure to maintain an AML staff adequate to handle the review of

suspicious activity alerts, and (5) failure to appropriately designate customers as "high-risk."

252.     Following the OCC report, the Department of Justice opened a grand jury investigation into HSBC's conduct.  On December 11, 2012, HSBC Group and HSBC US entered into a Deferred Prosecution Agreement ("DPA") with the United States, in which HSBC admitted that, among other violations, HSBC US willfully failed to establish and maintain an effective AML program in violation of 31 U.S.C. § 5318(h)(1), and that it willfully failed to establish any due diligence on foreign correspondent accounts—*i.e.*, HSBC Mexico—in violation of 31 U.S.C. § 5318(i)(1).

253.     In a statement of facts accompanying the DPA, HSBC admitted:

From 2006 to 2010, [HSBC US] violated the BSA and its implementing regulations.  Specifically, [HSBC US] ignored the money laundering risks associated with doing business with certain Mexican customers and failed to implement a BSA/AML program that was adequate to monitor suspicious transactions from Mexico.  At the same time, [HSBC Mexico Group], one of [HSBC US's] largest Mexican customers, had its own significant AML problems.  As a result of these concurrent AML failures, at least $881 million in drug trafficking proceeds, including proceeds of drug trafficking by the Sinaloa Cartel in Mexico and the Norte del Valle Cartel in Colombia, were laundered through [HSBC US] without being detected.  HSBC Group was aware of the significant AML problems at [HSBC Mexico Group], yet did not inform [HSBC US] of these problems and their potential impact on [HSBC US's] AML program.

254.    With respect to HSBC Mexico, HSBC admitted:

- Due to the lack of controls at HSBC Mexico, HSBC Mexico was the preferred financial institution for drug cartels and money launderers;

- Drug traffickers deposited hundreds of thousands of dollars in bulk U.S. currency each day into HSBC Mexico, often in numerous specially shaped boxes that fit the precise dimensions of the teller windows, and that the money was subsequently wired to accounts throughout the United States;

- HSBC employees and managers executed a "massive money-laundering scheme" at multiple branches in Sinaloa state;

- Despite repeated warnings from authorities that drug proceeds were being laundered through HSBC Mexico in USD accounts and that HSBC was, according to one drug lord, "the place to launder money," HSBC Mexico continued to accepted billions of USD deposits each year, which it then exported to HSBC US;

- HSBC Mexico systematically failed to conduct adequate and required KYC diligence, particularly for the "Cayman Islands" USD-denominated accounts, which proliferated and were "massive[ly] misuse[d] ... by organized crime"; and

- HSBC Mexico knowingly maintained hundreds of active accounts for suspected money launderers for several years after those accounts had been ordered to be closed.

255.    HSBC further admitted that illicit proceeds laundered in HSBC Mexico were subsequently moved through HSBC US because of at least four willful AML failures.  These AML failures included:

- HSBC US's failure, despite known risks, to conduct any due diligence on HSBC Mexico, for which it maintained a correspondent account, and thus its failure to identify, detect, or guard against HSBC Mexico's significant AML deficiencies;

- HSBC US giving Mexico its *lowest* risk rating, thus causing, by intentional design under its monitoring system, over $670 billion in wire transfers from HSBC Mexico to go unmonitored;

- HSBC US's sudden and unexplained failure to routinely and adequately monitor its affiliates' USD cash purchases, including over $9.4 billion in USD purchases from HSBC Mexico, causing discrepancies and suspicious activity to go undetected and unreported; and

- HSBC US's willfully failure to provide adequate staffing and resources to maintain an effective AML program.

256.     With respect to HSBC Group, HSBC admitted that despite knowing and appreciating the severe AML risks in HSBC Mexico, HSBC Group failed to warn HSBC US of the risks and the implications those risks had on HSBC US's business and AML program.

257.     HSBC admitted that at least $881 million of illicit proceeds of drug cartels were laundered through HSBC Mexico and into HSBC US as a result of its AML failures.  This amount also included drug proceeds laundered through the BMPE.  Although not explicitly stated in the DPA, the proceeds that were laundered through the BMPE represented the proceeds of cocaine trafficked by the Mexican drug cartels, including the Sinaloa, Juárez, and Los Zetas Cartels, and, as described in ¶¶ 127-131 above, was the means by which the Mexican drug cartels paid the Colombians for that cocaine.

258.    HSBC admitted that these and other facts were true and accurate; that HSBC is responsible for the acts of its officers, directors, employees, and agents; and that if the matter were to proceed to trial, the Department of Justice would be able to prove beyond a reasonable doubt, with admissible evidence, the facts stated in the factual statement accompanying the DPA.

259.    In addition to laundering money for drug cartels, HSBC also admitted that it willfully moved, or permitted to be moved, hundreds of millions of dollars illegally through the U.S. financial system on behalf of banks located in Cuba, Iran, Libya, Sudan, and Burma, and persons listed as parties or jurisdictions sanctioned by the Office of Foreign Assets Control of the U.S. Department of Treasury ("OFAC"), in violation of U.S. economic sanctions.  In so doing, HSBC admitted that it, among other things, intentionally disguised and concealed the payment messages on behalf of the sanctioned entities so that wires would be routed through the United States without being held, rejected, or blocked pursuant to U.S. sanctions regulations administered by OFAC.  HSBC further admitted that its conduct, among other things, prevented U.S. banks from filing required BSA and OFAC-related reports with the United States, and caused U.S. financial institutions, including HSBC US, to record false information in their records.

260.    As part of its DPA, HSBC paid $1.9 billion in forfeiture and fines, which represented only a small fraction of its $13.5 billion in profits for fiscal year 2012.  However, not a single person associated with HSBC was indicted for his or her participation in the longstanding and egregious criminal conduct that occurred at HSBC.

## V.    CLAIMS FOR RELIEF

### COUNT I:  FOR DAMAGES UNDER THE ATA FOR SUPPORTING TERRORISM

### (18 U.S.C. § 2333, 18 U.S.C. § 2339A)

261.    Plaintiffs re-allege the above allegations as if fully set forth herein.

262.     At all relevant times, the Mexican drug cartels, including the Sinaloa, Juárez, and Los Zetas Cartels, were illicit paramilitary organizations that terrorized Mexico and regions of the United States through widespread and horrific acts of violence against Mexican and U.S. nationals, targeting law enforcement, government officials, journalists, and innocent civilians, including women and children.  This gruesome violence appears to be intended to (1) intimidate or coerce the civilian populations of Mexico and the United States, (2) influence the policy of the Mexican and U.S. governments by intimidation or coercion, or (3) affect the conduct of the Mexican and U.S. governments by mass destruction, assassination, or kidnapping.

263.     At all relevant times, HSBC was aware of the widespread acts of terrorism committed by the Mexican drug cartels against both Mexican and U.S. nationals.  The horrific scope and methods of Mexican drug cartel violence has been documented in numerous public reports and notices, many of which were disseminated to HSBC's employees.  Indeed, senior compliance and AML officials of HSBC commented internally about the widespread drug cartel violence in Mexico and the fear it instilled in the public.

264.     At all relevant times, HSBC provided material support and resources to the Mexican drug cartels, including the Sinaloa, Juárez, and Los Zetas Cartels, and their acts of terrorism by providing critical financial services needed by the cartels to launder their illicit proceeds and obtain access to the international financial system.  Specifically, HSBC, among other things, systematically and over an extended period of time accepted for deposit billions of dollars in currency, travelers' checks, and other monetary instruments from cartel money launderers, and provided other critical banking services for them, including processing billions of dollars of wire transactions.  These services were critical in helping the drug cartels create a façade of legitimacy

through which they could establish, grow, and continue their illicit enterprises, including their global criminal infrastructure, their deep-seated system of corruption throughout Mexico and beyond, and their paramilitary forces through which they execute widespread acts of terrorism against law enforcement, media outlets, and the public, including the Victims in this case.

265.     HSBC further aided the Mexican cartels by providing the financial network for a trade-based money laundering system (the BMPE) that allowed the Mexican cartels to efficiently and safely pay Colombian cocaine producers, including the Norte del Valle Cartel, for the cocaine the Mexican cartels trafficked into the United States.  Indeed, because the Mexican drug cartels were inextricably intertwined with Colombian cocaine producers as their exclusive traffickers of cocaine into the United States, any money laundering services that HSBC provided to the Colombian cartels necessarily materially supported the Mexican cartels.

266.     HSBC's financial services were also critical in concealing the nature and source of the Mexican cartels' illicit proceeds, thus preventing them from detection and seizure by law enforcement.

267.     At all relevant times, HSBC knew or was willfully blind to the fact that it provided substantial and systematic material support, including financial services, to the Mexican drug cartels.  As alleged above, despite repeated warnings from law enforcement, regulators, and other government agencies about the money laundering risks associated with their Mexican business lines, HSBC willfully designed criminally inadequate AML processes, procedures, and controls, guaranteeing that its AML function would not detect, report, or prevent the laundering of illicit funds through its banks.  Under this criminally deficient AML regime, bank employees were allowed to open and maintain high risk accounts without monitoring the account or obtaining

appropriate, or sometimes any, KYC information.  Indeed, in many cases, employees manufactured and fabricated KYC information for accounts.  Bank employees further accepted large deposits of USD cash, sequentially numbered traveler's checks, and other instruments under circumstances that revealed unmistakable signs of money laundering.  These unmistakable signs included numerous large cash deposits made by individuals who, with no known source of income, pushed bundles of cash through teller windows in boxes designed to fit the precise dimensions of the windows.  In several cases, employees accepted bribe payments from cartel money launderers and helped the cartels execute massive money laundering schemes.  Further, in many cases, even when the AML function identified money laundering accounts and ordered them to be closed, HSBC kept the accounts active for years thereafter, knowing or suspecting that drug cartels were using them to launder money.

268.    By knowingly providing financial services to the Mexican drug cartels and laundering billions of dollars of their illicit proceeds, HSBC violated 18 U.S.C. § 2339A, entitled "Providing material support to terrorists."  Section 2339A forbids persons from providing material support or resources, or concealing or disguising the nature, location, source, or ownership of material support or resources, knowing or intending that the support or resources are to be used in preparation for, or in carrying out, a violation of any of a number of predicate criminal statutes, many of which Mexican cartels routinely violate.  The predicate crimes include:

- Murder of a U.S. national while the national is outside the United States (18 U.S.C. § 2332);

- Torture of a U.S. citizen outside of the United States (18 U.S.C. § 2340A);

- Killing, kidnapping, maiming, or assaulting with a deadly weapon persons in the United States under circumstances involving conduct transcending national boundaries (18 U.S.C. § 2332b);

- Murder or attempted murder of an agent or employee of the United States while such agent or employee is engaged in or on account of the performance of official duties (18 U.S.C. § 1114);

- Seizing, detaining, or threatening to kill or injure U.S. citizens outside of the United States in order to compel a third party or a government from doing or abstaining from doing any act as an express or implicit condition for the release of the person detained (18 U.S.C. § 1203); and

- Conspiring within the United States to torture, kidnap, kill, or maim persons outside the United States (18 U.S.C. § 956).

269.    By providing financial services to the Mexican drug cartels and laundering billions of dollars of their illicit proceeds, HSBC provided material support and resources to the cartels and concealed the nature, location, source, and ownership of the drug cartels' material support and resources, knowing that such support and resources would be used to violate the predicate statutes under section 2339A, including murdering, kidnapping, and torturing U.S. citizens outside the United States.

270.    HSBC's systematic support provided to the Mexican drug cartels in violation of section 2339A was also, in itself, an act of international terrorism under the ATA.  Providing or concealing material support or resources for known Mexican paramilitary organizations that routinely commit horrific acts of violence against government officials, law enforcement,

journalists, and the general public in violation of sections 2339A: (1) involves acts dangerous to human life in violation of criminal law, (2) occurs primarily outside the United States or transcends national boundaries, and (3) appears to be intended to intimidate and coerce a civilian population, to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination, or kidnapping.

271.    Plaintiffs were injured by reason of acts of international terrorism.  The Victims were injured, kidnapped, or murdered in violation of one or more of the predicate statutes under 18 U.S.C. § 2339A (including 18 U.S.C. §§ 956, 1114, 1203, 2332 and 2340A) by the very Mexican drug cartels for whom HSBC knowingly provided and concealed material support and resources.

272.    HSBC's systematic and prolonged support in providing financial services and laundering billions of dollars of drug proceeds for the Sinaloa, Juárez, Los Zetas and Norte del Valle cartels proximately caused the attacks on the Victims and the injuries to Plaintiffs, including the Victims' estates, survivors, and heirs.

273.    Thus, under the ATA, HSBC is liable to Plaintiffs for the maximum amount of damages authorized under the ATA, 18 U.S.C. § 2333.

WHEREFORE, Plaintiffs respectfully request judgment against all Defendants for the maximum amount allowed under the ATA, 18 U.S.C. § 2333, including reasonable costs and attorneys' fees, and for any other relief the Court deems just and proper.

### COUNT II:  FOR DAMAGES UNDER THE ATA FOR FINANCING TERRORISM

### (18 U.S.C. § 2333, 18 U.S.C. § 2339C)

274.    Plaintiffs re-allege the above allegations as if fully set forth herein.

275.     By knowingly providing financial services to the Mexican drug cartels and

laundering billions of dollars of their illicit proceeds, HSBC further violated 18 U.S.C. § 2339C,

entitled "Prohibitions against the financing of terrorism."  Section 2339C forbids anyone from,

among other things, unlawfully and willfully providing or collecting funds, or attempting or

conspiring to provide or collect funds, with the intent or knowledge that such funds be used, in

full or in part, to carry out any act intended to cause death or serious bodily injury to a civilian, or

to any other person not taking an active part in the hostilities in a situation of armed conflict,

when the purpose of such act, by its nature or context, is to intimidate a population, or to compel

a government or an international organization to do or to abstain from doing any act.  Section

2339C further forbids anyone in the United States, or any U.S. national or U.S. entity outside the

United States, from knowingly concealing or disguising the nature, location, source, ownership, or

control of any material support or resources, or any funds or proceeds of such funds, knowing or

intending that such support, resources, or funds will be used to carry out any terrorist act.

276.     HSBC unlawfully and willfully provided funds to, and collected funds from, the

Mexican drug cartels, knowing that the cartels would use such funds, in full or in part, to carry out

acts intended to cause death or serious bodily injury to civilians, public officials, journalists, and

others, and that the purpose of such acts, by their nature or context, would be to intimidate the

Mexican and U.S. populations, or to compel the Mexican and U.S. governments to, among other

things, abstain from interfering with their illicit and murderous enterprises.  Further, HSBC

knowingly concealed or disguised the nature, location, source, ownership, or control of material

support or resources, or funds or proceeds of such funds, knowing the fact that the cartels would

use the funds to carry out the same types of terrorist acts.

277.     HSBC's money laundering services provided to the Mexican drug cartels in violation of section 2339C were also, in themselves, acts of international terrorism under the ATA.  Providing or collecting funds, or concealing funds, on behalf of known Mexican paramilitary organizations that routinely commit horrific acts of violence against government officials, law enforcement, journalists, and the general public in violation of sections 2339C: (1) involves acts dangerous to human life in violation of criminal law, (2) occurs primarily outside the United States or transcends national boundaries, and (3) appears to be intended to intimidate or coerce a civilian population, to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination, or kidnapping.

278.     Plaintiffs were injured by reason of acts of international terrorism.  The Victims were seriously injured, kidnapped, or murdered by the very Mexican drug cartels for whom HSBC knowingly provided, collected, and concealed funds, and the purpose of the attacks on the Victims were, by their nature or context, to intimidate the Mexican and U.S. populations, or to compel the Mexican and U.S. governments to, among other things, abstain from interfering with their illicit and murderous enterprises.

279.     HSBC's systematic and prolonged support in providing financial services and laundering billions of dollars of drug proceeds for the Sinaloa, Juárez, Los Zetas and Norte del Valle cartels proximately caused the attacks on the Victims and the injuries to Plaintiffs, including the Victims' estates, survivors, and heirs.

280.     Thus, under the ATA, HSBC is liable to Plaintiffs for the maximum amount of damages authorized under the ATA, 18 U.S.C. § 2333.

WHEREFORE, Plaintiffs respectfully request judgment against all Defendants for the maximum amount allowed under the ATA, 18 U.S.C. § 2333, including reasonable costs and attorneys' fees, and for any other relief the Court deems just and proper.

## VI.      DEMAND FOR JURY TRIAL

281.    Plaintiffs demand a jury trial for all claims alleged herein.

Respectfully submitted,

*/s/ Michael Eisenkraft*
Michael B. Eisenkraft
Cohen Milstein Sellers & Toll PLLC
88 Pine Street
14th Floor
New York, NY 10005
(212) 838-7797
(212) 838-7745 (fax)
meisenkraft@cohenmilstein.com

Geoffrey A. Graber
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW
Fifth Floor
Washington DC 20005
(202) 408-4600
(202) 408-4699 (fax)
(*pro hac vice* to be filed)
ggraber@cohenmilstein.com

Richard M. Elias
Greg G. Gutzler
Tamara M. Spicer
ELIAS GUTZLER SPICER LLC
1924 Chouteau Ave., Suite W
St. Louis, MO 63103
(314) 833-6645
(314) 621-7607 (fax)
(*pro hac vices* to be filed)
Relias@egslitigation.com
Ggutzler@egslitigation.com
Tspicer@egslitigation.com

Benigno Trey Martinez
LAW OFFICES OF BENIGNO TREY MARTINEZ
1201 E. Van Buren Street
Brownsville, TX 78520
(956) 546-7159
(956) 544-0602 (fax)
(*pro hac vice* to be filed)
Trey@mblaw.com

E. Michael Rodriguez
ATLAS, HALL, & RODRIGUEZ, LLP
50 W. Morrison Road, Suite A
Brownsville, TX 78520
(956) 574-9333
(956) 574-9337 (fax)
(*pro hac vice* to be filed)
Mrodriguez@atlashall.com

*Attorneys for Plaintiffs*