UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARY M. ZAPATA, et al.,

      Plaintiffs,

    -against-         1:17-cv-06645-NGG-CLP

HSBC HOLDINGS PLC, et al.,

      Defendants.


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE
12(b)(6)**


Date: April 13, 2018

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  FACTS ......................................................................................................................... 2

   A.   THE TERRORISM ATTACKS AT ISSUE.................................................................. 2

   B.   HSBC'S MATERIAL SUPPORT TO THE MEXICAN DRUG CARTELS...................... 4

III. STANDARD OF REVIEW ............................................................................................ 7

IV.  ARGUMENT................................................................................................................. 8

   A.   THE CARTELS ARE TERRORISTS. ................................................................... 10

   B.   THE ATTACKS ON THE PLAINTIFFS WERE ACTS OF INTERNATIONAL TERRORISM. ........... 14

   C.   DEFENDANTS VIOLATED THE MATERIAL SUPPORT STATUTES WITH THE REQUIRED
        SCIENTER................................................................................................... 16

        1.   HSBC Knew It Was Providing Material Support to the Drug Cartels. ................ 17

        2.   HSBC Knew that the Money Laundering Support It Provided Furthered the
             Cartels' Terrorism. .............................................................................. 20

   D.   HSBC'S VIOLATION OF 2339A AND 2339C IS AN ACT OF INTERNATIONAL
        TERRORISM.................................................................................................. 24

   E.   HSBC'S ATA VIOLATION PROXIMATELY CAUSED PLAINTIFFS' INJURIES....................... 27

   F.   PLAINTIFFS HAVE ALLEGED DIRECT CONDUCT AGAINST HSBC GROUP AND GRUPO
        FINANCIERO.................................................................................................. 33

V.   CONCLUSION................................................................................................................ 33

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662  (2009) .................................................................................... 7

*Batalla Vidal v. Nielsen*, --- F. Supp. 3d ---, 2018 WL 1532370 (E.D.N.Y. 2018) ...................... 7

*Boim v. Holy Land Found. for Relief & Dev. (Boim III)*, 549 F.3d 685 (7th Cir. 2008) ....... passim

*Chambers v. Time Warner, Inc.*, 28 F.3d 147  (2d Cir. 2002) ...................................................... 7

*Fields v. Twitter, Inc.,* 881 F. 3d 739 (9th Cir. 2018) .................................................................. 31

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................. 8, 31

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................... passim

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) .......................................... 29

*Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167
   (S.D.N.Y. 2017) ................................................................................................................ 24, 27

*In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018) ........................... passim

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011) ............................................. 7

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ........................................... 16, 24, 25, 26

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................... 14, 20, 21, 22

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287  (E.D.N.Y. 2015) ....................................... passim

*Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85 (D.D.C. 2017) ......................................... 23, 31

*Rothstein v. UBS AG*, 708 F. 3d 82 (2d Cir. 2013) ...................................................... 23, 27, 30

*Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2006 WL 2862704
   (E.D.N.Y. Oct. 5, 2006) ......................................................................................................... 25

*Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199 (E.D.N.Y. 2007) .......................................... 20

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ........................... passim

*United States v. Ramirez*, 38 F. Supp. 3d 818 (S.D. Tex. 2014) .......................................... 12, 21

*Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609
(E.D.N.Y. 2006) ............................................................................................ 8, 25, 29

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014)........................10, 13, 16, 24

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010)................................... passim

*Zapata v. HSBC Holdings plc*, No. 1:16-cv-030, 2017 WL 6939209
(S.D. Tex. Sept. 14, 2017) ........................................................................... 12

**<u>Statutes</u>**

18 U.S.C. § 956 ..................................................................................................... 15, 34

18 U.S.C. § 1114 .................................................................................................... 15

18 U.S.C. § 2331 ................................................................................................. passim

18 U.S.C. § 2332 .................................................................................................... 15

18 U.S.C. § 2333 ................................................................................................. passim

18 U.S.C. § 2339A ............................................................................................... passim

18 U.S.C. § 2339B ................................................................................................. 13

18 U.S.C. § 2339C ............................................................................................... passim

**<u>Other Authorities</u>**

House Committee on Homeland Security, Subcommittee on Investigations,
*A Line in the Sand: Confronting the Threat at the Southwest Border*,
U.S. House of Representatives (2006) ............................................................ 12, 13

S.Rep. No. 102-342 (1992) ..................................................................................... 8, 31

W. Page Keeton et al., *Prosser and Keeton on Torts* (5th ed. 1984) .......................... 28

## I.   <u>INTRODUCTION</u>

The Mexican drug cartels are among the most barbaric organizations on earth.  Since the early 2000s, they have terrorized civilians and governments both in Mexico and the United States, killing tens of thousands of people, including journalists, civilians, public officials, and law enforcement, often in gruesome public displays designed to intimidate and control the Mexican government and the civilian population.  Plaintiffs in this case have, unfortunately, experienced this terror first hand, being survivors of attacks themselves, or family members of American victims massacred by the Mexican cartels.  For almost a decade prior to these tragic massacres, HSBC[1] knowingly provided substantial and sustained financial services to the very cartels who murdered the victims in this case, laundering collectively billions of dollars of their illicit money, with conduct as egregious as HSBC employees actively colluding with cartels in executing massive money laundering schemes.  This conduct earned HSBC the dubious title of being the preferred financial institution for drug cartels and known as the "place to launder money."

The issue in this case is whether, under these facts, HSBC is liable to Plaintiffs under the Anti-Terrorism Act ("ATA") for materially supporting the terrorist activities of the cartels.  The answer is yes.  As will be described in more detail below, Plaintiffs have, at a minimum, plausibly alleged that (1) the Mexican drug cartels fit within the expansive definition of international terrorism of the ATA, (2) the attacks in this specific case were acts of terrorism, (3) HSBC violated criminal terrorism-related statutes by knowingly providing material support and

---

[1] Plaintiffs use the same nomenclature for the HSBC Defendants as used in their Complaint. "HSBC Mexico" shall refer to Defendants HSBC México S.A., Institución de Banca Múltiple, Grupo Financiero HSBC and Grupo Financiero HSBC, S.A. de C.V.  "HSBC US" shall refer to Defendant HSBC Bank U.S.A., N.A.  "HSBC Group" shall refer to Defendant HSBC Holdings plc.  "HSBC" shall refer collectively to all Defendants.

financial services to the cartels, (4) said support was, in itself, an act of terrorism under the

ATA, and (5) said violations of the ATA proximately caused Plaintiffs' injuries in this case.

## II.  FACTS

This is an action brought against HSBC under the ATA, 18 U.S.C. § 2333(a), by

American victims of horrific drug cartel terrorism.  Plaintiffs allege that HSBC knowingly

laundered billions of dollars for narco-terrorist organizations, including the Juarez, Los Zetas,

and Sinaloa Cartels, knowing that they would use such financial support to plan, prepare for, and

advance their acts of terrorism.  Plaintiffs' Complaint ("Compl.") ¶¶ 7, 11.  Plaintiffs allege that

this conduct constituted a violation of 18 U.S.C. § 2339A, which forbids providing material

support to terrorism, and 18 U.S.C. § 2339C, which forbids financing of terrorism.  Compl. ¶¶

268, 276.  Plaintiffs further allege that these criminal violations were, in themselves, acts of

international terrorism under the ATA, and that these acts proximately caused Plaintiffs' injuries.

Compl. ¶¶ 270, 272, 277, 279.

## A.  The Terrorism Attacks at Issue

Victims Jaime Zapata and Victor Avila, Jr. were Special Agents for Immigration and

Customs Enforcement ("ICE"), a federal law enforcement agency under the Department of

Homeland Security.  Compl. ¶ 1.   On February 15, 2011, while on assignment transporting

cargo to Mexico City, the two were attacked in broad daylight by two truckloads of Los Zetas

militants on a highway outside of the city of San Luis Potosí.  _Id._  While travelling in an armored

vehicle displaying U.S. diplomatic plates, the agents were chased down, flanked, and forced off

the road.  _Id._  Ignoring cries from the Special Agents that they were U.S. agents, the militants

fired over 100 rounds from AK-47s and other military-grade weapons inside and at the vehicle,

killing Special Agent Zapata and seriously wounding Special Agent Avila.  _Id._

Victim Lesley Enriquez Redelfs was an employee of the U.S. Consulate Office in Ciudad Juárez, and her husband, victim Arthur Redelfs, was a detention officer for the El Paso County Sheriff's Department. Compl. ¶ 3. On Saturday, March 13, 2010, Arthur, Lesley, and their seven-month-old daughter attended a children's birthday party in Ciudad Juárez hosted by the U.S. Consulate Office. *Id.* As they were leaving the birthday party in their SUV, they were followed and ambushed by members of an enforcement arm of the Juárez Cartel. *Id.* Lesley, who was four months pregnant, was shot twice in the head. *Id.* Arthur then fled for the American border as the Juárez Cartel enforcers chased the Redelfs through the streets, spraying their car with more bullets. *Id.* Just before reaching the border, Arthur was gunned down. *Id.* The Redelfs' infant daughter was found screaming in the backseat. *Id.* At the same time, other Juárez Cartel enforcers chased down and killed the spouse of another U.S. Consulate employee as he left the same birthday party with his two young daughters, who were also wounded in the attack. *Id.*

Two months later, another American victim, Rafael Morales Valencia ("Rafael Morales, Jr."), was also killed by the Mexican cartels. Compl. ¶ 4. May 7, 2010 was Rafael Jr.'s wedding day. *Id.* As Rafael Jr. exited the church with his new bride, approximately 16 assassins from the Sinaloa Cartel invaded the church courtyard. *Id.* Armed with military-grade assault rifles and accompanied by corrupt Mexican police officers who barricaded the road to the church, the assassins forced the entire wedding congregation, including small children, to the ground. *Id.* When one young man, stricken with fear, tried to flee, they shot him in the back, killing him. *Id.* The assassins then assaulted Rafael Jr.'s groomsman and uncle—Guadalupe Morales. *Id.* After Rafael Jr.'s brother and best man, Jaime Morales Valencia, pleaded with the cartel members to stop, the assassins forced Rafael Jr., his uncle, and his brother into their trucks

and abducted them.  *Id.*  The corrupt police officers then locked the gate to the church courtyard, trapping the horrified congregation inside.  *Id.*  After transporting the three men to a "safe house," the Sinaloa Cartel tortured them and then wrapped duct tape around their heads and faces, killing them by asphyxiation.  *Id.*  Their bodies were found a few days later discarded in the back of a pickup truck in front of a park in a residential neighborhood in Juárez.  *Id.*

On December 10, 2008, victim Felix Batista—an outspoken anti-kidnapping advocate, hostage negotiator, and former U.S. Army Major—was kidnapped by members of Los Zetas while he was in Saltillo, Coahuila.  Compl. ¶ 5.  Los Zetas targeted Batista shortly after he gave presentations to the local community on how to avoid being kidnapped—which was an important part of Los Zetas' criminal enterprise in the area.  *Id.*  Despite desperate pleas for his release by his wife and five children, the cartel killed Batista and put his body in an acid bath. *Id.*

### B.   HSBC's Material Support to the Mexican Drug Cartels

For the decade leading up to the terrorist attacks at issue, HSBC was complicit in laundering billions of dollars of drug trafficking proceeds for Mexican drug cartels, including the Sinaloa, Juarez, and Los Zetas Cartels.  Compl. ¶ 148.  The staggering amount of money laundering that occurred through HSBC was the result of a coordinated conspiracy among the HSBC Defendants.  Compl. ¶ 149.  The coordinated conspiracy worked as follows.

First, HSBC Mexico knowingly accepted for deposit billions of illicit U.S. Dollar (USD) cash smuggled from the U.S. into Mexico.  Compl. ¶ 150.  This occurred because HSBC Mexico branch managers, account executives, and other employees routinely opened and maintained high risk accounts for drug traffickers without performing basic due diligence required by law and by routinely fabricating customer due diligence information.  Compl. ¶¶ 155, 167-68.  HSBC

4

Mexico employees then accepted large amounts of bulk USD cash deposits under circumstances where the illicit nature of the proceeds was unmistakable.  Compl. ¶ 156.  For example, drug traffickers—who stated at account opening that they would move only a few hundred dollars a month through the account—would routinely deposit hundreds of thousands of dollars of cash in boxes specially designed to fit the precise dimensions of the teller windows.  Compl. ¶¶ 156, 186.  In many cases, HSBC Mexico employees accepted bribe payments to launder money for the cartels, including, for example, instances where several HSBC Mexico branches coordinated to execute, in the words of HSBC itself, a "massive money laundering scheme" involving over $100 million USD for the Sinaloa Cartel.  Compl. ¶¶ 178, 254.  Even when HSBC Mexico's compliance function ordered accounts to be closed, HSBC Mexico failed to close the accounts, keeping them active for years while drug traffickers continued laundering money through them. Compl. ¶¶ 196-206.

Once this illicit bulk cash was deposited, HSBC Mexico further assisted the drug cartels in laundering their illicit money into the United States through its correspondent account with its affiliate HSBC US.  A correspondent account is a domestic account held by a foreign bank, such as HSBC Mexico, that is used for deposits, payments, and international transfers of funds. Compl. ¶ 211.  It is through its correspondent account at HSBC US that HSBC Mexico wired and otherwise transferred billions of dollars of the illicit proceeds into accounts held in the U.S. Compl. ¶¶ 230-32.  HSBC Mexico also sold substantially all of the physical illicit USD cash deposited in its institutions to HSBC US, which money was transported into the United States, and deposited, among other places, in the Federal Reserve.  Compl. ¶ 221.

HSBC US facilitated HSBC Mexico's wiring of illicit drug proceeds into the United States by implementing several intentional and criminal policies that rendered HSBC US, at a

minimum, willfully blind to the obvious illicit nature of the transactions:

- First, pursuant to a policy set by HSBC Group, and in violation of law, HSBC US failed to do *any* due diligence on its correspondent relationship with HSBC Mexico, which, if it had, would have revealed HSBC Mexico's systemic lack of controls, culture of recklessness, and the extreme money laundering threat that HSBC Mexico posed. Compl. ¶¶ 210-215.

- Second, despite receiving numerous government reports and alerts of the extreme threat of money laundering posed by Mexico, beginning in at least 2006, HSBC US, per a policy set by HSBC Group, gave Mexico its *lowest* money laundering risk rating. As a consequence, substantially all wires originating from Mexico were excluded from HSBC US's monitoring system, including over 316,000 transactions worth $670 billion from HSBC Mexico alone. Compl. ¶¶ 226-231.

- Third, despite knowing of the high money laundering risks associated with its USD cash import business, beginning in 2006, HSBC US stopped regular monitoring of USD cash imports. As a result, it failed to detect, stop, or report to authorities the unusual growth in USD exports from HSBC Mexico—over $9.4 billion from July 2006 to December 2008 alone—which far outstripped the volumes supplied by much bigger financial institutions in Mexico and other HSBC affiliates. When asked by regulators about this failing, HSBC US personnel falsely represented that they had been monitoring the cash imports, and when unable to procure supporting documents, they stated that they intentionally kept no documents to avoid "increased legal risk." Compl. ¶¶ 216-225.

HSBC Group actively designed and controlled the scheme that allowed billions of dollars of drug cartel money to be laundered from HSBC Mexico into the United States. As described in more detail in Plaintiffs' brief addressing HSBC's Group's separate motion to dismiss, HSBC Group set the very offending policies that allowed billions of dollars of cartel proceeds to be laundered through HSBC Mexico and HSBC US, actively managed both entities, was fully aware of the massive money laundering risks and activities, and yet intentionally failed to take the steps necessary to stop cartel proceeds from being laundered into the United States. *See* Compl. ¶¶ 242-249; Plaintiffs' Brief in Opp. to HSBC Group's Mot., pp. 2-4.

As a result of the above conduct, HSBC Group and HSBC US were prosecuted by and entered into a "Deferred Prosecution Agreement" with the United States Department of Justice. Compl. ¶ 252. In the DPA, HSBC Group and HSBC US admitted much of the conduct

described above.  Compl. ¶¶ 253-58.  HSBC US further admitted that it willfully failed to

conduct due diligence on HSBC Mexico and willfully failed to implement an adequate anti-

money laundering (AML) program in violation of its obligations under the Bank Secrecy Act

("BSA").  Compl. ¶ 252.  HSBC Group and HSBC US admitted that as a result of these willful

failures, at least $881 million were laundered by drug cartels from HSBC Mexico into the United

States.  Compl. ¶ 253.

### III.   <u>STANDARD OF REVIEW</u>

A Rule12(b)(6) motion tests the legal adequacy of the plaintiff's complaint.  *Batalla*

*Vidal v. Nielsen*, --- F. Supp. 3d ---, 2018 WL 1532370, *2 (E.D.N.Y. 2018).  To survive a Rule

12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face.  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)).  While the court need not credit threadbare recitals of elements supported by mere

conclusory allegations, the court accepts all well-pleaded factual allegations in the complaint as

true, and draws all reasonable inferences in the plaintiff's favor.  *Batalla Vidal*, 2018 WL

1532370, *2 (citing *Chambers v. Time Warner, Inc.*, 28 F.3d 147, 152 (2d Cir. 2002)).

Determining plausibility "is a context specific task,… which depends on a host of considerations:

the full factual picture presented by the complaint, the particular cause of action and its elements,

and the existence of a plausible alternative explanations so obvious that they render the

plaintiff's inferences unreasonable."  *Batalla Vidal*, 2018 WL 1532370, at *2 (citing *Iqbal*, 556

U.S. at 678 and *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011)) (internal

quotations omitted).

## IV.  **ARGUMENT**

The civil liability provision of the ATA provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a).

By its very design, the ATA imposes liability on secondary actors who materially support, financially or otherwise, the primary perpetrators of terrorism.  *See Boim v. Holy Land Found. for Relief & Dev. (Boim III)*, 549 F.3d 685, 690-91 (7th Cir. 2008).  Congress intended the ATA to impose "liability at any point along the causal chain of terrorism" so as to "interrupt, or at least imperil, the flow of money."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 495 (E.D.N.Y. 2012) (citing S.Rep. No. 102-342, at 22 (1992)); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) (same).  This design "makes good sense as a counterterrorism measure" because "damages are a less effective remedy against terrorists and their organizations than against their financial angels."  *Boim III*, 549 F.3d at 690.  Thus, while collecting judgments against terrorist organizations is "well-nigh impossible," suits "against financiers of terrorism can cut the terrorists' lifeline."  *Id.* at 691.

 Liability under the ATA for supporters of terrorism is compelled by the text of the ATA through a "chain of incorporations" of statutory provisions flowing from section 2333(a),[2] the civil liability provision.  *Id.* at 690; *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 40-42 (D.D.C. 2010).  The analysis begins with the definition of "international terrorism," which is defined as

---

[2] Unless otherwise stated, all reference to statutory sections are from Title 18 of the United States Code.

activities that … (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States …; (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate …."

18 U.S.C. § 2331(1).

The next link in the statutory chain is a series of criminal statutes under the ATA which forbid persons from materially supporting terrorism. Two are relevant here—sections 2339A and 2339C. Section 2339A forbids providing or concealing material support or resources, including financial services, knowing or intending that such material support or resources are to be used in violating several enumerated terrorism-related criminal statutes. 18 U.S.C. § 2339A(a). Similarly, section 2339C forbids providing or collecting funds with the intent or knowledge that such funds will be used, in full or part, to carry out, among other things, violent acts against civilians, or anyone not taking an active part in an armed conflict, when the purpose of such acts, by their nature or context, is to intimidate a population or compel a government or international organization to do or abstain from doing any act. 18 U.S.C. § 2339C(a)(1)(B).

Under this statutory framework, Plaintiffs have plausibly alleged that HSBC is liable under the ATA for knowingly providing material support to the terrorism of the Mexican cartels that brutally murdered the victims in this case. Specifically, Plaintiffs have plausibly alleged that (A) the cartels are terrorist organizations as defined under the ATA, (B) the attacks on the Plaintiffs in this case were acts of terrorism, (C) HSBC violated the relevant material support statutes, i.e., sections 2339A and 2339C, with the requisite scienter, (D) that such violations were

9

in and of themselves acts of international terrorism, and (E) that said acts of terrorism

proximately caused Plaintiffs' injuries.

## A.    <u>The Cartels Are Terrorists.</u>

Central to all of HSBC's arguments (including its arguments related to causation) is its

contention that the Mexican drug cartels are, in HSBC's words, "nothing like the designated

terrorist organizations whose acts are the basis for virtually every other ATA case."  HSBC's

Brief in Supp. of 12(b)(6) Mot. ("HSBC Br.") at 1.  HSBC's core premise, however, is incorrect:

the Mexican drug cartels—as recognized by numerous sources, including federal courts,

congressional committees, and other government agencies—employ terrorism in ways that are

*indistinguishable* from those employed by designated terrorist organizations.

As an initial matter, the ATA's definition of "international terrorism" is expansive,

including *any* activities that (1) involve criminal acts that are violent or dangerous to human life,

(2) that occur primarily outside the United States or transcend national boundaries, and (3) that

"appear to be intended" to intimidate or coerce a civilian population or to influence or affect the

policy or conduct of a government by mass destruction, assassination, or kidnapping. 18 U.S.C. §

1331(1).  Importantly, this definition, which focuses on how the acts "appear to be intended,"

does not contain an element of subjective motive.  *Weiss v. Nat'l Westminster Bank PLC*, 768

F.3d 202, 207 n.6 (2d Cir. 2014); *Boim III*, 549 F.3d at 693-94.  Thus, it matters not whether acts

that "appear to be intended" to intimidate or coerce a civilian population or government are

actually motivated by religious objectives, political goals, profit, or psychosis—all such conduct

falls within the scope of the ATA.  The ATA's definition of terrorism is focused on acts, not

labels.

As Plaintiffs have catalogued at length in their Complaint, the cartels fit squarely within the ATA's definition of terrorism.  They are among the most dangerous, barbaric, and gruesome organizations ever known, functioning as sophisticated paramilitary organizations that routinely use terrorism to intimidate, coerce, and control governments and civilian populations.  *See generally* Compl.  ¶¶ 60-88.  With the horrific murders of politicians, judges, prosecutors, law enforcement, journalists, and masses of innocent and defenseless civilians, including children, the cartels have demonstrated a complete disregard of human life and have destroyed countless lives.  *Id.*  The cartels' terrorism has included mass attacks on civilians, which include hurling grenades into civilian crowds, massacring all inhabitants of drug rehabilitation centers, burning civilians alive in a public casino, and kidnapping busloads of civilians and murdering them all when they refused to serve as their operatives.  Compl. ¶ 68.  Moreover, the cartels often display their murders and mutilations in spectacular showings of barbarism, attended by messages warning the public of similar fates, with the apparent purpose and definite effect of intimidating and coercing the civilian population and government of Mexico to accept the cartels as the de facto authority and do their bidding.  And their methods have worked: media outlets have shuttered their doors, politicians have resigned, and law enforcement has either looked the other way or joined the cartels, allowing the cartels to operate with impunity in much of Mexico.  *See, e.g.,* Compl. ¶¶ 71-72.

These are not just allegations—they are facts, corroborated by substantial authority.  For example, Judge Hanen, although finding that he lacked personal lacked jurisdiction to adjudicate this dispute against some of the Defendants, agreed with the premise that the cartels function as terrorist groups:

> The [Mexican Drug Trafficking Organizations ("DTOs")] employ terror and intimidation to achieve their goals.  For example, the Zetas publicly display and/or

11

post online gruesome pictures of dead bodies and body parts to frighten local citizens, Mexican law enforcement, journalists and rival organizations. The Zetas are linked to a number of massacres, including the torture and mass execution of nearly 200 migrants traveling in northern Mexico in 2011. In addition to arming themselves with military-style assault weapons, the DTOs are known to utilize insurgent or terrorist techniques such as car bombs, grenades, and rocket-propelled-grenade launders. Acting Administrator of the Drug Enforcement Administration Chuck Rosenberg declared the Mexican DTOs to be "the most significant drug trafficking organizations operating in the United States today," describing them as "dangerous," "highly sophisticated," and warned that they are "increasingly a threat to the safety and security of our communities."

*Zapata v. HSBC Holdings plc*, No. 1:16-cv-030, 2017 WL 6939209, at \*1 (S.D. Tex. Sept. 14, 2017). In so holding, Judge Hanen cited to multiple sources, including reports issued by the Congressional Research Service—a legislative branch agency within the Library of Congress well known for its authoritative, objective, and nonpartisan analysis—and the Drug Enforcement Administration. *Id.; see also United States v. Ramirez*, 38 F. Supp. 3d 818, 826 (S.D. Tex. 2014) (describing the depth and extent of the violence of the Mexican drug cartels).

Additionally, a subcommittee of the House Committee on Homeland Security, after conducting a thorough investigation, held that the methods of the Mexican drug cartels are indistinguishable from those of terrorist organizations. *See* House Committee on Homeland Security, Subcommittee on Investigations, *A Line in the Sand: Confronting the Threat at the Southwest Border*, U.S. House of Representatives, at 12 (2006).[3] The subcommittee found that the "drug cartels operating along the southwestern U.S. border are a 'country unto themselves' with intelligence capabilities, weaponry and communications equipment that challenges the Border Patrol and local law enforcement." *Id.* at 22. The report further found that the "ruthless methods employed by these cartels to torture and kill their competitors are no different than the

---

[3] Available at https://www.hsdl.org/?view&did=467046.

techniques used by Al Qa'ida and other terrorist organizations.  This level of brutality is particularly troubling as the cartels are executing these vicious murders a mere stones-throw from U.S. soil." *Id.* at 12.

HSBC does not dispute any of the above, instead focusing on the fact that cartels have not been designated as official terrorist organizations by the State Department.  HSBC, however, concedes, as it must, that such designations are "not required" for an ATA claim.  *See* HSBC Br., 26 n.12.  This is because the ATA defines terrorism broadly in terms of acts, not labels.  *See* 18 U.S.C. § 2331(1).  Importantly, of the several statutes in the ATA framework that forbid the provision of material support to terrorism, only one forbids providing material support to a designated "foreign terrorist organization," while the others forbid supporting terrorism more generally.  *Compare* 18 U.S.C. § 2339B (forbidding providing material support to designated foreign terrorist organizations) *with* 18 U.S.C § 2339A (forbidding providing material support to those committing a number of predicate terrorism crimes) *and* 18 U.S.C. § 2339C (forbidding financing or collecting funds for general acts of terrorism).  This statutory framework confirms that Congress intended that the ATA cover international terrorism in all of its forms, not just terrorism committed by the handful of groups who have received an official designation.

HSBC also contends that an ATA plaintiff must establish that a group is "politically motivated" to establish an ATA violation.  HSBC Br., 25-26.  This, however, is not an element of the ATA's definition of international terrorism, which focuses on the objective appearance of the acts, not the subjective motive of the assailants.  *See Weiss*, 768 F.3d at 207 n.6; *Boim III*, 549 F.3d at 693-94.

The very authority upon which HSBC relies confirms this.  Citing congressional authority, HSBC lists the "politically motivated" acts that it contends are, by their very nature,

crimes of international terrorism, including "the detonation of bombs in a metropolitan area, the kidnapping of a high-ranking government official, … the deliberate assassination of persons to strike fear into others to deter them from exercising their rights[,] or the destruction of vital governmental facilities."  HSBC Br., p. 26 (citing H. Rep. No. 95-1283, at 45 (1978)).  These, however, are the *very* acts of terrorism that the cartels routinely engage in, all of which Plaintiffs have catalogued extensively in their Complaint.  *See, e.g.*, Compl. ¶¶ 68-69 (describing grenade attacks on civilians and media outlets, as well as other senseless and brutal mass murders of civilians), ¶¶ 74-76 (describing the kidnapping and murders of hundreds of government officials, as well as military and police officers), ¶ 80 (describing grenade attacks against multiple U.S. Consulate Offices in Mexico, resulting in temporary closings of such offices).  While making money may be a goal of the cartels, it is beyond dispute that they employ widespread terrorism for political ends, namely to strike fear in populations and governments, so that they may continue to grow, occupy entire regions of Mexico, and operate with impunity.  Thus, according to HSBC's own authority, the cartel's terrorism is politically motivated.

**B.** **The Attacks on the Plaintiffs Were Acts of International Terrorism.**

HSBC contends that the attacks at issue were not, as a matter of law, acts of terrorism. As an initial matter, whether a specific act constitutes an act of terrorism is not appropriately resolved on a motion to dismiss.  *See Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 581 n.7 (E.D.N.Y. 2005) (denying motion to dismiss, holding that the issue of whether alleged drive-by shootings and other crimes were acts of terror or mere street crime was "premature").

Moreover, it is apparent from Plaintiffs' well-pled allegations that the attacks on all Plaintiffs were acts of terrorism.  First, Plaintiffs have alleged that all victims in this case were killed or injured in violation of specific crimes of terrorism, all of which form the predicate

crimes under the material support statute—section 2339A—and that members of the cartels at issue were convicted of committing said crimes against the victims.  For example, with respect to Special Agents Zapata and Avila and Lesley Redelfs, Los Zetas operatives and Juarez operatives pled guilty to violations or attempted violations of section 1114—murder of a U.S. officer or employee on account of or while such employees were engaged in the performance of official duties.  Compl. ¶¶ 97, 105.  Further, with respect to the Redelfs and the Morales families, operatives from the Sinaloa and Juarez Cartels pled guilty to a violation of section 956—conspiring within the United States to commit murder in a foreign country.  Compl. ¶¶ 106, 112.  Moreover, the murders of all of the victims in this case violated section 2332, which forbids the murder of United States nationals while outside of the United States.  All of these crimes, which Plaintiffs have plausibly alleged occurred at the hands of the cartels at issue, are, by definition, crimes of terrorism.  *See* 18 U.S.C. § 2339A (defining the crimes of terrorism which it is illegal to materially support, including sections 956, 1114, and 2332).

Second, in addition to the crimes themselves being, by the very nature, acts of terrorism, it is clear from the face of Plaintiffs' Complaint that these crimes appear to be intended to intimidate and coerce a civilian population and government.  The ambush of two federal agents in broad daylight on a public highway while conducting a peaceful mission; the attack and slaughter of United States employees and their family members—including an infant and an unborn child—in broad daylight as they left a children's birthday party sponsored by the United States Consulate Office; the invasion of a civilian wedding by an army of cartel assassins and corrupt police officials followed by the kidnapping, torture, and murder of the groom and his wedding party; and the kidnapping and brutal murder of a United States citizen in retaliation for educating a besieged community about how to protect themselves from being abducted—these

15

senseless atrocities embody the essence of the Mexican drug cartels' reign of intimidation, coercion, and terror.

Despite these well-pled facts, HSBC contends that Plaintiffs' allegations are deficient because they have not pled the subjective purpose of the attacks. But HSBC again misconstrues the ATA's standard of terrorism where the subjective intent of the assailant is not an element. *See Weiss*, 768 F.3d at 207 n.6; *Boim III*, 549 F.3d at 693-94. The question is whether, objectively, the acts "appear to be intended" to intimidate or coerce a civilian population or government. *Id.* Plaintiffs have clearly alleged ample facts showing that these horrific attacks appeared to be so intended.

**C.      Defendants Violated the Material Support Statutes with the Required Scienter.**

Plaintiffs in this case have alleged that HSBC violated two statutes under the ATA framework that forbid providing material support to terrorism—sections 2339A and 2339C. HSBC does not contend that Plaintiffs have failed to allege that HSBC provided material support to or collected funds for the cartels at issue. HSBC, however, challenges Plaintiffs' allegations regarding scienter.

Both sections 2339A and 2339C, as well as section 2333(a) (the civil liability provision of the ATA), require proof of intentional misconduct. *Boim III*, 549 F.3d at 692; *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 331 (E.D.N.Y. 2015) (vacated and remanded on other grounds by *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018)). It is not, however, necessary to prove that a defendant actually intended its support would further an act of terrorism; rather the scienter element is met upon a showing that a defendant knowingly provided material support to an organization that commits terrorist acts, or was "deliberately indifferent" as to whether or not it did. *Boim III*, 549 F.3d at 693; *Linde* 97 F. Supp. 3d at 331; *Strauss v. Credit Lyonnais, S.A.*,

925 F. Supp. 2d 414, 428 (E.D.N.Y. 2013).  The deliberate indifference standard is met upon a showing a defendant "knows there is a substantial probability that the organization [to which it provides material support] engages in terrorism but … does not care."  *Boim III*, 549 F.3d at 693.  Thus, "when the facts known to [a defendant] place him on notice of a risk, he cannot ignore the facts and plead ignorance to the risk."  *Id.*; *Strauss*, 925 F. Supp. 2d at 428.

Here, contrary to HSBC's objections, Plaintiffs have plausibly alleged scienter, pleading specific facts showing that (1) HSBC knew it was providing billions of dollars of money laundering support to the cartels at issue, and (2) that such support was assisting the terrorist activities of the cartels.

### 1.     HSBC Knew It Was Providing Material Support to the Drug Cartels.

Plaintiffs have alleged with specificity facts that all of the HSBC Defendants—including HSBC Group, HSBC Mexico, and HSBC US—knew and/or were deliberately indifferent to the fact that they were helping the cartels launder billions of dollars.

The scope of HSBC's complicity in laundering money for drug cartels was nothing short of staggering.  Plagued by what HSBC Mexico's director of AML described as "a culture [of] pursuing profits and targets at all costs," HSBC Mexico's management had "absolutely no respect for AML controls and the risks to which the Group was exposed."  Compl. ¶ 182.

With a management culture that had "absolutely no respect for AML," the field branches at HSBC Mexico were allowed to run amuck.  From fabricating required "know-your customer" (KYC) information, to knowingly maintaining accounts for money launderers, to actually participating in money laundering schemes with the cartels, HSBC employees were complicit in the massive money laundering occurring through HSBC Mexico.  Specifically, employees at HSBC Mexico:

- Executed "a massive money laundering scheme" involving over $100 million in USDs for the Sinaloa Cartel in multiple branches in Sinaloa state (Compl. ¶¶ 178, 254);

- Routinely accepted without question USD cash deposits despite unmistakable signs of money laundering, such as depositors who claimed they would only move a few hundred dollars a month, but instead deposited hundreds of thousands of USD a day, often in boxes specially designed to fit through the teller windows (Compl. ¶¶ 9, 254);

- Maintained hundreds of accounts for known drug cartel money launderers, even after those accounts were ordered closed by the AML officials (Compl. ¶¶ 196-204); and

- Maintained fictional offshore "Cayman Islands" accounts, a contrivance used to facilitate USD cash deposits, which were, in the words of one HSBC employee, "massive[ly] misuse[d] … by organized crime," and used, among other thing, to purchase aircraft for drug cartels; HSBC allowed these accounts to proliferate, ignoring audits that warned that over 50 percent of the accounts lacked adequate KYC information, with 15 percent lacking files altogether (Compl. ¶¶ 189-95).

Senior executives at HSBC Mexico and HSBC Group were aware of the recklessness and corruption at HSBC Mexico but allowed it to continue.  They were notified of the AML problems in many ways.  Examples include:

- Meetings in November 2007 and February 2008 between Mexico regulators and HSBC Mexico's CEO, where the regulators said they (1) had serious concerns that the USDs being deposited at HSBC Mexico (in excess of $3 billion per year) were far greater than what HSBC's market share suggested and potentially represented illegal drug proceeds, (2) that there was "suspicious internal activity" at HSBC, (3) that authorities had detected money laundering at HSBC, which HSBC failed to report, and (4) that they had a recording from a drug lord who said that HBSC was the place to launder money (Compl. ¶¶ 177-80);

- A February 2008 interview of HSBC Mexico's director of AML by HSBC Group's head of compliance where the AML director said, among other things, that he feared for his personal civil and criminal exposure; that "it was only a matter of time" before the bank and employees faced criminal sanctions for money laundering; and that there were allegations that 60 to 70 percent of the laundered drug proceeds in Mexico went through HSBC (Compl. ¶ 182);

- A July 2008 email from a senior compliance official to HSBC Group's head of compliance warning that a sub-director at HSBC Mexico informed him that over 1,000 high-risk accounts had been identified, that there "was little or no accountability in high-risk regions for managers who knowingly accepted suspect

clients," and that he was "alarmed at the gap between what [HSBC] sai[d] about integrity and proper AML controls, and what is actually happening out in the field, particularly in states close to the US border" (Compl. ¶ 184); and

- A November 2008 email from an HSBC Mexico AML employee to HSBC Mexico's director of AML, warning of massive money laundering occurring at HSBC branches, where employees were, in violation of HSBC policy, routinely accepting bundles of USD cash from money launderers, sometimes close to a million dollars a day, without getting authority from superiors; the employee noted that in his investigation, "**NOT ONE SINGLE PERSON**" had heard about HSBC's policy against accepting over $100,000 in USD without authority from managers, and that HSBC was "not 'Preventing' anything" and "allowing the organized criminals to launder their money …." (Compl. ¶ 186) (emphasis in original).

Despite these warnings, HSBC Mexico accepted a record amount of USD cash deposits in 2008—$4.1 billion—which exceeded by over $1 billion the amount of annual USD cash deposits accepted in the four prior years.  Compl. ¶ 188.  The amount more than doubled the amount of USD cash deposits at Mexican banks with a much higher market share than HSBC Mexico.  *Id.*

The billions of dollars laundered at HSBC Mexico was then further laundered through HSBC US because of several *intentional* deficiencies in HSBC US's AML controls that rendered HSBC US blind to the risks associated with HSBC Mexico and *guaranteed* that laundered proceeds would pass through HSBC US undetected.  As describe in the Statement of Facts, *supra,* the intentional deficiencies included: (1) HSBC US's failing, pursuant to HSBC Group's explicit direction, to do any due diligence on HSBC Mexico, with whom it had a foreign correspondent banking relationship; (2) HSBC US's failure to monitor the billions of dollars of USD currency that it purchased and imported from HSBC Mexico; (3) HSBC US giving Mexico, a country of primary money laundering concern, its *lowest* risk grade, thereby intentionally failing to monitor over $670 billion in wire transactions from HSBC Mexico alone; and (4) HSBC US's intentional failure to adequately staff its AML departments, resulting in backlogs of

tens of thousands of suspicious activity alerts.  *See generally* Compl. ¶ 207-41.  These intentional

deficiencies in HSBC US, which HSBC US and HSBC Group admitted were willful, are the very

definition of "deliberate indifference," where a party intentionally takes steps to blind itself from

the fact that the party is complicit in criminal activity.

Thus, Plaintiffs have plausibly alleged that all HSBC Defendants—including HSBC

Mexico, HSBC US, and HSBC Group—knew of and/or were deliberately indifferent to their

complicity in laundering billions of dollars of drug cartel proceeds.

### 2. HSBC Knew that the Money Laundering Support It Provided Furthered the Cartels' Terrorism.

It is not necessary to prove that Defendants knew that the material support they provided

to the cartels would be used for a specific act of terrorism; rather, as noted above, it is enough to

show that they "knew there [was] a substantial probability that an organization [to which they

provide material support] engages in terrorism but d[id] not care."  *See Boim III*, 549 F.3d at 693;

*see also Linde*, 97 F. Supp. 3d at 331; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y.

2009) (not necessary to show that a defendant in fact knew that its actions would support

terrorism).  While sections 2339A and 2339C require a showing of knowledge that the support or

resources provided are to be used in the commission of terrorist acts, "[n]either requires the

specific intent to aid or encourage the particular acts that injured the plaintiffs."  *Linde*, 384 F.

Supp. 2d at 586 n.9; *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 215 (E.D.N.Y. 2007)

(citing *Linde* for the same proposition); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284,

1309 (S.D. Fla. 2018) (same).

Thus, to show the requisite knowledge under 2339A, "plaintiffs need only allege that [a

bank] provided financial services knowing or intending that such provision would generally

facilitate the terrorist activities" of the group in question.  *Wultz*, 755 F. Supp. 2d at 46.

Similarly, section 2339C "does not require a showing of specific intent that the defendant acted to further the organization's terrorist activities or that it intended to aid or encourage the particular attack giving rise to a plaintiff's injuries…. Mere knowledge that the funds provided and collected would be used to carry out the predicate act is enough." *Id.* at 47 (citing, among other sources, *Linde*, 384 F. Supp. 2d at 588). Thus, a bank's knowledge that funds "could be [used to carry out terrorist attacks], even if they actually were not, is enough." *Wultz*, 755 F. Supp. at 47.

Here, HSBC makes the remarkable claim that even if the facts could raise an inference that HSBC knew it was providing money laundering services to the cartels, the allegations "do nothing to establish" that the laundered funds "would be used to commit violence in Mexico." HSBC Br., 31. In other words, HSBC contends that an international bank operating in over 80 countries, with its hand on the pulse of the economic and political affairs of every major country, including Mexico, was oblivious to the fact that the cartels which it supported for nearly a decade were massacring scores of people, including journalists, government officials, law enforcement, and civilians, to achieve their objectives. This contention is meritless.

It is "common knowledge that [drug cartels] are the proponents of kidnapping, torture, and murder on both sides of the border." *Ramirez*, 38 F. Supp. 3d at 826. Since the early 2000s, their barbarism has been widely covered by local, national, and international news media, as well as State Department, congressional, and other governmental reports. *See, e.g.*, Compl. ¶ 145. Numerous HSBC executives received these publications at or around the time they were published. Compl. ¶¶ 145-46, 229. The uncontrollable violence has caused the State Department to issue continuous travel warnings and advisories since at least 2006, warning American citizens to avoid entire cities and states of Mexico. Compl. ¶¶ 87-88. But despite this

common knowledge, HSBC, who at all relevant times had a substantial presence in every region of Mexico, disclaims knowledge that the cartels were employing terrorism to intimidate and coerce the Mexican federal, state, and local governments, as well as the civilian populations.

This contention is belied by the well-pleaded facts, which establish that HSBC executives were fully aware of the connection between HSBC's money laundering for the cartels and the violence in Mexico.  For example, in discussing the fact that there was no accountability for HSBC Mexico employees in the field who "knowingly accept[ed] suspect clients," a senior HSBC Group compliance executive wrote to HSBC Group's head of compliance that he was concerned that his source at HSBC Mexico, if found out, would be murdered by the drug cartels. Compl. ¶ 184.  Specifically, he stated, of his source, that "[h]is misgivings should of course be treated confidentially.  I don't want my sources fired or killed.  (No exaggeration here – more people are dying in the drug wars in the north of the country than are being killed in Afghanistan or Iraq)."  Compl. ¶ 184.  Thus, it is clear that Plaintiffs have plausibly alleged that HSBC knew that its material support to the drug cartels was aiding barbarous organizations who were killing scores of people throughout Mexico.

Under similar facts, multiple cases have held that allegations that a defendant provided knowing support to groups who engage in terrorism is sufficient to satisfy the scienter requirement of sections 2339A, 2339C, and 2333.  *See, e.g.*, *Strauss*, 925 F. Supp. 2d at 429-30 (holding that a genuine issue of fact existed as to scienter under the ATA and section 2339C where Plaintiffs established that the defendant bank provided financial services for charities it suspected were associated with terrorist groups); *Linde*, 384 F. Supp. 2d at 588 (denying motion to dismiss ATA claims predicated on section 2339C where plaintiff alleged that a financial institution knew that the funds it received as deposits and transmitted to various organizations

would be used to conduct unspecified acts of terrorism); *Wultz*, 755 F. Supp. at 45-46 (denying motion to dismiss ATA claims predicated on violations of sections 2339A and 2339C where plaintiffs alleged that a financial institution knew that the funds it transferred to a terrorist group could be used to carry out a terrorist attack).

This is particularly true, where, as here, the groups being supported—i.e. the Mexican cartels—have no legitimate purposes: "Where support is given to a known terrorist group having only violent organizational goals—with no philanthropical, educational, or other socially useful purposes—certainly there is at least a jury question as to whether the payments were made with the requisite 'knowing or intending' *mens rea*" required under section 2339A. *Chiquita Brands*, 284 F. Supp. 3d at 1320.

HSBC does not address this above authority, instead relying on *Owens v. BNP Paribas S.A.*, which is inapposite. 235 F. Supp. 3d 85 (D.D.C. 2017). There, unlike here and the above-cited cases, the allegations were not that the defendant bank processed transactions *directly* for or to a terrorist organization; rather the allegations were that the bank processed transactions for the Sudan—a sovereign state—some of which plaintiffs claimed the Sudan subsequently transferred al-Qaeda. *Id.* at 99. Importantly, in holding the allegations regarding scienter (and causation) to be insufficient, the court distinguished the facts of that case, as well as the Second Circuit's opinion in *Rothstein v. UBS AG*, 708 F. 3d 82 (2d Cir. 2013), from the typical ATA cases cited above. *Owens*, 235 F. Supp. 3d at 97 (distinguishing cases where the support is given directly to a terrorist group from the cases where the support is alleged to have gone through a sovereign state intermediary). Thus, *Owens* is distinguishable from this case and the other authority cited above, where the allegations were that a bank knowingly provided financial services directly to a terrorist organization.

HSBC's reliance on *Hussein v. Dahabshiil Transfer Servs. Ltd.* is also misguided. 230 F. Supp. 3d 167 (S.D.N.Y. 2017). In dismissing Plaintiffs' claim, the court found that, unlike here, there were no allegations that the bank's provision of banking services was done while on notice that there were terrorist groups involved "or under other suspicious circumstances that would raise 'red flags.'" *Id.* at 177. In so holding, the court acknowledged the substantial authority cited above, all of which are comparable to this case, where courts have found the scienter component was adequately pled. *Id.* at 175-76. Thus, *Hussein* supports Plaintiffs' position, not HSBC's.

**D.** **HSBC's Violation of 2339A and 2339C Is an Act of International Terrorism.**

In addition to proving that HSBC violated sections 2339A and 2339C, Plaintiffs must prove all of the definitional requirements of "international terrorism" under section 2331(1). *Linde v. Arab Bank, PLC*, 882 F.3d 314, 325-26 (2nd Cir. 2018). Here, HSBC challenges Plaintiffs' allegations with respect to section 2331(1)(B), which requires that HSBC's conduct "appears to be intended" to intimidate or coerce a civilian population or to influence or affect a government. This requirement "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss*, 768 F.3d at 207 n.6 (citing *Boim III*, 549 F.3d at 693-94). The "appears to be intended" is "not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender." *Boim III*, 549 F.3d at 694.

Given the objective nature of the inquiry, in *Boim III*, the Seventh Circuit held that providing financial support to a terrorist organization can satisfy the "appears to be intended" element of section 2331(1). *Id.* Writing for the court, Judge Posner concluded that given the "foreseeable consequences" that supporting a terrorist group would augment the group's

resources and enable the group to expand its terrorism, "such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes …." *Id.* (internal quotations omitted).[4]

Following *Boim III*, the great weight of authority, including multiple cases from this Court, have held that where a financial institution or other organization knowingly provides financial support to a terrorist organization, such actions create an inference that they "appear to be intended" to intimidate or coerce a civilian population, or influence or affect a government. *Goldberg*, 660 F. Supp. 2d at 427 (holding that a violation of a material support terrorism statute can satisfy the definitional requirements of section 2331(1)); *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2006 WL 2862704, at *12 (E.D.N.Y. Oct. 5, 2006) (same); *Weiss*, 453 F. Supp. 2d at 613 (same); *Chiquita Brands*, 284 F. Supp. 3d at 1319 ("If a defendant gives money to a terror organization, knowing of the aims and activities of that organization, this conduct creates a jury question as to whether it may objectively be viewed as that which 'appears to be intended' to [intimidate] or coerce a civilian population or government."); *Wultz*, 755 F. Supp. 2d at 48-49 (denying motion to dismiss where the plaintiffs alleged that a financial institution met the "appeared to be intended" standard by continuing to execute financial transactions involving a terrorist organization despite being warned that it was doing so and asked to desist).

In *Linde*, the Second Circuit recently addressed this very issue.  882 F.3d at 325-28. There, the court vacated and remanded a verdict and judgment in favor of ATA plaintiffs

---

[4] While HSBC does not in its motion address whether the alleged violations of 2339A and 2339C "involve violent acts or acts dangerous to human life" as required under section 2331(A), the *Boim III* court held that such violations can meet this definitional requirement: "Giving money to [a terrorist organization], like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.'" *Boim III*, 549 F.3d at 690.  Multiple courts are in accord. *See Goldberg*, 660 F. Supp. 2d at 113-14 (citing cases); *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2006 WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006).

because the court held that the trial court erroneously instructed the jury that a violation of

section 2339B meets the definitional requirements of section 2331(1) as a matter of law.  *Id.*  The

court held that the jury should have been instructed on all of the definitional elements of 2331(1).

*Id.*  The court, however, did *not* reverse the substantial case law from this Court and elsewhere

holding that knowingly providing financial support to terrorist organizations can create a triable

issue of fact on the "appears to be intended" and other definitional elements.  *Id.*  Rather, the

court suggested that the issue is appropriately decided by a jury.  *Id.* at 327 (holding that the

plaintiffs' arguments about causation and the terrorist act element "raises questions of fact for a

jury to decide.").  This is, of course, confirmed by the fact that the court remanded the case with

instructions that the trial court properly charge the jury on the definitional elements of section

2331(1).  *Id.* at 327-28.[5]

Thus, a financial institution's knowingly providing financial services to a terrorist group

can satisfy the "appears to be intended" definitional requirement section 2331(1)(B), and, here,

Plaintiffs have plausibly alleged that HSBC's conduct appears, objectively, to be intended to

coerce or intimidate a civilian population or affect or influence a government.  The allegations in

this case are flagrant and egregious.  Plaintiffs do not allege that HSBC discretely provided

routine banking services to the cartels.  Rather, the allegations are that the same groups who have

terrorized Mexico for years, committing unthinkable atrocities that have crippled communities

throughout the country, routinely walked into the local community HSBC branches with bundles

of their blood money (sometimes in the millions of dollars), and HSBC openly accepted them

without question.  In multiple instances, the HSBC bankers were coordinating with the cartels

and other HSBC branches to launder the money.  With coordinated action between all HSBC

---

[5] In reality, however, the vacatur and remand ended the case, as the parties agreed to forego retrial as part of a pre-existing settlement agreement.  *Id.* at 318.

Defendants, the money was laundered and integrated into the international banking system.  This support allowed the cartels to continue their operations, including funding their terrorism.

In essence, the well-pled allegations establish that HSBC, for nearly a decade, worked hand in glove with the cartels, earning itself the notoriety of being the preferred financial institution of drug cartels, and did so in a very open and public manner while the cartels were murdering tens of thousands of people, including journalists, civilians, public officials, and law enforcement.  These allegations, at a minimum, create an inference that HSBC's conduct, like that of the cartels they openly assisted, "appeared to be intended" to coerce or intimidate a civilian population or affect or influence a government.

**E.     HSBC's ATA Violation Proximately Caused Plaintiffs' Injuries.**

To recover under the ATA, a plaintiff must show that his or her injuries were sustained "by reason of" an act of international terrorism.  18 U.S.C. § 2333(a).  This language requires a showing of proximate causation.  *Rothstein*, 708 F.3d at 95.

Courts, however, including this Court, have consistently held that "but-for" causation is not required; that is, there is no requirement that an ATA plaintiff proceeding on a material support predicate show that the support supplied was actually used to carry out the specific acts of violence causing the plaintiff's injury.  *Linde*, 97 F. Supp. 3d at 324-28; *Hussein*, 230 F. Supp. 3d at 171 n.3 ("Plaintiffs are not required to establish 'but-for' causation."); *Goldberg*, 660 F. Supp. 2d at 429 (same); *Strauss*, 925 F. Supp. 2d at 433-34 (same); *Gill*, 839 F. Supp. 2d at 507 (same); *Chiquita Brands*, 284 F. Supp. 3d at 1310 n.23 (same).

As this Court held in *Goldberg,* "[c]ommon sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the

plaintiff.  Such a burden would render the statute powerless to stop the flow of money to

international terrorists, and would be incompatible with the legislative history of the ATA."  660

F. Supp. 2d at 429 (emphasis in original); *see also Strauss*, 925 F. Supp. 2d at 433 ("[P]laintiffs

who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy

the proximate cause standard.  Such a task would be impossible and would make the ATA

practically dead letter …."); *Linde*, 97 F. Supp. 3d at 327 ("[A] but-for causation requirement

would eviscerate the civil remedy available under § 2333.  I cannot conclude that Congress

enacted a meaningless provision here.").

Proximate cause "is a legal inquiry—focusing largely on foreseeability—that asks

whether X and Y are sufficiently connected to justify holding one accountable for the other as a

matter of legal policy."  *Linde*, 97 F. Supp. 3d at 324.  Thus, in the ATA context, "when a

tortfeasor acts with the knowledge that its conduct will, in concert with that of others, result in

harm that would not otherwise occur, it is appropriate to hold each tortfeasor accountable."  *Id.* at

327.  This Court and others have likened the liability of those who provide financial support to

terrorists to that of environmental polluters:

> Even if the amount of pollution caused by each party would be too slight to
> warrant a finding that any one of them had created a nuisance [i.e. caused injury],
> "pollution of a stream to even a slight extent becomes unreasonable [and therefore
> a nuisance] when similar pollution by others makes the condition of the stream
> approach the danger point.  The single act itself becomes wrongful because it is
> done in the context of what others are doing."

*Linde*, 97 F. Supp. 3d at 327; *Boim III*, 549 F. Supp. 3d at 696-97 (quoting W. Page Keeton et

al., *Prosser and Keeton on Torts* § 52, p. 354 (5th ed. 1984)).

Not only are ATA plaintiffs not required to trace a defendant's financial support to their

specific attack, under the proximate cause standard it is not necessary to show that the money

was used for terrorism at all.  Because "money is fungible[,] giving support intended to aid an

organization's peaceful activities frees up resources that can be used for terrorist acts." *Goldberg*, 660 F. Supp. 2d at 429 (quoting *Weiss*, 453 F. Supp. 2d at 631, and *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000)).  Applying this same logic in *Boim III*, the Seventh Circuit held that because of the fungibility of money, even a donation to a terrorist organization earmarked for purely charitable purposes could subject the donor to ATA liability.  549 F.3d at 698.

Applying the above law, courts have found a triable issue of fact on proximate cause upon allegations or evidence of a defendant's knowing support of a terrorist organization prior to that organization's attack on a plaintiff.  For example, in *Linde*, the court affirmed a jury verdict on evidence that the defendant bank processed several million dollars of financial transfers to Hamas leaders and Hamas-controlled charities: "[A] reasonable juror could conclude that the sizable amount of money sent from Defendant to Hamas front organizations was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue," and that "Hamas' increased ability to carry out deadly attacks was a foreseeable consequence of sending millions of dollars to groups controlled by Hamas."  97 F. Supp. 3d at 328.  Similarly, in *Strauss*, the court held that a genuine issue of material fact existed as to proximate causation despite the fact that plaintiffs could not show that any of the millions of dollars in banking services the defendant bank provided to a Hamas charitable front were used to finance the terrorist attacks at issue.  925 F. Supp. 2d at 432.

Likewise, in *Goldberg*, the court held that plaintiffs had plausibly demonstrated proximate causation by alleging that the defendant financial institution processed a mere $25,000 in wire transfers to a known terrorist organization prior to a terrorist bombing: "A fact finder could plausibly find that it was entirely foreseeable that transmitting money to a terrorist

organization would lead to violence and Congress had precisely that lethal connection in mind in passing the ATA." 660 F. Supp. 2d at 430. And in *Chiquita Brands*, the court held that evidence that a defendant contributed $32,000 per year to a large terrorist organization created a triable issue of fact of causation: "Viewing this evidence in the light most favorable to Plaintiffs, as it must, the Court finds sufficient evidence to create a jury question on the issues of whether [the defendant's] nine-year stream of funding to the FARC was a material and substantial factor in bringing about deaths of Plaintiff's decedents." 284 F. Supp. 3d at 1317-18.

Applying the above law, it is clear that HSBC's provision of billions of dollars in financial services for the Mexican drug cartels proximately caused the deaths and injuries alleged in this case. None of the factual patterns in the cases in *Boim III*, *Linde*, *Strauss*, *Goldberg*, or *Chiquita Brands* comes close to the scale of support that Defendants provided to the drug cartels in this case. Indeed, the amount of HSBC's material support here surpasses by orders of magnitude the combined support the defendants provided in those cases. If an alleged $25,000 in wire transactions involving Hamas was enough to sustain a complaint against the defendant in *Goldberg*, or $32,000 per year in contributions to FARC created a triable issue of fact in *Chiquita Brands*, then clearly HSBC's admitted $881 million will support a complaint here.

HSBC's arguments to the contrary are without merit. HSBC relies largely on the Second Circuit's opinion in *Rothstein*, contending that *Rothstein* "is emblematic of most ATA cases against financial institutions." HSBC Br., 16. This is incorrect—*Rothstein* is an atypical ATA case because, unlike here and the above authority, the allegations in *Rothstein* were that a defendant bank was liable for providing material support to a sovereign state intermediary—Iran—which the defendants alleged subsequently used the material support to aid a terrorist group. 708 F.3d at 83-85. This was central to *Rothstein's* finding of no proximate cause, and

subsequent opinions have recognized this important distinction. In *Owens*, for example, another

case involving allegations involving a sovereign intermediary (and relied upon by HBSC), the

court distinguished its facts and *Rothstein* from the typical ATA case:

> [I]t is important to remember that *Rothstein*, unlike most ATA cases, involved actors who were not directly connected to any terrorist organization or to agents of a terrorist organization. Typically, ATA cases brought against banks deal with those who were processing transactions for a terrorist organization or a terrorist front, the nature of the organization dealing with the bank therefore making it foreseeable that the funds processed would likely be used for acts of terrorist violence. In contrast, the bank defendants in *Rothstein* had dealt with a truly independent intermediary: Iran.

*Owens*, 235 F. Supp. 3d at 97. Thus, *Rothstein* does not, as HSBC contends, defeat a finding of

proximate causation where, as here, the allegations are that HSBC knowingly provided material

support directly to the terrorist organizations at issue.

The other authority cited by HSBC is inapposite and factually distinguishable. *Fields v.*

*Twitter, Inc.*, for example, did not involve factual allegations that a bank worked in tandem with

a terrorist organization to launder billions of dollars; rather, it involved allegations that Twitter

failed to timely shut down Twitter accounts that were used by terrorists spreading propaganda.

881 F. 3d 739, 742-43 (9th Cir. 2018). Social media cases are distinguishable from financial

support cases, particularly given that Congress's stated intent in enacting the ATA was to

"interrupt, or at least imperil, the flow of money" to terrorist groups. *Gill*, 893 F. Supp. 2d at

495 (citing S.Rep. No. 102-342, at 22). The remaining cases cited are similarly distinguishable

in that they also involve claimed propaganda support by the media, or the plaintiffs failed to

allege that claimed support was knowingly provided directly to the terrorist organizations at

issue.

HSBC also falsely claims that Plaintiffs have not alleged a direct relationship between the

cartels at issue and HSBC. For example, HSBC claims that Plaintiffs have failed to allege a

direct relationship between the Sinaloa Cartel and HSBC Mexico. HSBC Br., 14-15. This is remarkable assertion given that Plaintiffs have alleged, and HSBC has *admitted,* that HSBC employees and managers, among other things, executed a "massive money-laundering scheme" for the Sinaloa Cartel in excess of $100 million dollars, and that Sinaloa drug dollars flowed directly from HSBC Mexico to HSBC US as the result of HSBC's criminal activity. Compl. ¶¶ 253-54.

Contrary to HSBC's assertions, the complaint is replete with allegations that HSBC had a direct banking relationship with the money launderers for every cartel at issue in this suit— including the Sinaloa, Juarez, and Los Zetas Cartels. *See, e.g.,* Compl. ¶ 148 (alleging HSBC laundered money for all three cartels), ¶ 157 (alleging members of all three cartels bribed HSBC employees), ¶ 197 (alleging HSBC failed to close money laundering accounts associated with all three cartels), ¶¶ 198-201 (alleging that HSBC knowingly maintained a banking relationship with Sinaloa cartel money launderer), ¶¶ 202-206 (alleging that HSBC knowingly did business with a money launderer for all three cartels). Indeed, the staggering misconduct at HSBC, which, during the relevant time, has been credited to having facilitated 60 to 70 percent of the total drug proceeds laundered in Mexico, earned HSBC Mexico, by HSBC's own admission, the title of the "preferred financial institution of drug cartels and money launderers." Compl. ¶¶ 182, 254.[6]

In summary, HSBC provided substantial and continuous money laundering support to the cartels for the decade preceding the attacks at issue in this suit. And while others may be involved in cartel money laundering, only HSBC can claim the dubious honor of being the

---

[6] HSBC also makes the false claim that Plaintiffs have not alleged a connection between the deaths of Leslie and Arthur and Redelfs and the Juarez Cartel. To the contrary, the leader of the Juarez Cartel in Juarez—Acosta Hernandez—pled guilty for conspiring to murder the Redelfs, and admitted that he himself laundered money on behalf of the Juarez Cartel, which was reinvested to fund, among other things, the purchase of weapons, ammunitions, and other supplies to continue the organization's murderous activities. Compl. ¶ 106.

cartels' preferred financial institution.  Compl. ¶ 254.  As the above law makes clear, these

allegations are sufficient to make a plausible case of proximate causation.

**F.**     **Plaintiffs Have Alleged Direct Conduct Against HSBC Group and Grupo Financiero**

HSBC claims that Plaintiffs have not alleged that HSBC Group and Grupo Financiero

engaged in any of the relevant conduct at issue.  This is false.  As already discussed in detail

above, as well as Plaintiffs' accompanying brief in opposition to HSBC Group's 12(b)(2)

motion, the parent companies, particularly HSBC Group, played an active and integral role in the

money laundering activity at issue.  Therefore, dismissal of these entities is inappropriate,

particularly at the motion to dismiss stage.

## V.   CONCLUSION

For these reasons, Plaintiffs respectfully request that HSBC's motion be denied in full.

Dated: April 13, 2018

                              Respectfully Submitted,

                              */s/ Richard M. Elias*_____
                              Richard M. Elias
                              Greg G. Gutzler  (pro hac to be filed)
                              Tamara M. Spicer
                              ELIAS GUTZLER SPICER LLC
                              130 S. Bemiston Ave, Suite 302
                              St. Louis, MO 63103
                              (314) 274-3311
                              relias@egslitigation.com
                              ggutzler@egslitigation.com
                              tspicer@egslitigation.com

Michael B. Eisenkraft
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
(212) 838-7745 (fax)
meisenkraft@cohenmilstein.com

Geoffrey A. Graber
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington DC 20005
(202) 408-4600
(202) 408-4699 (fax)
ggraber@cohenmilstein.com

Benigno Trey Martinez
LAW OFFICES OF BENIGNO TREY
MARTINEZ
1201 E. Van Buren St.
Brownsville, TX 78520
(956) 546-7159
(956) 544-0602 (fax)
Trey@mblaw.com

E. Michael Rodriguez (*pro hac* to be filed)
ATLAS, HALL, & RODRIGUEZ, LLP
50 W. Morrison Road, Suite A
Brownsville, TX 78520
(956) 574-9333
(956) 574-9337 (fax)
Mrodriguez@atlashall.com

*Attorneys for Plaintiffs*