UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MARY M. ZAPATA, individually and as administrator of the estate of Jaime J. Zapata; AMADOR ZAPATA JR.; AMADOR ZAPATA III, individually and as administrator of the estate of Jaime J. Zapata); CARLOS ZAPATA; JOSE ZAPATA; E. WILLIAM ZAPATA; VICTOR AVILA, JR., individually and as guardian for S.A. and V.E.A.; VICTOR AVILA; MAGDALENA AVILA VILLALOBOS; JANNETTE QUINTANA; MATHILDE CASON, individually and as administrator of the estate of Arthur and Lesley Redelfs, and as guardian for R.R.; ROBERT CASON; REUBEN REDELFS; PAUL REDELFS; KATRINA REDELFS JOHNSON; BEATRICE REDELFS DURAN; RAFAEL MORALES, individually and as administrator of the estate of Rafael Morales Valencia; MARIA MORALES; MORAIMA MORALES CRUZ, individually and as guardian for G.C., A.C., and N.C.; JUAN CRUZ; LOURDES BATISTA, individually and as administrator of the estate of Felix Batista; ADRIELLE BATISTA; AMARI BATISTA; ALYSANDRA BATISTA; ANDREA BATISTA; ADAM BATISTA; MARLENE NORONO; and JACQUELINE BATISTA,

**MEMORANDUM & ORDER**

**17-CV-6645 (NGG) (CLP)**

Plaintiffs,

-against-

HSBC HOLDINGS PLC; HSBC BANK U.S.A., N.A.; HSBC MEXICO S.A. INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO HSBC; and GRUPO FINANCIERO HSBC, S.A. de C.V.,

Defendants.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Thirty victims and family members of victims of violent acts perpetrated by Mexican

drug cartels bring this suit under the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq. (the "ATA"),

alleging that Defendants HSBC Holdings plc ("HSBC Holdings"); HSBC Bank USA, N.A.

("HSBC US"); and two Mexican HSBC subsidiaries: (1) HSBC México S.A., Institución de

1

Banca Múltiple, Grupo Financiero HSBC, and (2) Grupo Financiero HSBC, S.A. de C.V. ("HSBC Mexico" and "Grupo Financiero" respectively and, collectively, the "Mexican HSBC Entities") committed acts of international terrorism by laundering drug proceeds for the cartels. (Compl. (Dkt. 1) ¶¶ 8-12.) HSBC Holdings moves to dismiss the complaint for lack of personal jurisdiction (HSBC Holdings Mot. to Dismiss for Lack of Jurisdiction ("HSBC Holdings Mot.") (Dkt. 32)), and all Defendants move to dismiss the complaint for failure to state a claim under the ATA (Mot. to Dismiss for Failure to State a Claim ("Defs. Mot.") (Dkt. 33)). For the reasons set forth below, HSBC Holdings' motion to dismiss for lack of personal jurisdiction is GRANTED and the remaining Defendants' motion to dismiss for failure to state a claim is GRANTED.

## I. BACKGROUND

### A. Factual Allegations

The Plaintiffs are victims and family members of the victims of five of Mexico's largest and most powerful drug cartels: the Sinaloa Cartel, the Juarez Cartel, the Los Zetas Cartel, the Gulf Cartel, and the Norte del Valle Cartel (collectively, the "Cartels"). (Compl. ¶¶ 1, 51-88.) The complaint details atrocities committed by the Cartels including: "gruesome public displays designed to intimidate and coerce" (id. ¶¶ 62-65); "attacks on children and women" (id. ¶¶ 66-67); "mass murders" (id. ¶ 68); "attacks on the media" (id. ¶¶ 69-73); "attacks on public officials" (id. ¶ 74); "attacks on police and military" (id. ¶¶ 75-76); "kidnappings" (id. ¶ 77); and "attacks on American civilians and officials" (id. ¶¶ 78-88). Plaintiffs allege that they or their family members were injured or killed in Mexico by acts of cartel violence between 2008 and 2011, incidents they characterize as "terrorist attacks." Specifically Plaintiffs allege that they were injured by:

2

- The 2011 attack outside San Luis Potosí on ICE Special Agents Jaime Zapata and Plaintiff Victor Avila, Jr. by the Los Zetas Cartel (id. ¶¶ 90-97);

- The 2010 attack in Ciudad Juárez by the Juarez-Cartel-aligned Barrio Aztecas street gang on U.S. consular employee Lesley Redelfs and her husband, Arthur Redelfs, in front of their infant child (id. ¶¶ 98-106);

- The 2010 murder in Ciudad Juárez of Rafael Morales, Jr., and members of his family by "assassins from the Sinaloa Cartel" (id. ¶¶ 107-112); and

- The 2008 murder in Saltillo, Coahuila, of U.S. security consultant Felix Batista by the Los Zetas Cartel (id. ¶¶ 113-115).

According to Plaintiffs, the Cartels rely on money laundering to integrate the substantial cash proceeds of their drug sales into the legitimate economy. (Id. ¶¶ 116-33.) As part of the laundering process, cash is deposited into USD-denominated bank accounts through intermediaries, typically either individuals or currency exchange businesses known as "casas de cambio." (Id. ¶¶ 126-133.) Plaintiffs allege that HSBC Mexico routinely opened USD-denominated accounts for and accepted large cash deposits from individuals and entities that were "known or suspected money launderers for [the Cartels]" (including casas de cambio and corporations known to work with or for the Cartels) without obtaining required know-your-customer ("KYC") information. (Compl. ¶¶ 159, 174-176). Plaintiffs further allege that these deposits were subsequently laundered by HSBC US into the American financial system, by wire transfers through HSBC US's correspondent account with HSBC Mexico, and by HSBC US's "Banknotes" program, through which it purchased bulk physical currency from HSBC Mexico. (Id. ¶¶ 216-225.) All of this, according to Plaintiffs, was possible because, despite several warnings from within and without the organization, HSBC Holdings, HSBC US, and HSBC Mexico deliberately maintained substandard anti-money laundering ("AML") policies, and because HSBC US failed to conduct appropriate due diligence on HSBC Mexico. (Id. ¶¶ 154-259.)

3

On December 11, 2012, HSBC Holdings and HSBC US entered into a deferred prosecution agreement in which they admitted laundering at least $881 million in drug-trafficking proceeds and agreed to pay $1.9 billion in forfeiture and fines. (Id. ¶¶ 250-259.)

## B.     Procedural History

### 1.     Prior Litigation

Before instituting the present action, Plaintiffs filed a nearly identical complaint in the Southern District of Texas before Judge Andrew S. Hanen. (Compare First Amended Complaint, Zapata v. HSBC Holdings plc, No. 16-cv-30 (S.D. Tex. May 3, 2016) (the "Texas Action") (Dkt. 36); with Compl.) After Judge Hanen dismissed HSBC Holdings and the Mexican HSBC Entities for lack of personal jurisdiction, Plaintiffs voluntarily dismissed the Texas Action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) and refiled in this court. See Zapata v. HSBC Holdings plc, No. 16-cv-30, 2017 WL 6939209, at *6 (S.D. Tex. Sept. 4, 2017) ("Zapata I") (dismissing HSBC Holdings); Zapata v. HSBC Holdings plc, No. 16-cv-30, 2017 WL 6939210, at *9 (S.D. Tex. Oct. 17, 2017) ("Zapata II") (dismissing the Mexican HSBC Entities); see also Notice of Voluntary Dismissal (Dkt. 36 at ECF 12-14); Order Dismissing Plfs. Claims Without Prejudice (Dkt. 36 at ECF 16).)

### 2.     The Instant Action

Plaintiffs bring this action pursuant to the ATA's civil remedies provision, codified at 18 U.S.C. § 2333(a). Section 2333(a) provides for recovery of treble damages and attorney's fees by United States nationals and their estates, survivors, and heirs for injuries sustained "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). In support of their claim that Defendants engaged in acts of "international terrorism," Plaintiffs allege that Defendants violated two criminal provisions of the ATA: 18 U.S.C. § 2339A, which criminalizes the provision

material support to terrorists, and 18 U.S.C. § 2339C, which criminalizes the financing of terrorism.[1]

Plaintiffs bring ATA claims against:

1) Defendant HSBC Holdings, the ultimate parent company of all HSBC entities, including the remaining Defendants. HSBC Holdings is incorporated in England and Wales and headquartered in London.

2) Defendant HSBC US, a federally chartered bank headquartered in McLean, Virginia, with its principal office in New York City.

3) Defendant Grupo Financiero, an indirect subsidiary of HSBC Holdings.

4) Defendant HSBC Mexico, the principal operating company of Defendant Grupo Financiero.

Currently before the court are HSBC Holdings' motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and all Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).

The court will first address HSBC Holdings' Rule 12(b)(2) motion and then address the remaining Defendants' Rule 12(b)(6) motion.

## II.    HSBC HOLDINGS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

HSBC Holdings offers two arguments in support of its motion. First, HSBC Holdings asserts that, under principles of issue preclusion, Zapata I estops Plaintiffs from relitigating the issue of personal jurisdiction over HSBC Holdings in this proceeding.[2] (See Mem. in Supp. of HSBC Holdings Mot. ("HSBC Holdings Mem.") (Dkt. 34) at 2-5.) Second, HSBC Holdings contends that, assuming issue preclusion does not apply, Plaintiffs have failed to establish

---

[1] As discussed in greater detail infra Section III.B, however, well-pleaded allegations that a defendant violated either of these statutes are not themselves sufficient to plead an ATA claim. See Linde v. Arab Bank PLC, 882 F.3d 314, 326 (2d Cir. 2018) (jury instruction that finding a violation of material support statute was sufficient to find defendant had committed an act of international terrorism within the meaning of ATA's civil remedies provision was reversible error).

[2] For the purpose of resolving HSBC Holdings' motion, the court takes judicial notice of Zapata I, Zapata II, and all filings in the Texas Action. See TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 498-99 (2d Cir. 2014).

personal jurisdiction over HSBC Holdings under Federal Rule of Civil Procedure 4(k)(2). (Id. at 5-8.)

For the reasons discussed below, the court agrees that Judge Hanen's order in the Texas Action has preclusive effect and, thus, Plaintiffs cannot reargue the issue in this proceeding.[3] Accordingly, HSBC Holdings' motion to dismiss for lack of personal jurisdiction is GRANTED.

### A.     Legal Standard

Issue preclusion, also referred to as collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001). As is relevant here, issue preclusion applies to jurisdictional determinations, including those of personal jurisdiction, notwithstanding that a dismissal for lack of personal jurisdiction does not constitute an adjudication "on the merits" for claim preclusion (i.e. res judicata) purposes. See, e.g., Ins. Co. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n.9 (1982) ("It has long been the rule that [issue preclusion] appl[ies] to jurisdictional determinations—both subject matter and personal." (citations omitted)); see also Kasap v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1248 (D.C. Cir. 1999) ("[U]nder principles of issue preclusion, even a case dismissed without prejudice has preclusive effect on the jurisdictional issue litigated.").

In federal question cases such as this, whether a prior federal court judgment has preclusive effect in a subsequent proceeding is governed by federal common law. See Wyly v. Weiss, 697 F.3d 131, 140 (2d Cir. 2012) (citing, inter alia, Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002)). In this circuit, issue preclusion applies where: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the

---

[3] Accordingly, although the court need not reach the merits of Plaintiffs' contentions, it agrees with Judge Hanen and would reach the same conclusion for substantially the same reasons were the issue properly presented.

previous proceeding; (3) the party [raising the issue] had a full and fair opportunity to litigate the issue [in the prior proceeding]; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Marvel, 310 F.3d at 288-89 (citation and internal quotation marks omitted). The party asserting preclusion bears the initial burden of proving the identity of the issues, while the party opposing preclusion bears the burden of showing the absence of a full and fair opportunity to litigate the claims involving the precluded issue. See White v. Prof'l Claims Bureau, 284 F. Supp. 3d 351, 358-59 (E.D.N.Y. 2018) (citing Khandhar v. Elfenbein, 943 F.2d 244, 247 (2d Cir. 1991)).

A "final" judgment for issue preclusion need not be one that is immediately appealable. Rather, the Second Circuit takes a "broad view of the application of collateral estoppel to rulings made at an interim stage of litigation." United States v. Alcan Aluminum Corp., 990 F.2d 711, 719 (2d Cir. 1993). Thus, when determining whether to accord an interlocutory order preclusive effect, courts are instructed to consider broad factors such as "the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961). Indeed, for collateral estoppel purposes, "'[f]inality' . . . may mean little more than that the litigation of a particular issue has reached such a stage that the court sees no really good reason for permitting it to be litigated again." Id.

**B.    Discussion**

While the parties do not appear to disagree that the first three elements of the test are satisfied, the court addresses them briefly before turning to the primary issue in dispute—i.e. whether Zapata I constitutes a "valid and final judgment on the merits" in light of Plaintiffs' subsequent voluntary dismissal of the Texas Action under Rule 41(a)(1).

1.   Whether the Issue Presented Is "Identical" to that Presented in the Prior Proceeding

While, as set forth above, determinations of personal jurisdiction are subject to issue preclusion, the doctrine typically does not apply to a subsequent action instituted in a separate jurisdiction from the original action, as a defendant may lack minimum contacts with one jurisdiction but have them with another. Accordingly, where, as here, the subsequent action is brought in a different court, the personal jurisdiction issue is generally not "identical" for preclusion purposes. Cf. e.g., Krepps v. Reiner, 588 F. Supp. 2d 471, 478 (S.D.N.Y. 2008) ("When a plaintiff files two actions against the same defendant in the same district, the personal jurisdiction issue is generally identical." (emphasis added) (citation omitted)).[4]

In the case at bar, however, the parties agree that the federal long-arm statute (Rule 4(k)(2))—the rule under which Judge Hanen decided HSBC Holdings' motion in the Texas action, see Zapata I, 2017 WL 6939209, at *4—provides the sole basis for this court to potentially exercise personal jurisdiction over HSBC Holdings (see Plfs. Mem. in Opp. to HSBC Holdings Mot. ("Plfs. Mem. I") (Dkt. 36) at 5 ("[T]he parties agree that jurisdiction should be analyzed under the federal long-arm statute.")). Because the jurisdictional analysis under the federal long-arm statute asks whether a defendant has sufficient minimum contacts with the United States as a whole, see Porina v. Marward Shipping Co., 521 F.3d 122, 126-27 (2d Cir. 2008), the fact that the current proceeding was instituted in a different district from the Texas Action is immaterial. Further, the complaint does not set forth, nor is the court aware of, any jurisdictional facts not known or knowable to Plaintiffs when they filed the Texas Action. See

---

[4] For example, while Judge Hanen held that the Southern District of Texas could not exercise personal jurisdiction over the Mexican HSBC Entities under the Texas long-arm statute, see generally Zapata II, the parties do not dispute that this court may exercise personal jurisdiction over the Mexican HSBC Entities under the New York long-arm statute.

Krepps, 588 F. Supp. 2d at 478 (in a subsequent action instituted following a dismissal for lack

of personal jurisdiction, the "jurisdiction issue is generally identical unless . . . the plaintiff

alleges new material facts that could not have been previously discovered in the exercise of due

diligence"). Accordingly, the court is satisfied that the issue presented by HSBC Holdings'

motion is "identical" for preclusion purposes.

### 2. Whether the Issue Was Actually Litigated and Decided in the Prior Proceeding and Whether the Parties Had a Full and Fair Opportunity to Litigate

Plaintiffs do not dispute that the controlling issue—whether personal jurisdiction over

HSBC Holdings under Rule 4(k)(2) is proper—was actually litigated and decided in the Texas

Action, nor do they argue that they were not provided with a full and fair opportunity to do so.

Having reviewed the docket in the Texas Action, the court cannot discern any basis to conclude

otherwise. Plaintiffs filed a brief opposing HSBC Holdings' motion in the Texas Action (see

Plfs. Mem. in Opp. to HSBC Holdings Mot., Texas Action (Dkt. 54)) and Judge Hanen expressly

considered Plaintiffs' arguments before concluding that jurisdiction over HSBC Holdings was

not permissible under Rule 4(k)(2), see Zapata I, 2017 WL 6939209, at *4-5. Accordingly, the

court concludes that these elements of the preclusion test have been satisfied. See, e.g., Moscato

v. MDM Grp., No. 05-cv-10313 (KMW), 2008 WL 2971674, at *4 (S.D.N.Y. July 31, 2008)

(finding issue preclusion barred reconsideration of personal jurisdiction over defendant where

prior court, with benefit of full briefing, "expressly considered Plaintiff's evidence and dismissed

the action against MDM for lack of personal jurisdiction").

### 3. Whether the Resolution of the Issue was Necessary to Support a Valid and Final Judgment on the Merits

The court turns now to the final element of the governing test, and the only matter

meaningfully in dispute between the parties: whether, in light of Plaintiffs' voluntary dismissal

of the Texas Action, Judge Hanen's order in <u>Zapata I</u> was sufficiently "final" to permit the application of issue preclusion.

HSBC Holdings argues, in the main, that there can be no meaningful argument that jurisdictional rulings are not "final" for the purpose of issue preclusion, and Plaintiffs' election to voluntarily dismiss the Texas Action cannot have affected its claims against HSBC Holdings because those claims had already been involuntarily dismissed by Judge Hanen. (<u>See</u> HSBC Holdings Mem. at 3; HSBC Holdings Reply Mem. in Support of Mot. (Dkt. 38) at 2.) In response, Plaintiffs rely on the doctrine that a Rule 41(a)(1) dismissal "put[s] the plaintiff in a legal position as if the first suit had never been brought" and contend that their voluntary dismissal of the Texas Action renders Judge Hanen's decision a legal nullity that, by definition, cannot have preclusive effect. (Plfs Mem. I at 3-4 (citing, <u>inter alia, Oneida Indian Nation of N.Y. v. Oneida County</u>, 622 F.2d 624, 629 n.7 (2d Cir. 1980).)

The question of what effect a Rule 41 voluntary dismissal has on the preclusive effect of prior orders issued in the dismissed action is one that, as far as the court is aware, the majority of federal appeals courts (including the Second Circuit) have yet to resolve. Those circuits that have considered the issue, namely the Fifth and the Eighth Circuits, have reached conflicting results. <u>Compare</u> <u>Harvey Specialty & Supply v. Anson Flowline Equip.</u>, 434 F.3d 320, 324 (5th Cir. 2005) (holding, in the context of examining relitigation exception to Anti-Injunction Act, that order in case terminated by Rule 41 dismissal was not "final" and thus could not be accorded preclusive effect (citing <u>In re Piper Aircraft Sys. Antitrust Lit.</u>, 551 F.2d 213, 220 (8th Cir. 1977)) <u>and</u> <u>Piper Aircraft,</u> 551 F.2d at 219 (because voluntary dismissal "carries down with it previous proceedings and orders in the action . . . [n]either res judicata nor collateral estoppel is traditionally applicable") (internal quotation marks and citations omitted); <u>with</u> <u>Robinette v.</u>

10

Jones, 476 F.3d 585, 589-590 (8th Cir. 2007) (holding that, notwithstanding Piper Aircraft,

voluntary dismissal of prior action did not vitiate preclusive effect of interlocutory grant of

summary judgment because, inter alia, "recent decisions have relaxed traditional views of the

finality requirement in the collateral estoppel context" (quoting In re Nangle, 274 F.3d 481, 484-

85 (8th Cir. 2001) (internal quotation marks omitted)).

As a matter of first impression, the court concurs with the Eighth Circuit's more recent

decision in Robinette v. Jones and, accordingly, holds that Plaintiffs' voluntary dismissal of the

Texas Action did not strip Zapata I of its preclusive effect. While Plaintiffs correctly

characterize Judge Hanen's order as "interlocutory" insofar as it did not fully dispose of the

Texas Action, the Second Circuit has long emphasized that an order need not be immediately

appealable for it to nonetheless be sufficiently "final" so as to preclude further litigation on the

issue decided. See, e.g., Zdanok v. Glidden Co., 327 F.2d 944, 955 (2d Cir. 1964) ("[C]ollateral

estoppel does not require a judgment which ends the litigation and leaves nothing for the court to

do but execute the judgment, but includes many dispositions which, though not final in that

sense, have nevertheless been fully litigated." (citation and internal quotation marks omitted)

(alteration adopted)). As set forth above, when determining whether to accord interlocutory

orders preclusive effect, courts are instructed to consider broad factors such as "the nature of the

decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the

opportunity for review." Lummus, 297 F.2d at 89. As applied to Zapata I, these factors weigh in

favor of preclusion.

Since the parties completed briefing this issue, Chief Judge McMahon and Judge Marrero

of the Southern District of New York have each had occasion to apply the Lummus factors to

interlocutory orders and, in both instances, held that preclusion was appropriate. See Ferring

11

B.V. v. Serenity Pharmaceuticals, LLC, 391 F. Supp. 3d 265, at 281-90 (S.D.N.Y. 2019) (prior district court grant of summary judgment in ongoing litigation entitled to preclusive effect); Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC, 16-cv-4270 (VM), 2019 WL 3940218, at *3-7 (S.D.N.Y. July 29, 2019) (issues decided in prior bankruptcy court denial of motion to dismiss bankruptcy petition entitled to preclusive effect). Much of the analysis in these decisions is equally applicable to the circumstances of this case. As was true of the prior order in Ferring, Judge Hanen's opinion in Zapata I is easily described as a "textbook district court opinion—one that identifies and applies binding authority, derives legal principles from persuasive authority, and applies case law to the particulars of the case." Ferring, 391 F. Supp. 3d at 286. Additionally, Zapata I was decided upon full briefing by the parties, such that Plaintiffs cannot contend that they did not have an opportunity to be heard. Id.; see also Rocky Aspen, 2019 WL 3940218, at *4. Moreover, application of issue preclusion in this case would further the policies underlying the doctrine, namely "reliev[ing] parties of the cost and vexation of multiple lawsuits, conserv[ing] judicial resources, and, by preventing inconsistent decisions, encourag[ing] reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94 (1980); see also, e.g., Env'tl Def. v. United States Env'tl Prot. Agency, 369 F.3d 193, 202 (2d Cir. 2004) (same).

However, neither Ferring nor Rocky Aspen involved an interlocutory order in a case that ultimately terminated in a Rule 41(a)(1) dismissal. This distinction is not without consequence; both Judge McMahon and Judge Marrero considered the fact that the parties would have or did have an opportunity to seek review (either at the conclusion of the still-pending prior action, as in Ferring, or by means of an interlocutory appeal to the district court, which the parties in Rocky Aspen sought but were denied) as weighing in favor of finding preclusion. Here, however, Plaintiffs' voluntary dismissal of the Texas Action rendered Zapata I unreviewable as a matter of

law.  See Microsoft Corp. v. Baker, 137 S. Ct. 1702, 1715 (2017); cf. Bechuck v. Home Depot U.S.A., 814 F.3d 287, 295 (5th Cir. 2016) (in the normal course, a voluntary dismissal on consent under Rule 41(a)(2) is not appealable).  And there is support in this circuit for the proposition that an unappealable order cannot, as a matter of law, be accorded preclusive effect. See Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir. 1986) (noting, in dictum, that "although failure to appeal does not prevent preclusion, inability to obtain appellate review . . . does" (citations omitted)); see also Kay-R Elec. Corp. v. Stone & Webster Const. Co., Inc., 23 F.3d 55, 59 (2d Cir. 1994) (denial of summary judgment not entitled to preclusive effect because, inter alia, "[t]here is of course no opportunity to review a denial of a motion for summary judgment"); but see Rocky Aspen, 2019 WL 3940218, at *4 ("[T]he opportunity for appellate review on the merits is not a necessary feature before an order can be afforded preclusive effect; it is only one consideration.").

This distinction, however, is not sufficient to resuscitate Plaintiffs' jurisdictional arguments.  As noted in Ferring, Gelb embraces only those "decisions that are, by law, unreviewable by their very nature."  Ferring, 391 F. Supp. 3d at 285 (emphasis added) (citing Medisys Health Network, Inc. v. Local 348-S United Food & Commercial Workers, AFL-CIO, 337 F.3d 119, 124 (2d Cir. 2003) (matters determined by district court attendant to remand of action to state court have no preclusive effect because remand orders are unreviewable as a matter of law)); cf. Kay-R Elec. Corp. 23 F.3d at 59.  Zapata I, however, which was a final judgment on the claims as against HSBC Holdings, was not "by its very nature" unreviewable; it only became so because of Plaintiffs' deliberate choice to invoke their right under Rule 41(a)(1) to voluntarily dismiss the Texas Action.

Indeed, had Plaintiffs wished to seek appellate review of Zapata I, there were several options available to them. For example, Plaintiffs could have moved Judge Hanen to certify Zapata I for interlocutory appeal to the Fifth Circuit; they could have litigated their claims against HSBC US (the last defendant remaining in the Texas Action after Zapata II) to judgment in the Southern District of Texas and then appealed Zapata I to the Fifth Circuit as of right; or they could have simply consented to HSBC's proposal to transfer the Texas Action to the Southern District of New York (which, Defendants conceded, could exercise personal jurisdiction over all defendants in the Texas Action except HSBC Holdings), thereby preserving Zapata I for appeal before the Second Circuit while permitting Plaintiffs to litigate their claims against all of the remaining defendants. Instead, Plaintiffs opposed the transfer, insisting that it was their "prerogative to proceed against only HSBC US in [the Southern District of Texas] and separately determine whether it is necessary to proceed against HSBC Mexico in a separate action" (Plfs Opp. to HSBC Mexico Mtn. to Transfer, Texas Action (Dkt. 52), at 24), only to dismiss the entire Texas Action a mere three days after Zapata II and refile in this court shortly thereafter.

It seems the purpose of Plaintiffs' procedural maneuvers was to preserve their jurisdictional arguments against HSBC Holdings in hopes of finding a more sympathetic audience. But regardless of whether Plaintiffs actually set out to engage in the type of forum shopping that a rational observer would infer from their actions, Rule 41 is not so broad as to allow Plaintiffs to force Defendants to relitigate, and this court to decide, an issue squarely presented and resolved in the Texas Action. Put another way, Plaintiffs' decision to avail themselves of Rule 41's "one free dismissal" Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 398

(1990) does not qualify as a "really good reason," Lummus, 297 F.2d at 89, to permit Plaintiffs to relitigate this issue.

In reaching this conclusion, the court is mindful of the rule that a Rule 41(a)(1) dismissal generally annuls the dismissed proceeding. See United States v. L-3 Comms. EO Tech., 921 F.3d 11, 19 (2d Cir. 2019) ("[I]t is hornbook law that a voluntary dismissal without prejudice under Rule 41(a) leaves the situation as if the action had never been filed." (citation, internal quotation marks, and emphasis omitted).) The court is also aware of that the fact that Rule 41, by its terms, permits a certain amount of forum shopping. See Harvey Specialty, 434 F.3d at 324 n.15. Neither of these factors, however, commands a different result in this case.

First, notwithstanding the broad language that the circuits have sometimes used when discussing Rule 41(a)(1) dismissals, it is beyond dispute that invocation of this procedure does not, in fact, erase the prior proceedings.[5] To wit, even after an action is voluntarily dismissed, the court retains jurisdiction to, for example, impose sanctions for vexatious conduct, initiate contempt proceedings, and award damages under Rule 65(c). See Cooter & Gell, 496 U.S. at 394-95 ("[D]istrict courts may enforce Rule 11 even after the plaintiff has filed a notice of dismissal under Rule 41(a)(1)."); U.S. D.I.D. Corp. v. Windstream Comms., Inc., 775 F.3d 128, 134-135 (2d Cir. 2014) (district court can award damages under Rule 65(c) sustained as a result of injunction notwithstanding voluntary dismissal of action). While the decisions establishing these exceptions rest primarily on a jurisdictional analysis inapplicable to this case, the existence of such exceptions confirms a broader principle that is fully applicable here, namely that Rule 41 does not give parties carte blanche to manipulate the judicial process without consequence.

---

[5] Indeed, Plaintiffs themselves seem keen to preserve at least part of the record in the Texas Action. (See Plfs Mem. in Opp. to Defs. Mot. (Dkt. 37) at 11-12 (noting that "Judge Hanen . . . agreed with the premise that the cartels function as terrorist groups (citing Zapata I, 2017 WL 6939209, at *1)).)

Second, and perhaps more importantly, the observation that Rule 41(a)(1) permits forum shopping is almost invariably coupled with an emphasis on the fact that defendants wishing to hinder such "abuse" need do no more than file an answer. See, e.g., Harvey Specialty, 434 F.3d at 324 n.15 ("Defendants who desire to prevent plaintiffs from invoking their unfettered right to dismiss actions under Rule 41(a)(1) may do so by taking the simple step of filing an answer."); accord U.S. D.I.D. Corp., 775 F.3d at 135 ("Rule 41(a)(1) was designed to curb abuses of nonsuit rules by limiting the right to voluntary dismissal without prejudice to the brief period before the defendant had made a significant commitment of time and money." (quoting Cooter & Gell, 496 U.S. at 397 (internal quotation marks omitted) (alteration adopted)).[6] The option of filing an answer, however, was not available to HSBC Holdings when Plaintiffs dismissed the Texas Action because Judge Hanen had already dismissed HSBC Holdings as a defendant. Indeed, had HSBC Holdings been the only named defendant in the Texas Action, Zapata I would have ended the entire case and unquestionably precluded any further litigation on the jurisdictional issue; instead, however, the matter continued as against the Mexican HSBC Entities (until they were dismissed by Zapata II) and HSBC US. For whatever else it may allow, Rule 41(a)(1) cannot be read to permit Plaintiffs to escape the consequences of Zapata I simply because they opted to sue four HSBC entities rather than HSBC Holdings alone.

For these reasons, the court holds that Defendants are estopped by Zapata I from arguing that this court may exercise jurisdiction over HSBC Holdings under Rule 4(k)(2) and, accordingly, grants HSBC Holdings' motion to dismiss for lack of personal jurisdiction.

---

[6] It bears noting that the Eighth Circuit also distinguished its decision in Robinette from its earlier decision in Piper Aircraft in part on the fact that the defendant in Robinette had already filed an answer, while the defendant in Piper Aircraft had not. See Robinette, 476 F.3d at 489 n.3.

## III.   HSBC US AND THE MEXICAN HSBC ENTITIES' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Having disposed of Plaintiffs' claims against HSBC Holdings, the court turns now to the remaining Defendants' (HSBC US and the Mexican HSBC Entities, hereinafter "HSBC") motion to dismiss.  At the outset, the court emphasizes that the question before it is not whether the Cartels should be condemned for the horrific violence that they inflict, including the unimaginable pain suffered by Plaintiffs at their hands.  Nor is the question before the court whether HSBC should face consequences for its admitted laundering of vast sums of money for international criminal organizations, including the Cartels, in violation of a bevy of federal and state criminal statutes.  Rather the question that the court must answer today is whether Plaintiffs plead sufficient facts to plausibly state a claim that, in addition to whatever other sanctions they might face, Defendants can be made to face the consequence of liability to Plaintiffs under the ATA.

In support of their assertion that the answer to this question is "no," Defendants contend, inter alia, that the complaint does not plausibly allege: (1) that Defendants' conduct proximately caused Plaintiffs' injuries; and (2) that Defendants' conduct amounted to "international terrorism," because Defendants' money laundering activities did "appear to [have] be[en] intended" to coerce a civilian population or influence the policy or conduct of a government. (See Defs. Mem. in Supp. of Mot. ("Defs. Mem.") (Dkt. 35) at 9-29.)  For the reasons that follow, the court agrees with both propositions.  Accordingly, Defendants' motion to dismiss is GRANTED.[7]

---

[7] Because the court dismisses HSBC Holdings from this action for lack of personal jurisdiction, it has not considered HSBC Holdings' conduct as part of this analysis.  Were it to do so, however, the result would not change.  Likewise, were the court to have held that it could exercise jurisdiction over HSBC Holdings, it would nonetheless have dismissed the claims as against HSBC Holdings under Rule 12(b)(6) for the reasons set forth herein.

## A.    Legal Standard

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (per curiam). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

In reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). However, a court is not required to disregard "alternative explanations so obvious that they render the plaintiff's inferences unreasonable." Batalla Vidal v. Nielsen, 291 F. Supp. 3d 260, 269 (E.D.N.Y. 2018) (Garaufis, J.) (citation omitted).

## B.    Discussion

The ATA creates a private right of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). As discussed in greater detail infra, the "by reason of" language requires proof that the alleged act of international terrorism proximately caused the injuries for which recovery is sought.

International terrorism is, in turn, defined as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

    (i) to intimidate or coerce a civilian population;

    (ii) to influence the policy of a government by intimidation or coercion; or

    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Id. § 2331(1). Further, a plaintiff pleading an ATA claim must show that the defendant's alleged actions satisfy each element of the statutory definition of "an act of international terrorism," and may not rely on the defendant's alleged violation of other criminal prohibitions contained in the ATA to satisfy the second or third elements. See Linde v. Arab Bank PLC, 882 F.3d 314, 326 (2d Cir. 2018).

The ATA does not provide for secondary liability unless the act of international terrorism in question was carried out by an entity formally designated as a foreign terrorist organization (see id. § 2333(d)(2)), which is not true of the Cartels (see Defs. Mem. at 1; Plfs. Mem. in Opp. to Defs. Mot. ("Plfs. Mem. II") (Dkt. 37) at 13). Accordingly, for Plaintiffs' complaint to survive, it must plausibly allege not that the attacks that injured Plaintiffs were acts of international terrorism, but that HSBC's money-laundering activities were, in and of themselves, acts of international terrorism that proximately caused Plaintiffs' injuries.

    1.    Proximate Cause Under the ATA

As discussed supra, the ATA permits certain classes of individuals who have been harmed "by reason of" an act of international terrorism to bring a civil action for damages. 18 U.S.C. § 2331(a). As is true of other statutes creating a private right of action for individuals injured "by reason of" a violation thereof (e.g. the Racketeer Influenced and Corrupt

19

Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968), this language requires a plaintiff to allege and prove that the violation proximately caused her injuries. See Rothstein v. UBS AG, 708 F.3d 82, 95 (2d Cir. 2013) (§ 2331(a) requires showing of proximate cause because "[t]he 'by reason of' language had a well-understood meaning, as Congress had used it in creating private rights of action under RICO and the antitrust laws"). Proximate causation in the ATA context, in turn, requires the same showing as is required under other statutes that employ the same "by reason of" language, i.e. a sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought.[8] See id. at 91-92 (citing Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)); see also Fields v. Twitter, Inc., 881 F.3d 739, 744 (9th Cir. 2018) ("[T]o satisfy the ATA's 'by reason of' requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts."); Kemper v. Deutsche Bank AG, 911 F.3d 383, 392 (7th Cir. 2018) (proximate cause under ATA requires inquiry into "foreseeability, directness, and the substantiality of the defendant's conduct").

This direct link between the conduct (money laundering) and injuries (acts of violence committed by individuals affiliated with the Cartels) is entirely lacking in the complaint. Plaintiffs allege that HSBC helped the Cartels launder enormous sums of illicit cash into the Mexican and U.S. economies. Plaintiffs also allege that individuals hired by the Cartels and affiliated gangs committed what can only be described as horrific acts of violence against them and their family members.

---

[8] This, however, does not require a stringent showing of "but-for" causation, i.e. a tracing of the specific dollars alleged to have been laundered to each of the attacks suffered by Plaintiffs. See, e.g., Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 432-33 (E.D.N.Y. 2013) ("Strauss I") ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks .... Such a task would be impossible and would make the ATA practically dead letter.").

What Plaintiffs do not allege, however, is any relationship between HSBC's money laundering and the acts of violence perpetrated against them. Plaintiffs do not allege, for example, that the Cartels require laundered money to carry out any acts of violence in Mexico, let alone the specific atrocities inflicted upon Plaintiffs. Moreover, the Cartels are not cash-poor organizations; indeed, Plaintiffs acknowledge that the Cartels have abundant cash resources, and there is no plausible inference that the Cartels would not be able to commit these acts of violence without HSBC first laundering their money.[9] (See Defs. Mem. at 17-18; Compl. ¶¶ 116, 124-125.) See also Rothstein, 708 F.3d at 97 ("We see no nonconclusory allegation in the Complaint that plausibly shows that . . . Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS."); Fields, 881 F.3d at 749-50 ("At most, the SAC establishes that Twitter's alleged provision of material support to ISIS facilitated the organization's growth and ability to plan and execute terrorist attacks. But the SAC does not articulate any connection between Twitter's provision of this aid and Plaintiffs-Appellants' injuries."); Freeman v. HSBC Holdings plc, No. 14-cv-6601 (PKC), 2019 WL 4452364, at *17 (E.D.N.Y. Sept. 16, 2019) (dismissing ATA claims because, inter alia, the lack of any "plausible allegations that the attacks in Iraq were only possible due to Defendants' actions"); Ahmad v. Christian Friends of Israeli Communities, No. 13-cv-3376 (JMF), 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014).[10]

---

[9] For the purpose of this analysis, the court has not distinguished between the various HSBC entities. However, it notes that HSBC US's alleged conduct, is even further removed from the acts of violence suffered by Plaintiff than HSBC Mexico's conduct. Even if the court were to have found the allegations plausibly stated a claim as against HSBC Mexico (which it has not), it would still dismiss the claims against HSBC US.

[10] In Rothstein, the defendant was alleged to have processed transactions for a sovereign state (Iran). Since that decision, courts have generally employed a heightened standard when adjudicating ATA claims involving sovereign governments, which engage in a variety of legitimate, non-terroristic activities. See, e.g., Kemper, 911 F.3d at 393 ("When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute.").

While the Cartels are not sovereign governments, the underlying logic of these cases is applicable here. The Cartels may commit acts of terrorism but, as set forth in the complaint, they are, first and foremost, organized crime

The closest the Plaintiffs come to providing such an inference is in their assertion that the Cartels use laundered money to purchase "buildings, factories, equipment, weaponry, personnel, vehicles, aircraft, boats, submersible vessels, and raw materials" (Compl. ¶ 120), and that if the Cartels could no longer launder money they would "cease to exist" (id. ¶ 123). These conclusory allegations are simply insufficient to support a complaint.

Moreover, by imputing responsibility for the Cartels' continued existence to Defendants, Plaintiffs' theory would effectively hold HSBC liable for all Cartel violence. Indeed, were this enough to sustain a claim, the court would be left without an intelligible basis to distinguish between the specific attacks that form the basis of the complaint and the myriad examples of horrific and often terroristic violence inflicted upon others that comprise nearly 20% of its contents. (See Compl. ¶¶ 60-88.) And, as Defendants correctly argue, this is "precisely the kind of unlimited, sprawling, and speculative liability that proximate cause forbids" (Defs. Reply Mem. in Support of Mot. (Dkt. 39) at 9). See, e.g., Blue Shield of Virginia v. McCready, 457 U.S. 465, 476-77 (1982) ("An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4, there is a point beyond which the wrongdoer should not be held liable." (internal quotation marks and citation omitted)); accord Crosby v. Twitter, Inc., 921 F.3d 617, 625 (6th Cir. 2019) ("[W]e expect Defendants websites to cause some ripples of harm . . . . But without more, Defendants do not proximately cause all these potential ripples." (internal quotation marks and citations omitted)).

---

syndicates. (See, e.g., Compl. ¶ 41 ("The Mexican cartels are [] responsible for the production or supply over ninety percent of the illicit drugs imported into the United States . . . . They have also expanded into other criminal enterprises and now control major kidnapping, human trafficking, and extortion enterprises throughout Mexico and the world.").) Though the Cartels' main activities are certainly not the "legitimate . . . operations and programs" of a sovereign government, Rothstein, 708 F.3d at 97, nor are they international terrorism.

Equally unavailing is Plaintiffs' assertion that the sheer volume of funds laundered—at least $881 million by HSBC's own admission—is itself sufficient to support a complaint. (See Plfs. Mem. II at 29-30 (citing, inter alia, Strauss I, 925 F. Supp. 2d at 435 (denying summary judgment because "[o]n this record, a reasonable juror could conclude that . . . Hamas' increased ability to carry out deadly attacks was a foreseeable consequence of sending millions of dollars to groups controlled by Hamas"). The first problem with this theory is that, because Plaintiffs have not established any direct causal link between HSBC's money laundering and the incidents that injured them, they cannot make up for this fatal deficiency simply by pointing to the number of dollars laundered. Cf. Rothstein, 708 F.3d at 93 (no proximate cause notwithstanding fact that UBS had allegedly provided Iran "with hundreds of millions of dollars in cash"); Freeman, 2019 WL 4452364, at *12, *16-17 (no proximate cause notwithstanding fact that HSBC had allegedly "conspir[ed] to facilitate the transfer of billions of dollars to Iran").

Further, it is not at all clear that the cases (at least those from courts within this circuit) on which Plaintiffs rely remain good law in the wake of the Second Circuit's decisions in Rothstein and Linde, both of which were decided after nearly every case Plaintiffs cite. See, e.g., Strauss v. Credit Lyonnais, S.A., 379 F. Supp. 3d 148, 158-159 (E.D.N.Y. 2019) (granting summary judgment, albeit on grounds other than proximate cause, in light of Linde). Further, Plaintiffs' cases generally involve alleged donations to formally designated terrorist organizations such as Hamas (or front groups for such organizations), and the decisions denying motions to dismiss in these cases have rested on the theory that giving money to terrorist organizations definitionally enables them to commit additional acts of terrorism. See, e.g., In re Chiquita Brands Int'l, Inc., 248 F. Supp. 3d 1284, 1309-14, 1318 (S.D. Fla. 2018) (holding, under less-stringent "substantial factor" theory of proximate causation, that "a reasonable juror could conclude that giving money

to Colombian guerillas, having no function other than the perpetration of violence, would enhance the terror capabilities of the guerillas and lead to more violence"). As already discussed, however, the Cartels are not purely terrorist organizations, see supra n.10, and laundering money that the Cartels independently accumulate is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have.

Because Plaintiffs have failed to plead proximate cause, their claims must be dismissed.

2. Intent Under the ATA

An ATA complaint must plausibly allege that the conduct at issue objectively "appear[ed] to be intended" to intimidate civilians or influence a government. See 18 U.S.C. § 2331(1); Linde, 882 F.3d at 326. As applied to the complaint, this requires Plaintiffs to allege not that the incidents that injured them meet this standard, but that the actions undertaken by HSBC—i.e. money laundering—meet this standard.[11] While the court does not rule out the possibility that, under certain circumstances, a plaintiff could state a plausible ATA claim involving behavior that is facially non-violent, Plaintiffs do not do so here.

As Plaintiffs themselves note, while the court must draw all inferences in their favor in deciding this motion, it is not required to disregard "alternative explanations so obvious that they render the plaintiff's inferences unreasonable." (Plfs. Mem. II at 7 (quoting Batalla Vidal, 291 F. Supp. 3d at 369 (internal quotation marks omitted)).) And Plaintiffs' complaint unmistakably sets forth such a plausible alternative explanation for HSBC's conduct: greed. (See Compl. ¶ 126 ("In many instances, bank employees were bribed to accept" large cash deposits from

---

[11] Plaintiffs contend that Linde "did not reverse the substantial case law from this Court and elsewhere holding that knowingly providing financial support to terrorist organizations can create a triable issue of fact on the 'appears to be intended' and other definitional elements." (Plfs. Mem. II at 26.) The court is unpersuaded by this argument. The fact that the Second Circuit's decision in Linde related to a jury instruction is a function of the posture of the case at the time it was appealed, and nothing in the decision supports Plaintiffs' proffered interpretation.

known or suspected Cartel money launderers); id. ¶ 175 (cartel accounts were "a 'cheap' source of revenue" for HSBC); id. ¶ 182 (whistleblower blamed HSBC's AML failures on "a culture [of] pursuing profit and targets at all costs" (internal quotation marks omitted) (alteration in original)); id. ¶ 233 ("[F]rom 2006 to at least 2010, HSBC significantly reduced the resources available to its AML program in order to cut costs and increase its profits.").) In other words, to an objective observer, HSBC's conduct appeared to be "motivated by economics, not by a desire to 'intimidate or coerce.'" Kemper, 911 F.3d at 390; see also Freeman, 2019 WL 4452364, at *15 (dismissing ATA claims because, inter alia, "[d]efendants 'appear[ed]' to have been purely motivated by the opportunity to make money"). This defect is equally fatal to Plaintiffs' claims.

### 3.    Grupo Financiero

Defendants assert that Plaintiffs "do not allege any actionable conduct" by Grupo Financiero. (Defs. Mem. at 32.) The court agrees, and separately grants the motion as to Grupo Financiero on this basis as well.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS HSBC Holdings' (Dkt. 32) Motion to Dismiss for Lack of Personal Jurisdiction and GRANTS the remaining Defendants' (Dkt. 33) Motion to Dismiss for Failure to State a Claim.

The Clerk of Court is respectfully DIRECTED to enter judgment in favor of Defendants and close this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      September 30, 2019

NICHOLAS G. GARAUFIS
United States District Judge